**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **HEARTLAND SURGICAL SPECIALTY HOSPITAL, LLC,** | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-CV-2164 GTV/DJW |
| **MIDWEST DIVISION, INC. d/b/a HCA MIDWEST DIVISION** | ) ) ) | JURY TRIAL DEMANDED |
| Serve:    STK Registered Agent Inc.    9225 Indian Creek Pkwy.    32 Corporate Woods, Suite 1100    Overland Park, KS 66210-0000 | ) ) ) ) ) ) ) ) | |
| **ST. LUKE'S HEALTH SYSTEM** | ) ) | |
| Serve:    BSMWL, Inc.    9401 Indian Creek Pkwy    Suite 1200    Overland Park, KS 66210-2007 | ) ) ) ) ) ) ) | |
| **CARONDELET HEALTH SYSTEM** | ) ) | |
| Serve:    Registered Agent    Joseph R. Impicciche    4600 Edmundson Road    St. Louis, MO 63134 | ) ) ) ) ) ) ) | |
| **SHAWNEE MISSION HOSPITAL OF KANSAS CITY** | ) ) ) | |
| Serve:    Samuel H. Turner, Sr.    9100 W. 74th Street    PO Box 2923    Merriam, KS 66201 | ) ) ) ) ) | |

SSHW 39689v5

|  |  |
|---|---|
| **NORTH KANSAS CITY HOSPITAL** | ) ) ) ) |
| Serve: | ) |
|     Registered Agent | ) |
|     Peggy Schmit | ) |
|     2800 Clay Edwards Drive | ) |
|     North Kansas City, MO 64116 | ) |
|  | ) ) |
| **BLUE CROSS AND BLUE SHIELD** | ) |
| **OF KANSAS CITY** | ) |
|  | ) |
| Serve: | ) |
|     Registered Agent | ) |
|     Charles Brent Bertram | ) |
|     2301 Main St., One Pershing Square | ) |
|     Kansas City, MO 64108 | ) |
|  | ) ) |
| **COVENTRY HEALTH CARE** | ) |
| **OF KANSAS, INC.** | ) |
|  | ) |
| Serve: | ) |
|     National Registered Agents, Inc. | ) |
|     300-B East High Street | ) |
|     Jefferson City, MO 65101 | ) |
|  | ) ) |
| **UNITED HEALTHCARE, INC.** | ) |
|  | ) |
| Serve: | ) |
|     CT Corporate System | ) |
|     120 South Central Avenue | ) |
|     Clayton, MO 63105 | ) |
|  | ) ) |
| **HUMANA HEALTH PLAN INC.** | ) |
|  | ) |
| Serve: | ) |
|     CSC Lawyers Incorporating Service Co. | ) |
|     221 Bolivar Street | ) |
|     Jefferson City, MO 65101 | ) |
|  | ) ) |

| | |
|---|---|
| **AETNA, INC.** | ) |
| | ) |
| <u>Serve</u>: | ) |
|     CT Corporate System | ) |
|     120 South Central Avenue | ) |
|     Clayton, MO 63105 | ) |
| | ) |
| | ) |
| **CIGNA HEALTHCARE OF OHIO, INC. f/k/a** | ) |
| **CIGNA HEALTHCARE OF** | ) |
| **KANSAS/MISSOURI** | ) |
| | ) |
| <u>Serve</u>: | ) |
|     CT Corporate System | ) |
|     120 South Central Avenue | ) |
|     Clayton, MO 63105 | ) |
| | ) |
|                   **Defendants.** | ) |

## COMPLAINT

Plaintiff Heartland Surgical Specialty Hospital, LLC ("Heartland"), alleges for its Complaint against Defendants upon knowledge with respect to its own acts and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1. In the Fall of 2003, Plaintiff Heartland introduced new competition into the market for acute care in the Kansas City metropolitan area by opening a state-of-the-art hospital that could provide a higher-quality, lower cost treatment to patients requiring surgery, pain management, radiology, and other related services.

2. Even before the time Heartland opened its doors, Defendants embarked on a pattern of exclusionary, predatory, and other anticompetitive conduct designed to prevent Heartland, and other hospitals like it, from successfully entering the market and have since strived to put Heartland out of business through improper and illegal means.

