```
            IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF KANSAS


HEARTLAND SURGICAL SPECIALTY    )
HOSPITAL, LLC,                  )
                                )
              Plaintiff,        )   CIVIL ACTION
                                )
v.                              )   No.  05-2164-MLB
                                )
MIDWEST DIVISION, INC., et al., )
                                )
              Defendant.        )
                                )
```

## MEMORANDUM AND ORDER

This case comes before the court on defendant Board of Trustees of North Kansas City Hospital's ("Board") motion to dismiss plaintiff's claims for antitrust damages in counts 1 and 2 and dismiss count 3 in its entirety. (Doc. 75). The motion has been fully briefed and is ripe for decision. (Docs. 76, 89, 98). For the following reasons, the Board's motion is granted in part and denied in part.

**I.   FACTS**

Plaintiff's second amended complaint alleges that the twelve defendants violated the Sherman Act and tortiously interfered with plaintiff's prospective business relationships. (Doc. 111). Plaintiff, a specialty hospital, alleges in counts 1 and 2 that defendants violated the antitrust statutes by conspiring to keep it out of the Kansas City market in order to avoid competition. The Board filed this motion to dismiss the Sherman Act violations based on claims of immunity under the Local Government Antitrust Act ("LGAA"), 15 U.S.C. §§ 34 through 36. The Board also seeks to dismiss

count 3, the tort claim, under the theory that Missouri statutes grant sovereign immunity to the hospital or, in the alternative, to limit recoverable damages. Mo. Rev. Stat. §§ 537.600-537.650.

## II. Motion to Dismiss Standards: FRCP 12(b)(6)

The standards this court must utilize upon a motion to dismiss are well known. This court will dismiss a cause of action for a failure to state a claim only when it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle legal relief or when an issue of law is dispositive. See Ford v. West, 222 F.3d 767, 771 (10th Cir. 2000); Robinson v. Kansas, 117 F. Supp.2d 1124, 1129 (D. Kan. 2000). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to plaintiff. See Ford, 222 F.3d at 771; Davis v. United Student Aid Funds, Inc., 45 F. Supp.2d 1104, 1106 (D. Kan. 1998). Conclusory allegations, however, have no bearing upon this court's consideration. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (stating that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based"); Overton v. United States, 74 F. Supp. 2d 1034, 1041 (D. N.M. 1999) (citing Dunn v. White, 880 F.2d 1188, 1190 (10th Cir. 1989)). In the end, the issue is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims. See Robinson, 117 F. Supp.2d at 1129.

## III. ANALYSIS

**A. Immunity under the LGAA**[1]

The LGAA provides that a party cannot recover damages, interest on damages, costs, or attorney's fees for an antitrust violation from "any local government, or official or employee thereof acting in an official capacity."[2]  15 U.S.C. § 35.  The Board asserts that it is part of the local government for the city of North Kansas City and, therefore, immune from damages.

The Tenth Circuit, in <u>Tarabishi v. McAlester Regional Hosp.</u>, 951 F.2d 1558 (10th Cir. 1991), considered the question of whether a public trust hospital was a local government for purposes of the LGAA. The LGAA defines local government as "a city, county, parish, town, township, village, or any other general function governmental unit established by State law."  15 U.S.C. § 34.  The hospital defendant in <u>Tarabishi</u> argued that it was a general function governmental unit since the hospital was created by statute and the beneficiary is the city.  951 F.2d at 1558.  The court held that the issue was one of first impression and considered two factors in making its determination.

> First, we agree with the district court that a

---

[1] Plaintiff requests, in a footnote, that the court should allow plaintiff to conduct discovery. Although citing Fed. R. Civ. P. 56(f) as support, plaintiff fails to comply with the rule and applicable authority.  "A prerequisite to granting relief, however, is an affidavit furnished by the nonmovant."  <u>Committee for the First Amendment v. Campbell</u>, 962 F.2d 1517, 1522 (10th Cir. 1992). Plaintiff has not identified, by way or affidavit or otherwise, what evidence it will obtain through discovery and how plaintiff will obtain it.  Plaintiff's request is denied.