3.     Defendant HCA Midwest, as one of the largest hospital groups in the region, has led the charge against Heartland, organizing local traditional acute care hospitals to pressure insurance carriers to refuse managed care contracts to Heartland.  Other hospitals have joined the conspiracy against Heartland by agreeing with each other, and with managed care insurers, to deny Heartland contracts.

4.     Defendants' unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce  has consisted of a scheme to effectuate a boycott against Heartland resulting in managed care insurers' refusal to provide Heartland in-network contracts.  The hospitals have been unabashed in their scheme, publicly describing the emergence of specialty hospitals like Heartland as the "biggest threat we face," and publicly applauding the insurance companies for keeping Heartland out of their networks.

5.     Heartland seeks declaratory and injunctive relief, and damages to redress the violations of federal and state law as alleged herein.

## THE PARTIES

### *Plaintiff Heartland Surgical Specialty Hospital*

6.     Heartland Surgical Specialty Hospital, LLC is a Kansas limited liability company with its principal place of business located at 10720 Nall, Overland Park, Kansas 66211.  Heartland is a "Center of Excellence" for inpatient and outpatient procedures that include pain management, upper extremity and spine surgery, and minimally invasive surgery, among others, with plans to expand to provide all services provided by traditional acute care hospitals.  The facility provides advanced digital technology in MRI, CT, and myelographic diagnostics, unmatched in the Midwest.  Heartland also supports both spine and minimally invasive surgery teaching and research fellowships.

*The Hospital Defendants*

7.      Midwest Division, Inc. d/b/a HCA Midwest Division ("HCA Midwest") is a wholly owned subsidiary of HCA Inc., with its principal place of business at One Park Plaza Nashville, Tennessee 37203.  HCA Midwest operates 12 acute care hospitals in direct competition with Heartland including Research Medical Center, Independence Regional Health Center, Baptist-Lutheran Medical Center, Overland Park Medical Center, Medical Center of Independence, Lee's Summit Hospital, Menorah Medical Center, and Research Belton Hospital. Together, these HCA Midwest facilities maintain approximately 1,992 licensed beds.

8.      Saint Luke's Health System is a Missouri corporation with its principal place of business at 4401 Wornall Road, Kansas City, Missouri.  Saint Luke's operates three acute care hospitals in direct competition with Heartland including Saint Luke's Hospital of Kansas City, Saint Luke's Northland Hospital and Saint Luke's South.  Together, these St. Luke's facilities maintain approximately 877 licensed beds.

9.      Carondelet Health System is a Missouri corporation with its principal place of business at 4600 Edmundson Road, St. Louis, Missouri.   Carondelet operates two acute care hospitals in direct competition with Heartland including Saint Joseph Health Center and St. Mary's Hospital of Blue Springs.  Together, these Carondelet facilities maintain approximately 439 licensed beds.

10.     Shawnee Mission Hospital of Kansas City is a Kansas corporation with its principal place of business at 9100 W. 74th Street in Merriam, Kansas.  Shawnee Mission Hospital operates an acute care facility in direct competition with Heartland and maintains approximately 383 licensed beds.

11.     North Kansas City Hospital is a Missouri corporation with its principal place of business located at 2800 Clay Edwards Drive in North Kansas City, Missouri.  North Kansas

City Hospital operates an acute care hospital in direct competition with Heartland and maintains approximately 351 licensed beds.

12. These hospital Defendants separately and collectively have market power in the acute care services market and are sometimes referred to as the "Hospital Defendants" throughout this Complaint.

### *The Managed Care Defendants*

13. Blue Cross and Blue Shield of Kansas City ("Blue Cross") is a Missouri corporation with its principal place of business at 2301 Main St., One Pershing Square, Kansas City, Missouri. Blue Cross offers a variety of managed health care plans including HMOs under the names Blue Care Inc. and Blue Advantage, and PPOs under the names Preferred Care Blue, Preferred Health Professionals, and Preferred Care. Together, these plans have a local enrollment of approximately 800,000.