[2] The LGAA does not preclude plaintiff's claims against the Board for declaratory and injunctive relief.  <u>Thatcher Enterprises v. Cache County Corp.</u>, 902 F.2d 1472, 1477 (10th Cir. 1990).

>   significant consideration is where liability for an antitrust damage award will actually fall, in light of the LGAA's obvious concern to limit the imposition of treble damage awards on taxpayers. In this case, the City of McAlester is the beneficiary of the public trust, and as such is clearly not liable for any damage award made against the trust. Thus, the LGAA's concern about imposing unfair burdens on the taxpayers is not implicated.
>   Second, inasmuch as the question of the character of a local entity under the LGAA is a question of state law, we find it persuasive that around the time of the challenged conduct, the Oklahoma legislature clearly viewed public trust hospitals as entities different from political subdivisions. Indeed, under the provisions of the Governmental Tort Claims Act, Okla.Stat. tit. 51, § 152, immunity was granted to the "state, its political subdivisions, ... whether performing governmental or proprietary functions...." "Political subdivision" was thereafter defined as including a "municipality," a "school district," a "county," and "a public trust where a city, town school district or county is a beneficiary, provided, that for the purposes of this act, a public trust shall not include any hospital operating under a trust authority." Id. at 152(8). This clear exclusion suggests that the Oklahoma legislature at the time did not view public trust hospitals as entities comparable to municipalities, school district, or counties. While the Tort Claims Act's clear inclusion of public trust hospitals under its definition of political subdivisions since 1987 might suggest a different result today, we believe the former provisions indicate a conscious characterization of a public trust hospital under state law at the time relevant to this case.

Id. at 1566-67.

In order to apply the factors listed in Tarabishi, the court finds instructive an opinion by the Missouri Supreme Court that ultimately held "the Board is not a public entity in its own right, but rather a part of the City, and, for purposes of sovereign immunity, the Board enjoys such immunity as the City would enjoy." State ex rel. Bd. of Trustees of City of North Kansas City Memorial Hosp. v. Russell, 843 S.W.2d 353, 357 (Mo. banc 1992)(considering the Board's sovereign immunity in a medical malpractice action).

>   A full understanding of the nature of the Board requires an understanding of the statutory framework under

-4-

which the Board operates. North Kansas City Hospital was created under Chapter 96, [Mo. Rev. Stat.], specifically sections 96.150 through 96.228. The statute creating the predecessors to these sections was entitled "AN ACT to authorize cities of the third class to purchase, erect, lease, equip and maintain grounds and buildings for hospital purposes and to conduct and operate such hospital." The act does not describe itself as creating an entity to run hospitals for cities that own them. Rather, the title shows that the act was intended to give third class cities a means of operating hospitals.

Currently, Chapter 96 provides a mechanism for voters to petition for a tax to support a hospital. Section 96.150.1 provides that "[w]hen one hundred voters of any city of the third class shall petition the mayor and council asking that an annual tax ... be levied for ... a health care facility in such city ... the mayor and council shall submit the question to the voters." § 96.150.1, [Mo. Rev. Stat.] Supp. 1991. The statute specifies that the form of the question shall be in substantially the following form:

Shall there be .......... cent tax for .......... (establishment of, equipping, operating and maintaining) a .......... (hospital, nursing home, or convalescent home, etc.) in the city for the care and treatment of the sick, disabled and infirm?

§ 96.150.2 (Supp.1991). Upon a two-thirds vote, the tax is levied and set aside in a separate fund for the facility. § 96.150.3, [Mo. Rev. Stat.] Supp.1991.