14. Coventry Health Care of Kansas, Inc. ("Coventry") is a Kansas corporation with its principal place of business at 6705 Rockledge Dr., #900, Bethesda, Maryland. Coventry offers a variety of managed health care plans including HMOs, PPOs and Point of Service plans. Together these plans have a local enrollment of approximately 150,000.

15. United Healthcare, Inc. ("United") is a Maryland corporation with its principal place of business at 2811 Lord Baltimore Dr., Baltimore, Maryland. United offers a variety of managed health care plans including HMOs, PPOs and Point of Service plans. Together, these plans have a local enrollment of approximately 315,000.

16. Humana Health Plan Inc. ("Humana") is a Kentucky corporation with its principal place of business at 500 W. Main Street, Louisville, Kentucky. Humana offers a variety of managed health care plans including HMOs and PPOs. Together, these plans have a local enrollment of approximately 60,000.

17. Aetna, Inc. ("Aetna") is a Pennsylvania corporation with its principal place of business at 151 Farmington Ave., Hartford, Connecticut. Aetna offers a variety of managed health care plans including HMOs, PPOs and Point of Service plans. Together, these plans have a local enrollment of approximately 135,000.

18. Cigna Healthcare of Ohio, Inc. f/k/a Cigna Healthcare of Kansas/Missouri ("Cigna") is an Ohio corporation with its principal place of business at 900 Cottage Grove Road #5260, Hartford, Connecticut. Cigna offers a variety of managed health care plans including HMOs, PPOs and Point of Service plans. Together, these plans have a current local enrollment of approximately 155,000.

19. The managed care insurance component of the local health care market is dominated by Defendants Blue Cross, Coventry, and United. Together, these managed care systems have captured approximately 80% of the market for such services in the Kansas City metropolitan area, and along with the other insurers are sometimes referred to as "Managed Care Defendants" throughout the Complaint.

## JURISDICTION AND VENUE

20. This action is brought under Sections 4 and 6 of the Clayton Act, as amended, 15 U.S.C. §§ 15(a) and 26, alleging violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1. This Court has jurisdiction over the antitrust causes of action pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367.

21. Venue in this District is proper under Sections 4 and 12 of the Clayton Act, as amended, 15 U.S.C. §§ 15(b) and 22. Plaintiff resides, is found in, and transacts significant business in the District of Kansas. Defendants are found in and transact substantial business in this District.

**INTERESTATE COMMERCE**

22.     Much of the Hospital Defendants' revenues come from sources located outside of their home state, including from the federal government through such programs as Medicare. Moreover, all Defendants sell products and services in interstate commerce, and Defendants' conduct has an effect of the citizens of several states.

**ALLEGATIONS COMMON TO THE COMPLAINT**

*Heartland Opens a Specialty Hospital – and a Competitive Threat to the Hospital Defendants*

23.     Advances in medical care have demanded greater specialization in physicians. Quality and efficiency in delivery of this care has favored specialization in facilities as well. This is a nationwide trend.  Some traditional acute care hospitals, including the Hospital Defendants, have tried to respond to this trend by advertising and promoting special services and expanded facilities.  In other instances, physicians themselves have organized to develop and control an independent "Center of Excellence" for the benefit of patient care.

24.     In an effort to create such a Center of Excellence in the Kansas City metropolitan area, approximately two dozen physicians joined to form Heartland in 2003, creating a facility unmatched in providing state-of-the-art care and treatment.

25.     Heartland's facilities include seven high-tech operating rooms, each outfitted with a C-arm fluoroscopy unit for intraoperative safety and visualization, and 49 licensed beds. Inpatient rooms are each equipped with physical therapy equipment and modern entertainment systems for patient comfort.  The facility also has 10 overnight short-stay recovery suites, 20 pre- and post-procedure full-privacy walled suites, five Level-1 post-anesthesia care beds, one private adolescent recovery suite and three treatment rooms – each equipped with a C-arm fluoroscopy unit.

26. Heartland's radiology unit is an all-digital radiological suite, equipped with a 3.0 Tesla MRI scanner with twice the power of other scanners which improves accuracy and quality, and reduces scan time. A 40-slice CT scanner improves detail and decreases radiation exposure, and Stryker Endo-Suite, a fiber-optic real-time teleconferencing system, allows physicians and fellowship students to view real-time surgeries from a videoconferencing room.