Chapter 96 also includes provisions relating to the powers of boards of trustees. Specifically, "[t]he trustees shall have authority to operate, maintain and manage a hospital and hospital facilities, and to make and enter into contracts ...; to make and enter into leases [with some limitations] ...; and further to provide rules and regulations for the operation, management or use of a hospital...." § 96.150.5 [Mo. Rev. Stat.] Supp.1991. Nowhere in Chapter 96 is a board granted a corporate or political existence, perpetual succession, or existence after dissolution of its city. Neither is a board granted the power to sue and be sued, to tax, to issue bonds, or to hold property except as "special trustees."

The structure of a Chapter 96 board of trustees requires a close relationship between a board and its city. The members of a board are subject to control of the city because membership on the board depends upon selection by the city government. The members of a board are selected by the mayor with the approval of the council. § 96.160. The members of a board may be removed for any of the reasons listed in the statute upon a majority vote of the council. § 96.175. Even the size and composition of a board may, within limits, be varied by the city council. § 96.160. Furthermore, the funds of a Chapter 96 hospital are tied to

the city. The tax is levied by the city following approval by the voters of the city. § 96.150.3. The tax is levied and collected in the same manner as other municipal taxes. Id.; § 96.220. Any bonds issued for the hospital are issued by the city, upon recommendation of the board. § 96.222. Although a board has control of the expenditures of funds to operate the hospital, the funds are kept in the city treasury. § 96.190. The funds are kept separate from other city monies, but the board must annually make a "detailed report to the city council, showing the receipts of all funds and the expenditures therefrom, and showing each donation and amount thereof." § 96.200.

**B. Comparison with Other Boards and Entities**

That the Board is not an entity becomes clearer when the Board and Chapter 96 are compared with entities that have been recognized as such. The recent opinions of this Court contain examples of "public entities." These diverse entities have varying and distinct powers appropriate to fulfill the purposes for which they were created. However, all of these entities share the common feature of enabling statutes that expressly grant them corporate existence. The Board, on the other hand, has no existence except through the continued existence of the City of North Kansas City.

While the Board has some features in common with some of the entities in these cases, it lacks the fundamental feature of an existence separate and distinct from that of the City. Like the St. Louis Housing Authority, the Board is selected and may be removed by the city government. Like the New Liberty Hospital District, the Board operates a public hospital. But, both of these entities are specifically granted corporate existence and do not depend upon any other entity for their existence. It is this aspect of the entities involved in these previous cases that sets them apart from the Board in this case. Aside from the entities that have been before this Court in sovereign immunity cases, the statutes have other examples that provide useful comparisons.

The Board essentially argues that the legislature created the Board as an independent arm of the state, rather than a part of the City, for the sole purpose of running a hospital for the City. The legislature could have created such an entity, if it had wished. The law providing for hospital districts permits such an independent entity. See § 206.010.2. The statutes contain other examples of independent entities that might be created by the citizenry, such as the city library district, which "shall be a body corporate." § 182.140. Street light maintenance districts are "[t]o have perpetual existence." § 235.150. And if you create an ambulance district, it "shall be a body corporate and a political subdivision of the state." § 190.010. The legislature did not include any grant of separate existence when it enacted the original law providing for city hospitals in third class cities. Neither

-6-

>has it added such a grant in any of the amendments to the law. The most recent amendment occurred in 1987 and explicitly listed the authority of a Chapter 96 board of trustees but did not give the board any authority to have perpetual succession or to be a body corporate. See § 96.150.5, RSMo Supp.1991. Lacking any separate existence, the Board is not an entity but is a part of the City of North Kansas City.
>   Not all of the statutes defining some part of government create "entities." Statutes similar to the sections in Chapter 96 grant authority for zoning commissions and boards of adjustment, §§ 89.070-89.090, park boards in third class cities, §§ 90.500-90.570, and boards to operate municipally owned utilities, §§ 91.270, 91.480. The statutes do not grant corporate existence or political subdivision status to these boards either. These statutes govern the operation of parts of city government in the same way sections 96.150 through 96.228 govern operation of the Board. The statutes granting authority to the Board are like the statutes setting forth the powers of the mayor and city council in third class cities. See §§ 77.060-77.360. A city council has no corporate existence either. Rather, the city has corporate existence. § 77.010. A city has the power to sue and be sued, while the city council does not. Thus the Board is not a "public entity" in its own right, but rather a part of the City, and, for purposes of sovereign immunity, the Board enjoys such immunity as the City would enjoy.