27. Heartland is equipped to handle many of the services provided at traditional acute care hospitals, including those run by the Hospital Defendants. Moreover, Heartland is able to deliver patient care more safely and efficiently than traditional acute care hospitals, outscoring the competition in such critical cost areas as patient recovery time and infection rates.

28. For example, the average length of hospital stay for those patients undergoing combined anterior posterior spinal fusion approaches 9 days; Heartland patients are able to return home in half that time. Shorter hospital stays almost always correlate to lower infection rates: the national infection rate at acute care hospitals for patients undergoing invasive procedures like those performed at Heartland is over 3%; Heartland has consistently kept infection rates nearly 90% lower. These improved efficiencies mean that Heartland can deliver quality patient care at lower overall cost compared to that of acute care hospitals like the Hospital Defendants.

29. In 2004, the Joint Commission on Accreditation of Healthcare Organizations recognized these accomplishments and certified Heartland as an acute care hospital. The Joint Commission evaluates the quality and safety of care for more than 15,000 health care organizations, and is the only such group to establish and maintain objective review criteria for the nation's hospitals. To earn and maintain accreditation, organizations must have an extensive on-site review by a team of Joint Commission health care professionals, at least once every three years.

*The Hospital Defendants React to the Competitive Threat*

30.     The emergence of Heartland as a competitive threat to Defendants did not go unnoticed. Indeed, at least some of the Hospital Defendants have publicly acknowledged Heartland's competitive threat to acute care hospitals.

31.     On April 19, 2004, several Kansas City area hospital administrators and insurance company executives met to discuss competition from specialty hospitals – and how to fight it. Among those in attendance were representatives from several hospitals in the HCA Midwest system, the head of North Kansas City Hospital, as well as officers from Defendants Blue Cross, Coventry and Humana.

32.     When asked at the meeting what was the most serious challenge facing his institution, Kevin Hicks of Overland Park Regional Hospital (an HCA Midwest facility) declared, "Specialty hospital competition and the resulting competition from surgery specialty coverage."

33.     Specifically singled out for attack was Plaintiff Heartland. Bryan Rodgers, HCA Midwest's highest ranking executive, described Heartland as "the holy land at 435 and Nall from which all niche players emanate." David Carpenter, the President and CEO of Defendant North Kansas City Hospital described the emergence of specialty hospitals like Heartland as the "biggest threat we face." Carpenter also endorsed the Managed Care Defendants' plan to keep Heartland out of their networks.

*The Conspiracy to Keep Heartland out of Local Managed Care Networks*

34.     In response to the "competitive threat" Heartland posed to the Hospital Defendants, the Hospital Defendants conspired with each other and the Managed Care Defendants to boycott Heartland and prevent Heartland's access to managed care network contracts, the lifeblood for any hospital. Upon questioning from Heartland, the insurers have

admitted that they have succumbed to the pressure of the coordinated conduct of the Hospital Defendants – the largest suppliers of acute care services in the area – and agreed to deny Heartland in-network contracts.

35. Thus, despite Heartland's tireless efforts to obtain in-network contracts with area heath insurers to provide coverage to local residents who wish to have procedures completed at a state-of-the-art facility like Heartland, it has been categorically rejected. At the behest of Hospital Defendants, all of the major health insurers including the Managed Care Defendants have refused to provide Heartland in-network contracts, severely limiting its ability to treat patients, and dramatically impairing Heartland's business.

36. For example, in response to Heartland's request for an in-network contract, in October 2003, Randy Meyer from Blue Cross met with Heartland representatives at the Heartland facility. After touring the facilities and commenting on the quality of the hospital, Mr. Meyer denied Heartland's request to participate in Blue Cross's network, explaining that existing network hospitals, including Defendant HCA, had instructed Blue Cross not to offer Heartland a contract, and that Blue Cross was yielding to that pressure.

37. In December 2003, representatives from Heartland again met with Mr. Meyer, this time at Blue Cross's offices in Kansas City. Heartland again requested an in-network contract, with reimbursement rates identical to what Blue Cross offered to HCA and other local hospitals. Again Blue Cross refused, citing pressure from Defendant HCA and other hospitals.