Id. at 355-57 (citations omitted).

In considering the first factor in Tarabishi, the court must determine who will carry the liabilities of any potential damage award. Plaintiff urges this court to find that the Board is not considered a local government under the LGAA since the Missouri statutes state that the obligations incurred by the hospital shall be paid from the hospital fund and that the debt of the hospital is not the debt of the state or North Kansas City. (Doc. 89 at 17-18). While this argument seems logical on its face, the reality is that the fund created for the hospital is in part established by the taxpayers. Unlike the hospital in Tarabishi, the North Kansas City Hospital is a county hospital and created through the use of taxpayer dollars.

-7-

Accordingly, any liability would indirectly fall to the taxpayers as the hospital fund is, in part, established through tax dollars.

As to the second factor, both the Missouri statutes and Supreme Court establish that the Board is not considered a separate entity but rather an addition to the city government. Unlike Tarabishi, the Board cannot operate apart from the existence of the city. The court finds, based on the reasoning of the Supreme Court of Missouri, that the Board is a local government as that term is defined in the LGAA.[3] Defendant's motion to dismiss plaintiff's cause of action for antitrust damages in counts 1 and 2 is granted.[4]

**B. Sovereign Immunity**

In order to determine whether defendant is immune from tort action, the court must first determine whether Kansas or Missouri law applies. Generally, a federal trial court sitting in diversity applies the forum state's choice of law. Trierweiler v. Croxton and Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir. 1996). As for plaintiff's tort claim, the Kansas Supreme Court has held that the law of the state where the tort occurs controls. See Carolina Indus. Products, Inc. v. Learjet, Inc., 2001 WL 1636547, *9 n. 12 (D. Kan. Dec. 18, 2001)(citing Ling v. Jan's Liquors, 237 Kan. 629, 635, 703

---

[3] Plaintiff asserts that even if the Board is considered a local government it is not immune if it was not acting within its official capacity. While a finding that an employee or official was "acting in an official capacity" is required for immunity under the LGAA, this requirement does not apply to a local government. See 15 U.S.C. § 35(a). Plaintiff has initiated suit against the Board as an entity and not against the individual Board Trustees.

[4] At this time, the court has not ruled on plaintiff's claims under counts 1 and 2 for equitable relief and the associated attorney's fees and costs for those claims.

-8-

P.2d 731, 735 (1985)); Audiotext Communications Network, Inc. v. US Telecom, Inc., 912 F. Supp. 469, 473 (D. Kan. 1995).  Under this rule, the tort is deemed to have occurred where the wrong was felt. See Ling, 237 Kan. at 635.  Plaintiff, a Kansas resident with its principal and only place of business in Kansas, has alleged that it has suffered a loss of in-network contracts in the state of Kansas as a result of defendant's actions.  (Doc. 111 at 13).  Accordingly, the court finds that Kansas law applies to plaintiff's tort claim.[5]

Defendant urges this court to apply Missouri's immunity statutes and grant it sovereign immunity.  See Mo. Rev. Stat. § 537.600.  The Kansas Supreme Court in Head v. Platte County, Mo., 242 Kan. 442, 447, 749 P.2d 6, 9 (Kan. 1988), reviewed whether Kansas public policy permits a Kansas court to honor a sister state's sovereign immunity:

> By holding in Nevada v. Hall that nothing in the Constitution requires one state to apply a sister state's sovereign immunity in tort suits against the sister state, the United States Supreme Court left Kansas free to recognize Missouri's sovereign immunity as a matter of Kansas public policy. In the case at bar, the district court held that Kansas public policy favored the application of Missouri sovereign immunity to defendants. We disagree.
> Our decision in Holcomb firmly established that a sister state has no right to exercise its sovereign immunity within the borders of this state. Further, it has long been the public policy of Kansas to compensate its citizens and those within its borders for injuries occurring in Kansas which result from negligent acts outside of this state. This policy can be determined by the state's statutes governing the liability of residents, nonresidents, and Kansas governmental entities for tortious acts that injure an individual in this state. The statutory policy is stated by (1) K.S.A. 60-308(b)(2), which allows a plaintiff to bring suit in Kansas to recover damages for injuries occurring in this state which resulted from negligent conduct outside Kansas, and (2) the Kansas Tort Claims Act, K.S.A. 75-6101 et seq., which holds Kansas

---

[5] Defendant does not appear to controvert this determination.

-9-

> governmental entities liable for damages caused by their employees' acts or omissions within this state subject to specified exceptions.
> Following <u>Nevada v. Hall</u>, we are also free to recognize Missouri sovereign immunity as a matter of comity. Judicial comity is a principle by which the courts of one state or jurisdiction give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect. <u>In re Miller</u>, 228 Kan. 606, Syl. ¶ 3, 620 P.2d 800 (1980). Comity is not binding on the forum state, but is a courtesy extended to another state out of convenience and expediency. <u>Philadelphia v. Austin</u>, 86 N.J. 55, 64, 429 A.2d 568 (1981).
> We believe that, when considering comity, Kansas courts should give primary regard to the rights of its own citizens and persons who are within the protection of this state
> 
> \* \* \*
> 
> We hold that the public policy of this state is that a sister state is sovereign only within its own boundaries, and its immunity laws have no extraterritorial force.

<u>Head</u>, 242 Kan. at 447-448, 749 P.2d at 9-10.

Defendant asserts that the <u>Head</u> case is not applicable since plaintiff failed to allege that the Board committed an act of collusion in Kansas. (Doc. 98 at 6). Defendant, however, misstates the holding in <u>Head</u>. The Supreme Court of Kansas clearly stated that the public policy of the state is to compensate its residents for injuries they sustain within the state of Kansas, regardless of whether the negligent conduct occurred outside of the state line. The court finds that the Kansas Supreme Court would conclude that Missouri's sovereign immunity statutes do not apply since application in this case would be a violation of Kansas' public policy.

In the alternative, defendant asserts that the court should limit the amount of damages recoverable to $300,000.[6] <u>See</u> Mo. Rev. Stat.

---

[6] Defendant also seeks to have any claim for punitive damages dismissed. Plaintiff, however, responds that it has not stated a claim for punitive damages. (Doc. 89 at 11).

-10-

§ 537.600. Defendant argues that the Kansas Supreme Court would recognize that provision of Missouri's laws since the <u>Head</u> court held that a "Missouri governmental entity should not receive better treatment than a similarly situated Kansas governmental entity would receive." (Doc. 98 at 8). Kansas, however, limits liability at $500,000. K.S.A. 75-6105. Based on the prior analysis in <u>Head</u>, the court is not persuaded that the Kansas Supreme Court would limit the Board's liability to $300,000 when a similar Kansas entity would be subject to $500,000 in damages. Accordingly, defendant's motion to dismiss and/or cap its liability under count 3 is denied.

## IV. CONCLUSION

Defendant's motion to dismiss is granted in part and denied in part. Defendant's motion to dismiss the damages claims in counts 1 and 2 is granted and defendant's motion to dismiss count 3 is denied.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response

-11-

to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

    IT IS SO ORDERED.

    Dated this 21st    day of December 2005, at Wichita, Kansas.

                                      s/ Monti Belot
                                      Monti L. Belot
                                      UNITED STATES DISTRICT JUDGE