38. Other managed-care insurers similarly fell in line. For example, Heartland attempted on several occasions throughout 2003 and 2004 to communicate with representatives from Coventry regarding Heartland's participation as an in-network provider for Coventry.

Coventry steadfastly refused to communicate with Heartland, let alone offer Heartland an in-network contract.

39. Similarly, Heartland attempted on several occasions throughout 2003 and 2004 to communicate with UnitedHealthcare regarding Heartland's participation as an in-network provider for UnitedHealthcare. Like Coventry, UnitedHealthcare steadfastly refused to communicate with Heartland, let alone offer Heartland an in-network contract.

40. The other managed care networks operating in the Kansas City metropolitan area were similarly dismissive. Heartland attempted on several occasions throughout 2003 and 2004 to communicate with Aetna regarding Heartland's participation as an in-network provider for Aetna. Like its competitors, Aetna refused to offer Heartland an in-network contract, and in July 2003, Aetna acknowledged that its contract with area hospitals restricted its ability to add new providers to its in-network structure, including Heartland.

41. Heartland also attempted on several occasions throughout 2003 and 2004 to communicate with Cigna and Humana regarding Heartland's participation as an in-network provider. Like the other Managed Care Defendants, Cigna and Humana steadfastly refused to communicate with Heartland, let alone offer Heartland an in-network contract.

### *The Impact of Defendants' Conduct*

42. The collective effect of Defendants' concerted efforts to deny Heartland access to managed care contracts has had the desired effect. A significant percentage of prospective patients rely exclusively on their network coverage. Thus, although dozens of area surgeons have expressed a desire to perform surgeries at Heartland's facilities, their patients have been effectively locked out of the hospital because treatment is not covered by insurance. As a result, much of Heartland's state-of-the-art facilities are left unused and Heartland has suffered severe financial damage.

43. As a result of Defendants' conduct, the market has been harmed in that Kansas City area residents have been denied access to facilities that typically have demonstratively better patient satisfaction, lower costs, lower mortality rates, shorter hospital stays, and lower infection rates. Consumers have less choice in their health care options, and are foreclosed from choosing the facility they would otherwise chose absent Defendants' unlawful conduct.

44. Defendants' conduct achieves no legitimate efficiency that counterbalances these anticompetitive effects. Even assuming Defendants were able to show any pro-competitive redeeming virtue of their conduct, such pro-competitive effect could be achieved through an alternative means that is less restrictive on competition.

## RELEVANT MARKETS

45. Acute care hospital services constitutes the product dimension of the relevant market. The geographic dimension of this market is the Kansas City metropolitan area. As a result of Defendants' conduct, Plaintiff has been largely foreclosed from this market.

46. The combined services of spine and upper extremity surgery constitute the relevant sub-product dimension for the relevant market. The geographic dimension for this market is the greater Kansas City area. As a result of Defendants' conduct, Plaintiff has been largely foreclosed from this market.

## COUNT I

*Sherman Act Section One – Horizontal Contract, Combination, Conspiracy, and Agreement in Restraint of Trade, per se Unlawful and Unreasonable (Rule of Reason) Group Boycott*
*[Against Hospital Defendants]*

47. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 with the same force and effect as if set forth in full herein.

48. Since Heartland's inception, and continuing until the filing of this Complaint, the Hospital Defendants, and each of them, have continually engaged in an unlawful contract,

combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including a boycott against Heartland the effect of which has been to force managed care insurers to refuse Heartland in-network contracts.

49. The Hospital Defendants' unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In addition or in the alternative, the Hospital Defendants unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "rule of reason."

50. The Hospital Defendants' unlawful conduct has cut off access to a supply, facility, or market – namely access to managed care contracts – necessary for Heartland to compete in the acute care services market.

51. The Hospital Defendants' unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce has consisted of a scheme to effectuate a boycott against Heartland resulting in managed care insurers' refusal to provide Heartland in-network contracts. Upon information and belief, Hospital Defendants accomplished the boycott scheme by using their dominant position in the acute care service market to pressure managed care insurers to deny Heartland in-network contracts.

52. Heartland was and continues to be thereby damaged in an amount to be determined at trial.

## COUNT II

### *Sherman Act Section One – Vertical Contract, Combination, Conspiracy, and Agreement in Restraint of Trade, in furtherance of a Group Boycott, Unlawful and Unreasonable (Rule of Reason)*
### *[Against all Defendants]*

53.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 with the same force and effect as if set forth in full herein.

54.     Since Heartland's inception, and continuing until the filing of this Complaint, the Hospital Defendants, and each of them, have continually engaged in an unlawful contract, combination, conspiracy and agreement with the Managed Care Defendants, and each of them, in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including a boycott against Heartland the effect of which has been to cut-off Heartland's access to in-network contracts.

55.     Defendants' unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the "rule of reason."

56.     Defendants' unlawful conduct has cut off access to a supply, facility, or market – namely access to managed care contracts – necessary for Heartland to compete in the acute care services market.

57.     Defendants' unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce  has consisted of  a scheme to effectuate a boycott against Heartland resulting in managed care insurers' refusal to provide Heartland in-network contracts.

58.     Heartland was and continues to be thereby damaged in an amount to be determined at trial.

## COUNT III

### *Tortious Interference with Prospective Business Relationship*
### *[Against Hospital Defendants]*

59. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 with the same force and effect as if set forth in full herein.

60. Heartland has a business expectancy of obtaining in-network contracts with managed care health insurers, with the probability that such in-network contracts will yield future economic benefit to Heartland in the form of increased patient flow for procedures performed at Heartland.

61. The Hospital Defendants, and each of them, are aware of such expectancy.

62. But for the conduct alleged herein by each Hospital Defendant, Heartland was reasonably certain to have realized the in-network contracts and resulting economic benefit.

63. The Hospital Defendants' conduct as alleged herein was intentional.

64. As a result of the Hospital Defendants' conduct, Heartland was and continues to be thereby damaged.

## COUNT IV

### *Tortious Interference with Prospective Business Relationship*
### *[Against Managed Care Defendants]*

65. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 with the same force and effect as if set forth in full herein.

66. Heartland has a prospective business expectancy and relationships with insureds under managed care contracts with the probability that such patient relationships will yield future economic benefit to Heartland, in the form of increased patient flow for procedures performed at Heartland.

67. The Managed Care Defendants, and each of them, are aware of such expectancy.

68. But for the conduct alleged herein by each Managed Care Defendant, including the denial of access to in-network contracts, Heartland was reasonably certain to have realized increased patient flow and resulting economic benefit.

69. The Managed Care Defendants' conduct as alleged herein was intentional.

70. As a result of the Managed Care Defendants' conduct, Heartland was and continues to be thereby damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Heartland Surgical Specialty Hospital, LLC respectfully demands:

1. That the court declare, adjudge and decree that Defendants have committed the violations of federal law alleged herein;

2. That Defendants, their directors, officers, employees, agents, successors and members be enjoined from:

    a. directly or indirectly continuing or maintaining the boycott alleged herein and committing other violations of the Sherman Act;

    b. continuing, maintaining, entering into, and attempting to enter into any agreement or understanding the result of which would limit Heartland's efforts to secure contracts from managed care insurers;

    c. urging, inducing coercing, or pressuring, or attempting to urge, induce, coerce, or pressure, any managed care insurer to refuse Heartland managed care contracts;

    d. facilitating or attempting to facilitate agreements or understandings between or among managed care insurers relating to limiting managed care contracts to Heartland.

3.    That the Court award damages sustained by Heartland in an amount to be proved at trial, to be trebled according to law, plus interest, including prejudgment and post-judgment interest, attorneys' fees and costs of suit, and such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff Heartland hereby demands trial by jury of all issues properly triable thereby.

Dated:  April 26, 2005                    Respectfully submitted,

**STUEVE SIEGEL HANSON WOODY LLP**


        /s/ Norman E. Siegel
Patrick J. Stueve, Kan # 13847
Norman E. Siegel, D. Kan. # 70354
Todd M. McGuire, Kan # 19618
330 West 47th Street, Suite 250
Kansas City, MO 64112
Telephone:   (816)714-7100
Facsimile:  (816) 714-7101

**ATTORNEYS FOR PLAINTIFF
HEARTLAND SPECIALTY HOSPITAL, INC.**