IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| HEARTLAND SURGICAL SPECIALTY HOSPITAL, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 05-CV-2164 MLB/DWB |
| MIDWEST DIVISION, INC., et al., | ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO COMPEL HSSH TO PRODUCE A RULE 30(B)(6) WITNESS WITH KNOWLEDGE OF ITS PRODUCTION OF DOCUMENTS AND DATA

Defendants have moved, pursuant to Rules 30(b)(6) and 37(b), for an order compelling plaintiff HSSH to produce a witness who can testify to "matters known or reasonably available" to plaintiff on topics 8, 9, 10, 16 and 17 of defendants' Notice of 30(b)(6) Deposition of Heartland Surgical Specialty Hospital, L.L.C. (Doc. 351), as required by Rule 30(b)(6) and this Court's Status Conference Order No. 2 (Doc. 357), ¶ 2. Because HSSH has previously been ordered to produce a witness with knowledge on those topics, and has failed and refused to do so, defendants respectfully move for an award of their reasonable attorneys' fees and costs incurred in bringing this motion, and in taking a second Rule 30(b)(6) deposition on those topics, as an appropriate sanction under Rule 37(b).

### Nature of the Matter Before the Court

This motion is prompted by the same concerns that led defendants to request (and the Court to order) that HSSH produce a knowledgeable witness to testify about how plaintiff maintains its documents and data, and what HSSH did to identify and produce documents and

data responsive to defendants' document requests.  There are two main concerns.  First, HSSH's production is *underinclusive*, because numerous computers, servers, and disc drives apparently were never searched for responsive documents.  See §§ 1-4 below.  Second, HSSH's production is *overinclusive,* because HSSH produced tens of thousands of non-responsive documents that apparently were never reviewed for responsiveness to the document requests, despite HSSH's representations that it would conduct an "eyes-on review" by "humans, not machines," to "eliminate nonresponsive documents."  See § 5 below, and October 6, 2006 letter from Rick Bien to Pat Stueve, attached hereto at Tab A.

## Statement of Facts

To get the facts necessary to address these problems, defendants took the Rule 30(b)(6) deposition of HSSH on November 28 and 29, 2006, on topics 1-17 of the deposition notice.  Of those 17 topics, five are at issue here:

> 8.      The document retention policies applicable to any HSSH
> Financial Records, HSSH Patient Records, HSSH Financial
> Record, or HSSH Plans and Forecasts.
>
> 9.      The destruction, alteration, or loss of any HSSH Financial
> Records, HSSH Patient Records, HSSH Financial Reports, or
> HSSH Plans and Forecasts.
>
> 10.     The capabilities of HSSH's AdvantX, Great Plains, and
> SoftMed software, the data stored or used with that software, and
> the reports that can be generated with that software.
>
> 16.     The capabilities of the computer systems and software that
> HSSH uses or has used to create, transmit, or store e-mails and
> other electronic documents, and the extent to which HSSH can
> identify and produce information responsive to discovery requests
> in this Lawsuit that are stored on those systems.
>
> 17.     HSSH's search for, identification of and production of
> documents and information responsive to discovery requests in this
> Lawsuit.

HSSH produced one witness, its CEO Mary Nan Holley, to testify on these topics. Ms. Holley understood that she was required to testify to HSSH's knowledge on these topics, not just her own.[1]  (Excerpts of Ms. Holley's testimony are reproduced in the endnotes). She testified that she met with her staff and HSSH's counsel to learn what HSSH knows on those topics.[2]  However, the deposition clearly established that Ms. Holley had insufficient knowledge to answer questions on several key subjects. Those subjects are:

1.  What computer servers does HSSH use, and what data are stored on them?

2.  What computers, disk drives, and databases were searched for responsive documents?

3.  What are HSSH's document retention policies with respect to e-mail, and what was done to prevent deletion or destruction of responsive e-mail?

4.  Who is HSSH's e-discovery vendor, what was the vendor instructed to do, and what did it do?

5.  What was done to eliminate non-responsive documents from HSSH's production?

6.  What are the reporting capabilities of HSSH's Great Plains and AdvantX software, and can HSSH export its Great Plains and AdvantX databases to a file for production to defendants?

The following sections illustrate some of the more important questions that Ms. Holley could not answer on these subjects. In most cases, Ms. Holley testified that although she did not know the answer to the questions, others employed by HSSH would know the answer. HSSH's strategy of producing a witness who does not know the facts has frustrated and delayed defendants' discovery efforts. Ms. Holley's lack of knowledge on these subjects demonstrates a systematic violation of Rule 30(b)(6), which should be remedied by an order granting defendants' motion to compel.

On December 5, 2006, as detailed in the attached Certificate of Conference, defendants' counsel met and conferred with HSSH's counsel, and discussed Defendants' request that HSSH

produce a witness who could testify to HSSH's knowledge on these points. HSSH stated that it would not produce such a witness. The parties agreed that they are at an impasse.

**The Issues on which Ms. Holley Could Not Answer Questions**

1. <u>What computer servers does HSSH use, and what data are stored on them?</u>

Defendants asked Ms. Holley to identify HSSH's computer systems. She identified four computer servers, which she called "the big server," "the E-mail server," "the PACS system" (which stores only radiology images), and the phone system/voice mail server.[3]

Defendants then asked Ms. Holley about a list of HSSH's computer servers in a HSSH document regarding record retention procedures (deposition exhibit 31). That list includes several servers that Ms. Holley had not mentioned in her earlier testimony. Ms. Holley could not identify some of those servers, and did not know what data are stored on them. She said that Michael Coffman, HSSH's Director of Information Technology, would know the answers to those questions.[4] Ms. Holley could not provide a complete list of HSSH's computer systems, and did not know whether HSSH has such a list. She testified that Mr. Coffman or Mr. Van Horn (HSSH's CFO) could provide that information.[5]

As a result, defendants have been unable to learn the most basic information about HSSH's computer systems: what computers HSSH has, and what data are stored on them.

2. <u>What computers, disk drives, and databases were searched for responsive documents?</u>

Defendants then asked a series of questions about what computer files HSSH searched in an effort to locate documents responsive to our document request. Ms. Holley did not know the answers to most such questions, and said that only the people who were involved in the search for electronic documents would know. For example:

        a.     Ms. Holley did not know whether HSSH had searched the HSSH network drives that are used by current employees.[6]

4

     b.      Ms. Holley did not know whether HSSH had searched the HSSH network drives that were used by former employees.[7]

     c.      Ms. Holley did not know whether HSSH had searched email saved to the HSSH server by HSSH physicians.[8]

     d.      Ms. Holley did not know whether HSSH had searched archived email.[9]

     e.      Ms. Holley did not know whether HSSH had searched HSSH's voice mail server.[10]

     f.      Ms. Holley did not know whether HSSH had searched "the hard drives of individual workstations, laptops or hand-held computers" or the "floppy disks, zip disks or external drives" used by present or former HSSH employees.[11]

     g.      Ms. Holley did not know whether HSSH had searched the files on HSSH-owned computers that were issued to employees who no longer work for HSSH, including former CEO Kim Krause and former CFO Jim Morse.[12]

Ms Holley also did not know whether or not, as part of HSSH's document production, anyone had interviewed HSSH executives to find out where they store responsive electronic documents.[13]  As a result, defendants have no assurance that the relevant electronic files have been searched, or even that HSSH has made a good faith effort to find out where the relevant files are.

   3.  <u>What are HSSH's document retention policies with respect to e-mail, and what was done to prevent deletion or destruction of responsive e-mail?</u>

Defendants asked Ms. Holley whether HSSH has a document retention policy applicable to email.  She did not know.[14]  Defendants asked whether HSSH routinely deletes emails.  Ms. Holley answered "not to my knowledge," but she did not claim to have any knowledge on the

subject.[15]  When asked whether anyone enforces HSSH's policy that HSSH emails (if an

employee chooses to save them) be stored on a HSSH server, Ms. Holley said she did not know,

and Mr. Coffman would know.[16]

Defendants have thus been denied discovery on the basic question whether HSSH has

deleted any responsive emails, because Ms. Holley did not know the answer to that question.

4.  <u>Who is HSSH's e-discovery vendor, what was the vendor instructed to do, and what did
it do?</u>

Ms. Holley testified that she is not knowledgeable about HSSH's production of electronic

documents because she "relied on our outside vendor, Michael Coffman under my direction, and

litigation counsel to produce the electronic documents."[17]  The vendor searched for electronic

documents to be produced in this case,[18] and prepared the CDs containing those documents that

were delivered to defendants.[19]

Ms. Holley did not know the vendor's name,[20] and HSSH's counsel refused to reveal it

when asked that question directly at the deposition.[21]  Although HSSH later revealed the

vendor's name in an off-the-record conversation with counsel for one defendant, HSSH's refusal

to reveal it at the deposition prevented any follow-up examination.

Because Ms. Holley did not supervise the vendor or work directly with the vendor, she

does not know what documents the vendor selected for production.[22]  She does not know what

the vendor was instructed to do.[23]  She repeatedly testified that she does not know whether

particular files were searched for responsive documents, because "that was handled through the

outside vendor."[24]

By delegating the tasks of searching for and producing electronic documents to a vendor,

and then producing a 30(b)(6) witness who does not know what the vendor was instructed to do

or what it did, HSSH has denied defendants discovery on topic 17 of the deposition notice

6

("HSSH's search for, identification of and production of documents and information responsive to discovery requests in this Lawsuit").

5.  What was done to eliminate non-responsive documents from HSSH's production?

As noted above, one purpose of the deposition was to learn what HSSH did to eliminate non-responsive documents from its over 1-million-page document production. Ms. Holley was completely ignorant on this issue. She did not know what (if anything) her lawyers did to avoid producing non-responsive electronic documents.[25] She did not know whether anyone reviewed the email that HSSH produced to determine whether it was responsive to defendants' document requests.[26]

Defendants are entitled to testimony on this issue. HSSH should not be permitted to avoid its obligation to provide such testimony by the tactic of producing a witness who cannot answer questions on the subject.

6.  What are the reporting capabilities of HSSH's Great Plains and AdvantX software, and can HSSH export its Great Plains and AdvantX databases to a file for production to defendants?

Finally, defendants asked Ms. Holley whether HSSH's Great Plains and AdvantX software can export their entire databases to a file for production to defendants. This issue is important because HSSH stores almost all its patient billing and accounting records in its AdvantX and Great Plains databases. Defendants have requested copies of those databases in discovery. HSSH refuses to produce the databases, based on a year-old objection that producing the data would be "burdensome." Defendants tried to test that assertion by asking Ms. Holley whether HSSH's software can copy the data to a CD, which could then be handed to defendants.

On the first day of her deposition, Ms. Holley testified that she did not know whether the software can make a copy of the AdvantX databases, but she could answer that question after talking to her "IS manager."[27] Ms. Holley and her counsel promised to investigate and be

7

prepared to answer the question later in the deposition.[28]  She made a similar commitment to investigate the reporting capabilities of HSSH's Great Plains software.[29]

On the second day of the deposition, however, Ms. Holley testified that she had not investigated the issues as promised.[30]  Therefore, Ms. Holley never answered the question. HSSH still has not produced the requested data.  HSSH continues to rely on its objection that it would be too burdensome to produce a complete copy of the AdvantX and Great Plains databases.  Yet HSSH has avoided answering the most basic question about that "burdensomeness" objection: whether HSSH's computer systems can export all the requested data to a file for production to defendants.

Defendants are still in the "meet and confer" process regarding HSSH's refusal to produce a complete and current copy of its AdvantX and Great Plains databases (that is one of the issues on which HSSH and United have jointly moved for an extension of the deadline for motions to compel).  An order requiring HSSH to produce a witness who can answer questions about the factual basis for its "burdensomeness" objection to producing those databases would significantly assist the parties in resolving this important discovery issue.

## Questions Presented:

1. Did HSSH violate Rule 30(b)(6) and the Court's Status Conference Order No. 2 (Doc. 357) by failing and refusing to produce a witness with knowledge on the topics listed in defendants' deposition notice?

2. If so, what remedy is appropriate?

**Argument**

**1.  HSSH's refusal to produce a witness with knowledge violated Rule 30(b)(6) and the Court's Status Conference Order No. 2 (Doc. 357).**

Rule 30(b)(6) provides that a person designated to testify on behalf of a corporation "shall testify as to matters known or reasonably available to the organization." "Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice." Starlight Int'l Inc., v. Herlihy, 186 F.R.D. 626, 638 (D. Kan. 1999) (citations omitted). "If the designated deponent cannot answer those questions, then the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions, etc.  The corporation has an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are 'known or reasonably available' to the corporation." Id. at 638-39 (citations omitted).

"If it becomes obvious during the course of a deposition" that the witness is unprepared or unable to testify on the subject matters set forth in the deposition notice, the organization is "obligated to provide a substitute" witness. Id. at 639 (citation omitted).  Because Ms. Holley could not testify on the requested topics, HSSH was obligated to designate another corporate representative who could.  As detailed in the accompanying certification of compliance with Fed. R. Civ. P. 37 and D. Kan. Local Rule 37.2, defendants asked HSSH to produce another witness to testify on those subjects, and HSSH refused to do so.

**2.  The proper remedy is an order compelling HSSH to comply with Rule 30(b)(6) by producing a properly prepared witness, and awarding defendants their attorneys' fees and costs incurred in bringing this motion and taking a second deposition.**

HSSH should be sanctioned for its failure to comply with Rule 30(b)(6), and for its failure to obey the Court's Status Conference Order No. 2 (Doc. 357), ¶ 2, which required HSSH to produce a corporate representative to testify on topics 1-17 of the deposition notice.

9

"Producing an unprepared witness is tantamount to a failure to appear at a deposition." Id. (citations omitted). "Inadequate preparation of a Rule 30(b)(6) designee can be sanctioned based on the lack of good faith, prejudice to the opposing side, and disruption of the proceedings." Id. at 640 (citations omitted). "The mere fact that a party later has opportunity to again depose the representative does not cure the initial inadequacy of the witness." Id.

Here, as in Starlight Int'l, sanctions are justified because HSSH's violation of Rule 30(b)(6) has caused defendants to suffer "prejudice in the form of expense and wasted time," and because Ms. Holley's "lack of adequate preparation has disrupted the proceedings," and "prevented [defendants] from obtaining adequate answers to [their] inquiries." Id. at 640. "The court should diligently apply sanctions under Rule 37 both to penalize those who have engaged in sanctionable misconduct and to deter those who might be tempted to such conduct in the absence of such a deterrent." Id. at 647. Therefore, this Court should sanction HSSH by awarding defendants their reasonable attorneys' fees and costs incurred in bringing this motion, and in taking a second Rule 30(b)(6) deposition.

## Conclusion

Defendants are entitled to examine a witness who can testify to "matters known or reasonably available" to plaintiff on the subjects discussed above. The Court has previously ordered HSSH to produce a witness with knowledge on those topics, and HSSH has failed and refused to do so. Therefore, defendants respectfully request (1) an order compelling HSSH to produce a witness with the knowledge required by Rule 30(b)(6), and (2) an award of their reasonable attorneys' fees and costs incurred in bringing this motion, and in taking a second Rule 30(b)(6) deposition on those topics.

10

DATED: January 16, 2007

Respectfully submitted,

Law Offices of H. Reed Walker, P.A.

By: _/s/ H. Reed Walker_
      H. Reed Walker
      5800 Foxridge Dr.-Ste. 306
      Mission, KS 66202-2338
      Telephone: (913) 432-1826
      Telecopier: (913) 236-7115
      hreedwalker1@aol.com

      Robert E. Bloch
      Mitchell D. Raup
      John Roberti
      Sarah E. Josephson
      Mayer, Brown, Rowe & Maw LLP
      1909 K Street, NW
      Washington, DC 20006-1101
      Telephone: (202) 263-3000
      Facsimile: (202) 263-3300
      rbloch@mayerbrownrowe.com
      mraup@mayerbrownrowe.com
      jroberti@mayerbrownrowe.com
      sejosephson@mayerbrownrowe.com

      Allen D. Allred
      Lawrence C. Friedman
      Thompson Coburn LLP
      One US Bank Plaza
      St. Louis, MO 63101
      aallred@thompsoncoburn.com
      lfriedman@thompsoncoburn.com

      Attorneys for Defendants
      United HealthCare of the Midwest,
      Inc., and United HealthCare
      Insurance Co.

LATHROP & GAGE L.C.

By:   */s/ Richard N. Bien*
      Richard N. Bien, Dist. Kan. #70101
      2345 Grand Boulevard, Suite 2800
      Kansas City, Missouri 64108-2684
      Telephone:  (816) 292-2000
      Telecopier:  (816) 292-2001
      rbien@lathropgage.com

      D. Bruce Hoffman (pro hac vice)
      Hunton & Williams LLP
      1900 K Street, NW
      Washington, DC  20006
      Telephone: (202) 955-1500
      Telecopier: (202) 778-2201
      bhoffman@hunton.com

      Attorneys for Defendant
      CIGNA Healthcare of Ohio

STINSON MORRISON HECKER LLP

By:    /s/ *David E. Everson, Jr.*

David E. Everson, Jr.
Erin N. Schmidt
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Telephone: (816) 691-3108
Telecopier: (816) 691-3495
deverson@stinsonmoheck.com
eschmidt@stinsonmoheck.com

Margaret M. Zwisler
Eric J. McCarthy
Marguerite M. Sullivan
Brian E. Kowalski
Latham & Watkins LLP
555 Eleventh St., N.W., Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Telecopier: (202) 637-2201
margaret.zwisler@lw.com
eric.mccarthy@lw.com
marguerite.sullivan@lw.com
brian.kowalski@lw.com

Attorneys for Defendant
Midwest Division, Inc.

ARMSTRONG TEASDALE LLP

By:   /s/ *Edward R. Spalty*
      Edward R. Spalty
      2345 Grand Boulevard, Suite 2000
      Kansas City, MO 64108-2617
      Telephone:  (816) 221-3420
      Telecopier:  (816) 221-0786
      espalty@armstrongteasdale.com

      Robert J. Fogarty
      Erica L. Calderas
      Hahn, Loeser & Parks, LLP
      3300 BP Tower, 200 Public Square
      Cleveland, OH 44114
      Telephone:  (216) 621-0150
      Telecopier:  (216) 241-2824
      rjfogarty@hahnlaw.com
      elcalderas@hahnlaw.com

      Attorneys for Defendant
      Aetna, Inc.

BRYAN CAVE LLP

By:   /s/ *William Perry Brandt*
      William Perry Brandt
      Lynn S. McCreary
      Staci Olvera Schorgl
      3500 One Kansas City Place
      1200 Main Street
      Kansas City, MO 64105-2100
      Telephone:  (816) 374-3206
      Telecopier:  (816)  374-3300
      perry.brandt@bryancave.com
      lmccreary@bryancave.com
      soschorgl@bryancave.com

      Attorneys for Defendant
      Blue Cross Blue Shield of KC

SPENCER FANE BRITT & BROWNE

By:   */s/ Douglas M. Weems*
      Douglas M. Weems
      Philip W. Goodin
      1000 Walnut, Suite 1400
      Kansas City, MO 64106
      Telephone: (816) 474-8100
      Telecopier: (816) 474-3216
      dweems@spencerfane.com
      pgoodin@spencerfane.com

      Brian D. Boyle
      O'Melveny & Myers, LLP
      1625 Eye Street, NW
      Washington, DC 20006
      Telephone: (202) 383-5327
      Telecopier: (202) 383-5414
      bboyle@omm.com

      Gerald A. Stein
      O'Melveny & Myers LLP
      Times Square Tower
      7 Times Square
      New York, New York 10036
      Telephone: (212) 326-2000
      Telecopier: (212) 326-2061
      gstein@omm.com

      Attorneys for Defendant
      Humana Health Plan, Inc.

HUSCH & EPPENBERGER, LLC

By:   /s/ *Leonard L. Wagner*
      William A. Lynch, KS Fed. #77919
      Jeffrey J. Simon, KS #15231
      Leonard L. Wagner, KS Fed. #70076
      Michael S. Hargens, KS # 20689
      1200 Main Street, Suite 2300
      Kansas City, MO  64105
      Telephone (816) 421-4800
      Facsimile (816) 421-0596
      william.lynch@husch.com
      jeff.simon@husch.com
      leonard.wagner@husch.com
      michael.hargens@husch.com

      Attorneys for Defendants Coventry
      HealthCare of Kansas, Inc., Coventry
      Health and Life Insurance Company
      and SouthCare PPO, Inc

BLACKWELL SANDERS PEPER
MARTIN

By:   /s/ *Floyd R. Finch, Jr.*
      Floyd R. Finch, Jr.
      Shelley A. Runion
      4801 Main Street, Suite 1000
      P. O. Box 219777
      Kansas City, MO 64112
      Telephone:  (816) 983-8128
      Telecopier:  (816) 983-8080
      ffinch@blackwellsanders.com
      srunion@blackwellsanders.com

      Attorneys for Defendant
      Saint Luke's Health System

16

LEWIS, RICE & FINGERSH, LC


By:   /s/ *Richard B. Walsh, Jr.*
      Richard B. Walsh, Jr.
      500 North Broadway, Suite 2000
      St. Louis, MO 63102
      Telephone:  (314) 444-7722
      Telecopier:  (314) 612-7722
      rwalsh@lewisrice.com

      Attorneys for Defendant
      Carondelet Health System

ROUSE HENDRICKS GERMAN MAY PC

By:    /s/ *Brandon J.B. Boulware*
            Randall E. Hendricks
            Lawrence A. Rouse
            Brandon Boulware
            One Petticoat Lane Bldg.
            1010 Walnut St.-Ste. 400
            Kansas City, MO 64106
            Telephone: (816) 471-7700
            Telecopier: (816) 471-2221
            randyh@rhgm.com
            larryr@rhgm.com
            brandonb@rhgm.com

            Attorneys For Defendant
            Board of Trustees of the
            North Kansas City Hospital

KUTAK ROCK LLP

By:    /s/ *John M. McFarland*
            John M. McFarland
            Scott E. Harvison
            1010 Grand Blvd. - Ste. 500
            Kansas City, MO 64106
            Telephone: (816) 960-0090
            Telecopier: (816) 960-0041
            john.mcfarland@kutakrock.com
            scott.harvison@kutakrock.com

            Attorneys for Defendant
            Shawnee Mission Hospital

18

Endnotes:

Note 1:                                                  15
15   Q.  And you understand that you're
16   designated to testify as to Heartland's
17   knowledge about Topics 1 through 17 today?
18      A.  That is my understanding.
19      Q.  You're here to testify not only to your
20   own personal knowledge about those topics but as
21   to the company's knowledge?
22      A.  Correct.
23      Q.  And those include things that are not
24   your job responsibility and that you might not
25   personally know about; correct?
                                                         16
1      A.  Correct.
Note 2:                                                  16
2      Q.  What have you done to prepare yourself
3   to testify about Heartland's knowledge on those
4   17 topics?
5      A.  I have met with my chief financial
6   officer. I've met with my manager of medical
7   records. I also met at length with my director
8   of information technology, as well as litigation
9   counsel and corporate counsel.

Note 3:                                                  212
4      Q.  So you've got two servers, it sounds
5   like. One is the E-mail server, the exchange
6   server and the other is the big server which has
7   everything else. Are there any other computer
8   systems at Heartland that might store documents
9   related to this case, or documents responsive to
10   the discovery requests in this case?
11      A.  The PACS system has its own server. It
12   stores images, radiology images. Our Cisco
13   phone system, I believe, has its own server and
14   that's where voice mails would be stored,
15   incoming and outgoing call data, also."

Note 4:                                                  292
7      Q.  And where we would see in Deposition
8   Exhibit -- Defendants' Deposition Exhibit 31,
9   Heartland Spine & Specialty Hospital it should
10   be understood that that relates to and is a
11   document of Heartland Surgical Specialty
12   Hospital; is that correct?
13      A.  That is correct.
14      Q.  At the top of Plaintiff 0004153 there's
15   a line that says effective date and a revision
16   date and then in bold IS-0010. What does that
17   mean?

19

18   A.  The IS-0010?
19   Q.  Yes.
20   A.  IS refers to the department that the
21   policy is relative to and the 0010 is the number
22   of the policy in the IS department.
23   Q.  Would you turn the page to Plaintiff
24   0004154, which I guess is the second page of IS
25   policy 0010; correct?

293

1    A.  Uh-huh.
2    Q.  Uh-huh is "yes"?
3    A.  Yes.  I'm sorry.
4    Q.  There's a statement of the policy on
5    this page and then there is a list of bulleted
6    items called 2000 servers, exchange server, Biz
7    Talk server SQL server, SQL databases, Phillips
8    PACS server?
9    A.  Correct.
10   Q.  What is the 2000 servers, it's plural,
11   what is that?
12   A.  I believe that those are the big
13   servers -- the big server that houses our
14   databases.
15   Q.  That is not --
16   A.  It's a Microsoft Exchange -- or
17   Microsoft 2000.
18   Q.  Is there more than one?
19   A.  I was not aware of more than one, but
20   that doesn't mean that there isn't another one.
21   Q.  Is that one of the servers that you
22   previously identified or is that a different
23   server?
24   A.  I was identifying the 2000 server as
25   the server that houses the bulk of our

294

1    information.
2    Q.  Is that the server that would have the
3    AdvantX system on it?
4    A.  I believe so, but I am not positive.
5    Q.  Who would be a person who would know
6    the answer to that question, Mr. Coffman?
7    A.  Mr. Coffman.
8    Q.  Okay.  And would he also know the
9    answer to the question of how many 2000 servers
10   there are?
11   A.  Yes, he would.
12   Q.  The next bulleted item is the exchange
13   server, and I think you talked about that
14   yesterday.
15   A.  That's the E-mail server.
16   Q.  The next bulleted item is the Biz Talk
17   server, and I guess is that the voice mail
18   server?

20

19    A.  I believe so.
20    Q.  And that's something else Mr. Coffman
21  would know the definitive answer to?
22    A.  Correct.
23    Q.  And the voice -- is the voice mail
24  system something that's in Mr. Coffman's area of
25  responsibility?

                                    295
1     A.  Yes, it is.
2     Q.  Do you know if the Biz Talk server
3  saves voice mail messages?
4     A.  It's my understanding that it does,
5  yes.
6     Q.  Does it ever delete voice mail
7  messages?
8     A.  I do not know the answer to that.
9     Q.  Is that something that Mr. Coffman
10  would know the answer to?
11    A.  Yes.
12    Q.  Do you know how -- if there is an
13  archive in the Biz Talk server that permanently
14  saves all voice mail messages?
15    A.  Not that I'm aware of.
16    Q.  Is that something else Mr. Coffman
17  would know?
18    A.  Yes.
19    Q.  You believe he would know it.
20        The next bulleted item is the SQL
21  server?
22    A.  Uh-huh.
23    Q.  Uh-huh is "yes"?
24    A.  Yes.  Sorry.
25    Q.  That's all right.

                                    296
1        What is the difference between the SQL
2  server and the 2000 servers?
3     A.  I do not know the answer to that.
4  Mr. Coffman would be the one to give a
5  definitive answer to that.
6     Q.  And do you know what data is stored on
7  the SQL servers?
8     A.  I do not.
9     Q.  And the next item is SQL databases.
10  That's not a server; is that correct?
11    A.  My understanding is a database is a
12  database and a server is a server.
13    Q.  So it's something presumably -- do you
14  know if the SQL databases are stored on the SQL
15  server?
16    A.  That would be my assumption.
17    Q.  And Mr. Coffman would know the
18  answer -- the definitive answer to that
19  question?

                                     21

20    A.  Yes, he would.
21    Q.  Do you know what is -- what databases
22  are referred to as the SQL databases?
23    A.  I do not know definitively.  I believe
24  that AdvantX is an SQL database.
25    Q.  Is Great Plains an SQL database?

297
1    A.  I don't know that for sure."


Note 5:                          312
15    Q.  Is there a physical inventory of all of
16  the computers that Heartland Surgical Specialty
17  Hospital owns or has owned?
18    A.  I have not seen it.
19    Q.  Is that -- so you don't know whether
20  there is or isn't?
21    A.  That's correct.
22    Q.  There may be, there may not be;
23  correct?
24    A.  That's correct.
25    Q.  And Mr. Coffman would be the person who

313
1  would know the answer to that question?
2    A.  Either he or Mr. Van Horn.


Note 6:                          300
23    Q.  In preparing responses to -- or
24  assembling information to respond to the
25  discovery requests in this case, were all of

301
1  these -- the drives that you mentioned, the F
2  drive, the P drive, the individual user drives,
3  the administrative drive and the S drive
4  searched?
5    A.  I can't answer that specifically.
6    Q.  You don't know?
7    A.  I don't know specifically what all was
8  searched.
9    Q.  Who would be the person who would have
10  knowledge to answer that question?
11    A.  Mr. Coffman would and then the vendor
12  that counsel engaged to assist us with producing
13  that electronic discovery.


Note 7:                          417
12  First of all, you indicated that each
13  user at Heartland Surgical Specialty Hospital
14  has an individual user drive; is that correct?
15    A.  That is correct.


22

16    Q.   How many users are there at Heartland
17  Surgical Specialty Hospital?
18    A.   Oh, gosh.  This is a wild guess, but in
19  the neighborhood between eighty and a hundred.
20    Q.   Is that current users, eighty to a
21  hundred current users?
22    A.   Yes.
23    Q.   Have there been eighty to a hundred
24  users throughout the lifetime of Heartland
25  Surgical Specialty Hospital?

                          418
1     A.   No.  When the hospital originally
2  opened it had far less employees, as employees
3  have been added, the number of users have
4  increased.
5     Q.   Okay.  If an employee leaves Heartland
6  Surgical Specialty Hospital is their individual
7  drive reassigned to somebody else?
8     A.   No, it is maintained as their specific
9  information.
10    Q.   Okay.  And I just want to make sure.
11  Are those individual user drives for former
12  employees were also searched for data, for
13  electronic data; is that correct?
14    A.   I don't know for certain because that
15  was handled through the outside vendor with the
16  direction of our counsel.
17    Q.   And Mr. Coffman would have a better
18  idea of that than you would?
19    A.   He would.  He would.


Note 8:                   420
4
5     Q.   Okay.  Now, if the physician owners
6  saved their E-mails to the Heartland server,
7  were those E-mails searched in response to the
8  document requests?
9     A.   That would be my assumption.
10    Q.   But you don't know for sure?
11    A.   I don't know for sure.
12    Q.   Mr. Coffman would have a better idea of
13  that?
14    A.   Yes.


Note 9:                   426
11  ". . . I just want to make sure that all
12  archived E-mails or old E-mails as referenced in
13  this E-mail have actually been searched and
14  produced in response to our document requests.
15    A.   That would be my assumption, but I
16  don't know that for sure.
17    Q.   But you don't know that for sure?

                          23

18     A.  Mr. Coffman can tell you exactly
19  everything that was searched."

Note 10:                                294
16  The next bulleted item is the Biz Talk
17  server, and I guess is that the voice mail
18  server?
19     A.  I believe so.
20     Q.  And that's something else Mr. Coffman
21  would know the definitive answer to?
22     A.  Correct.
23     Q.  And the voice -- is the voice mail
24  system something that's in Mr. Coffman's area of
25  responsibility?

                    295
1     A.  Yes, it is.
2     Q.  Do you know if the Biz Talk server
3  saves voice mail messages?
4     A.  It's my understanding that it does,
5  yes.
6     Q.  Does it ever delete voice mail
7  messages?
8     A.  I do not know the answer to that.
9     Q.  Is that something that Mr. Coffman
10  would know the answer to?
11     A.  Yes.
12     Q.  Do you know how -- if there is an
13  archive in the Biz Talk server that permanently
14  saves all voice mail messages?
15     A.  Not that I'm aware of.
16     Q.  Is that something else Mr. Coffman
17  would know?
18     A.  Yes.

*   *   *

                    297
5  Q.  You have referred a couple of times
6  to -- oh.  Back to the Biz Talk Server.  Do you
7  know if that server is searchable?
8     A.  I believe that it is.
9     Q.  In assembling information that was
10  either responsive or potentially responsive to
11  the discovery requests, was a search of the Biz
12  Talk server made?
13     A.  I don't know that answer for sure.
14     Q.  Who would be the person who would know
15  the answer to that question?
16     A.  My counsel.
17     Q.  Your litigation counsel or your general
18  counsel?
19     A.  Litigation counsel.

\* \* \*

298
4   Q.  Do you know if an image or copy of the
5   Biz Talk server was provided to counsel?
6       A.  I do not know that.
7       Q.  Who would know the answer to that
8   question?
9       A.  Mr. Coffman."


Note 11:                                    311
3   "Q.  In assembling information responsive to
4   the discovery requests, did you or anyone at
5   your direction look at the hard drives of
6   individual desktop or laptop computers to
7   determine if there was responsive information?
8       A.  As it's related to electronic
9   production, I directed the IS manager to
10  cooperate with litigation counsel and the
11  outside vendor to provide any and all
12  information that was requested.
13      Q.  Do you know if the IS manager or anyone
14  under his direction examined the hard drives of
15  the individual workstations, laptops or
16  hand-held computers?
17      A.  I do not know.
18      Q.  Who would be the person that would know
19  the answer to that question?
20      A.  Again, as it comes to electronic
21  discovery, Mr. Coffman was directed by myself to
22  cooperate with litigation counsel and our
23  outside vendor for the production of all
24  electronic documents.
25      Q.  You don't know one way or the other

312
1   whether that external hard drive that was given
2   to outside counsel contains any documents that
3   were stored on the hard drive of an individual
4   computer?
5       A.  I do not know.
6       Q.  And I would take it you do not know
7   whether floppy disks, zip disks or external
8   drives were searched for responsive documents?
9       A.  I do not know.
10      Q.  And Mr. Coffman, who's an employee of
11  Heartland Surgical Specialty Hospital, would
12  know the answer to that question; is that
13  correct?
14      A.  That's correct."


Note 12:                                    319
24      Q.  Is there a -- are you aware of any

25

25   policy at Heartland Surgical Specialty Hospital

                                320
1    regarding the saving or elimination of data on
2    individual computers issued to employees after
3    they terminate?
4        A.  I'm sorry.  Could you repeat the
5    question?
6        Q.  Let me change the question.
7            Does -- when an employee terminates, do
8    you have any kind of an exit policy or plan?
9        A.  Only what would be included in the
10   documents in Exhibit 31.
11       Q.  Okay.  I did not find an indication in
12   Defendants' Exhibit 31 that there's a procedure
13   for recovering a computer, saving all of the
14   information on the hard drive of that computer,
15   and then either reissuing it or replacing the
16   hard drive or something like that.
17           Are you aware of whether -- whether the
18   policy's in here or not, whether that was done?
19       A.  I don't know the definitive answer to
20   that.  Mr. Coffman would.
21       Q.  And with respect to the information
22   assembled for response to discovery requests, do
23   you know whether data from Mr. Morse's laptop or
24   notebook computer that was not on the --
25   otherwise on the hard drive was included in the

                                321
1    data?
2        A.  I don't know.
3        Q.  And that would be a Mr. Coffman
4    question?
5        A.  Correct.
6        Q.  And would your answer be the same with
7    respect to Mr. Krause's computer?
8        A.  That would be correct.  The same.
9        Q.  Same answer?
10       A.  Same answer, yes.
11       Q.  And when I use the phrase Mr. Krause's
12   computer, I meant to say a computer issued by
13   Heartland Surgical Specialty Hospital to
14   Mr. Krause.
15       A.  Okay.
16       Q.  And would your answer, then, be the
17   same?
18       A.  My answer to a computer issued to
19   Mr. Krause, again, would be backed up on the
20   server, the information would be.  Anything more
21   specific, Mr. Coffman would have to respond to."

Note 13:                        323
21       Q.  . . . Are you aware whether anyone at

                                26

25  Heartland Surgical Specialty Hospital in

324

1  assembling documents responsive to discovery
2  requests, electronic documents, conducted
3  interviews of any of the executives to determine
4  where they stored their electronic documents?
5     A.  I don't know.
6     Q.  Is that something that Mr. Coffman
7  would know?
8     A.  Yes.

Note 14:                    305

16  "Q.  I've looked through Deposition Exhibit
17  31 and did not see a policy about deletion or
18  archiving of E-mail.  Is there such a policy?
19     A.  All of the policies related to document
20  retention have been included in this packet.

Note 15:                    305

21     Q.  Okay.  Does Heartland Surgical
22  Specialty Hospital routinely delete E-mail?
23     A.  Not to my knowledge.
24     Q.  Are there size limitations on an
25  individual E-mail account user's mailbox?

306

1     A.  Not that I'm aware of.

Note 16:                    306

2     Q.  Do individual E-mail account holders
3  have the ability to save E-mail files outside
4  their mailbox?
5     A.  Yes.
6     Q.  Where would those E-mails be -- where
7  are the potential places those E-mails could be
8  saved?
9     A.  They're instructed to save those E-mail
10  documents or attachments into their personal
11  drive on the server.
12     Q.  Are you aware of any other places that
13  E-mail account holders have saved E-mails and
14  attachments?
15     A.  I wouldn't know.
16     Q.  Is there any policing of the policy
17  that E-mails and attachments are to be saved to
18  the personal drive?
19              MR. McGUIRE:  Object to form.
20  Vague and ambiguous.
21     Q.  (By Mr. Bien)  Is there anyone who
22  checks to make sure that the policy is followed?
23     A.  I don't know specifically.

27

24     Q.   Who would be the person who would be
25   responsible -- or withdraw that.

307

1          Who would be the person with knowledge
2    about whether the policy that E-mails and
3    attachments are to be saved to a personal drive
4    is followed?
5          A.   Mr. Coffman would have knowledge of
6    that."

Note 17:                        357
11     Q.   (By Mr. Finch)   As I believe I
12   mentioned a few minutes ago, we have discovered
13   there are some documents just missing off of the
14   plaintiff's hard drive of mainly E-mails, or
15   almost exclusively E-mails, I guess, that was
16   produced to us on October 23rd.
17          Do you have any idea why there would be
18   documents missing?
19          A.   Again, I relied on our outside vendor,
20   Michael Coffman under my direction, and
21   litigation counsel to produce the electronic
22   documents.

Note 18:                        247
25     Q.   Was the F drive one of the drives that

248

1    was searched when you instructed the IS
2    department to search the drives -- or to search
3    the server for responsive documents to the
4    discovery requests?
5          A.   I know that all of the information on
6    the servers was copied on to an external hard
7    drive and then an outside vendor actually did
8    some searching.  I don't know exactly how they
9    searched.
10     Q.   Is that an outside vendor that was
11   retained by HSSH?
12          A.   Through our litigation counsel, yes.

Note 19:                        390
16     Q.   Who did put this disk together, this CD
17   together?
18          A.   It was my understanding it was our
19   vendor in conjunction with our litigation
20   counsel and Michael Coffman.

Note 20:                        303
4      Q.   Do you know the name of the vendor?

28

5   A.  I can't recall it right off the top of
6   my head.

*   *   *

420
15   Q.  Okay.  Now, you mentioned your vendor a
16   number of times today, and you don't recall the
17   name of your vendor that was used in this case.
18        Did you have a particular contact at
19   the vendor?
20   A.  I personally was not involved with that
21   process other than to direct Mr. Coffman to be
22   cooperative and to produce to our counsel and
23   the vendor whatever they asked for, so I didn't
24   have a contact.
25   Q.  And you don't know if Mr. Coffman had a

421
1   contact at the vendor, anyone in particular he
2   talked with?
3   A.  He had someone that he worked with, but
4   I don't know who it was.


Note 21:                           390
21   Q.  And has your memory been refreshed
22   about who that vendor is by the way?
23   A.  No.
24        MR. FINCH:  Can you tell us who
25   the vendor is so we can have it on the record

391
1   here?
2        MR. McGUIRE:  I'm not the
3   witness.  She has indicated she doesn't know.
4   It's so far afield from the topics.


Note 22:                           385
14   Q.  Is that part of this CD database that
15   has been generated and provided to us?
16   A.  I don't know.  Our counsel and vendor,
17   outside vendor, prepared all of that, and I
18   don't know what all was on there.


Note 23:                           302
3   Q.  Let me just ask you, what process was
4   used to identify electronic documents on the
5   servers at Heartland Surgical Specialty Hospital
6   to assemble information responsive to the
7   discovery requests?
8   A.  My understanding of the process is that
9   we made available a copy on an external hard
10   drive of all of our E-mail documents as well as

11  our office product documents.  And it's my
12  understanding that that hard drive --
13  information on that hard drive has been made
14  available to Defendants' counsel.
15      Q.  Okay.  Let's break that down a little
16  bit.  You said it's your understanding of the
17  process.  How did you obtain an understanding of
18  the process?
19      A.  I reviewed the process with counsel.
20      Q.  Were you involved in the process in any
21  way?
22      A.  Other than to direct Mr. Coffman to
23  cooperate.
24      Q.  So for details about how the process
25  was implemented we'd need to talk to

303

1  Mr. Coffman; is that correct?
2      A.  Mr. Coffman and the vendor that
3  assisted us, yes.
4      Q.  Do you know the name of the vendor?
5      A.  I can't recall it right off the top of
6  my head.

*  *  *

315
25      Q.  Did you do the -- was the same process

316
1  undertaken in attempting to identify electronic
2  documents that were responsive to the discovery
3  requests?
4      A.  Again, with respect to electronic
5  document production, I instructed Mr. Coffman to
6  cooperate fully with litigation counsel and our
7  outside vendor in producing that document.
8      Q.  And you don't have any understanding of
9  the details of what was done; is that correct?
10     A.  I do not.


Note 24:                          418
10      Q.  Okay.  And I just want to make sure.
11  Are those individual user drives for former
12  employees were also searched for data, for
13  electronic data; is that correct?
14      A.  I don't know for certain because that
15  was handled through the outside vendor with the
16  direction of our counsel.
17      Q.  And Mr. Coffman would have a better
18  idea of that than you would?
19      A.  He would.  He would.

Note 25:                                   219

22
23    Q.  How did you identify -- how did you
24  search for and identify the documents that were
25  requested that were on the SQL server?

                                           220
1     A.  Again, we pretty much produced all the
2  documents that we possessed.
3     Q.  Every single one?
4     A.  Pretty much.
5     Q.  Why did you do that?
6     A.  Because I didn't want to leave anything
7  out.
8     Q.  You understood that you were producing
9  things that no one had asked you to produce?
10         MR. McGUIRE:  I'm going to
11  object.  It's vague and ambiguous.  I think
12  there's a disconnect between produce in terms of
13  her providing something to counsel and then
14  having an understanding of what was provided to
15  defendants and what role lawyers or vendors had
16  in the process.  So you're using the same term
17  but I don't believe it's being used the same
18  way.  So I think the word produced is vague and
19  ambiguous to the witness and by the questioning
20  counsel and I just want to note that for the
21  record.
22         MR. RAUP:  Okay.
23     Q.  (By Mr. Raup) Having listened to your
24  counsel's comments do you have a different
25  answer?

                                           221
1     A.  When I refer to produced, those are
2  documents that I collected, gathered together,
3  and gave to litigation counsel.
4     Q.  So unlike your procedure with respect
5  to paper files, where you looked at the
6  documents and read them and thought about them,
7  for documents on the SQL server, you simply
8  copied them all?
9     A.  That's my understanding, yes.
10     Q.  And that would be all the documents
11  other than the AdvantX or Great Plains
12  databases, which you didn't copy?
13     A.  That is correct.
14     Q.  But you copied everything else on the
15  SQL server and gave it to your lawyers?
  *   *   *
                                           222
14     Q.  Do you know if your counsel did
15  anything to determine if those were responsive
16  or nonresponsive?
17     A.  I can't speak to that."

31

Note 26:                          223
13    "Q.  And what was done, if anything, with
14   the documents responsive to the search terms to
15   determine if they were responsive to the
16   document request?
17       A.  The E-mails that were the result of the
18   search terms were burned into a CD and provided
19   to counsel.
20       Q.  All of them?
21       A.  Yes.  If there was a responsive
22   document to the search term, yes, it was.
23       Q.  So unlike your procedure with respect
24   to paper documents, you didn't look at the
25   E-mails to determine if they were responsive?

                                  224
1        A.  No.
2        Q.  Do you know whether your lawyers did
3    anything to determine whether they were
4    responsive?
5        A.  I don't know.

*   *   *

                                  224
15   Q.  Do you know whether anyone, including
16   your lawyers, looked at each E-mail to determine
17   whether it was responsive?
18       A.  I don't know that for a fact, no."

Note 27:                          37
21       Q.  If we wanted, for example, to export
22   all of the data that AdvantX has on all of the
23   patient encounters that Heartland has had since
24   it opened, would AdvantX be able to put that
25   data into an Excel spreadsheet?

                                  38
1        A.  I honestly would have to ask my IS
2    manager.  I don't know.

Note 28:                          91
16       Q.  The question is could Heartland produce
17   a CD containing all of the information in its
18   AdvantX system about those transactions?
19       A.  I do not know the answer to that.
20       Q.  Who would know that?
21       A.  Michael Coffman.
22       Q.  And he's your IT manager?
23       A.  Correct.  Director.
24       Q.  Could we ask you to consult with

25  Mr. Coffman at a break or over lunch and try to

92

1  learn the answer to that question?
2      A.  Sure.
3      Q.  I would appreciate that.  That would be
4  great.
5      A.  You bet.
6          MR. McGUIRE:  Mickey, just so I'm
7  clear on that, you want to know if all data
8  elements contained in AdvantX can be exported
9  into a single Excel sheet is that the request?
10         MR. RAUP:  Yes, or if they can't
11 be done that way, could they be done in some
12 other machine readable form that we can use.
13         THE WITNESS:  To include the
14 comment section?
15         MR. RAUP:  Yes, please.
16         THE WITNESS:  I can do that.


Note 29:                          244
9      Q.  (By Mr. Bien)  A similar line of
10 question about Great Plains.  Are there standard
11 type reports that Great Plains produces?
12     A.  I believe that there are.
13     Q.  And would those be identified in the
14 same way as AdvantX, a pull down menu where
15 they're readily identifiable?
16     A.  I believe so, but I would have to look.
17     Q.  Could you investigate that?
18     A.  Yes, I can.
19     Q.  And if you're not able to determine it,
20 would Mr. Van Horn be the person most
21 knowledgeable about the Great Plains system?
22     A.  He would be.
23     Q.  And if you're not able to determine the
24 list of canned reports from AdvantX, is
25 Mr. Coffman the person most knowledgeable about

245

1  the AdvantX system?
2      A.  Yes, he is.

*  *  *

251

8      Q.  Okay.  Earlier today, you were asked a
9  number of questions about various things and you
10 indicated that Mr. Van Horn, the chief financial
11 officer, would be the person knowledgeable about
12 them and I tried to keep track of that and I
13 want to ask you some questions about that just
14 so we can kind of summarize what he may have
15 knowledge of that's responsive to the deposition

33

16  notice here today.
17      A.  Okay.
18      Q.  It's true, isn't it, that Mr. Van Horn
19  is the person who you indicated would be most
20  knowledgeable about Great Plains' capacity to
21  export data to Excel, ASCII, or other machine
22  readable form?
23      A.  That is correct.
24      Q.  And you had no knowledge of that topic?
25      A.  I do not.

                                252
1      Q.  Okay.
2      A.  I know that it's exportable, but I
3  don't know all the detail behind it.
4      Q.  And it's true, isn't it, that Mr. Van
5  Horn is the person who would have knowledge --
6  who you believe would have knowledge as to
7  whether formulas are included in information
8  exported from Great Plains into some other form
9  of electronic media?
10      A.  If anybody knows it, it would be
11  Mr. Van Horn, yes.


Note 30:                        273
17      Q.  Yesterday when I was asking you
18  questions I asked you a series of questions
19  about information that you would need to obtain
20  from Mr. Van Horn.
21          Do you recall those questions?
22      A.  Generally.  Not specifically.
23      Q.  Okay.  I asked you about Great Plains
24  data export.  I asked you about whether formulas
25  are included in Great Plains data export.  That

                                274
1  line of questioning.  About the log book, all of
2  those topics.
3          Do you recall that generally?
4      A.  Generally I do, yes.
5      Q.  And you indicated that Mr. Van Horn was
6  the most knowledgeable person on those topics.
7  Is it accurate to say that you did not have
8  information about those topics?
9      A.  I have information, general
10  information, about all of those topics, but the
11  specific details that you were inquiring about I
12  would need to double check with my CFO, yes.
13      Q.  And have you done anything since the
14  deposition break yesterday to obtain that
15  information and make yourself more
16  knowledgeable?
17      A.  I have not.
18      Q.  Do you recall, I also asked you some

                      34

19   questions about the AdvantX system, such as
20   exports to Excel and other machine readable
21   formats, procedure manual, whether AdvantX
22   information could be -- all information could be
23   exported. And you indicated that Mr. Coffman
24   would be the person most knowledgeable; is that
25   correct?

275

1       A.   As best I can recall, yes.
2       Q.   And it's true, isn't it, that you could
3    not answer those questions?
4       A.   Not to the level of detail that you
5    were inquiring about.
6       Q.   And have you done anything since we
7    broke last night to obtain that information so
8    that you could answer those questions?
9       A.   No.

# EXHIBIT A



RICHARD N. BIEN
(816) 460-5520
EMAIL: RBIEN@LATHROPGAGE.COM
WWW.LATHROPGAGE.COM

2345 GRAND BOULEVARD
SUITE 2800
KANSAS CITY, MISSOURI 64108-2684
(816) 292-2000, FAX (816) 292-2001

October 6, 2006

***VIA E-MAIL & U.S. MAIL***

Patrick J. Stueve, Esquire
Norman E. Siegel, Esquire
Todd M. McGuire, Esquire
Stueve Siegel Hanson Woody LLP
330 West 47th Street, Suite 250
Kansas City, MO 64112

      Re:    **Heartland Surgical Specialty Hospital, LLC v. Midwest Division, Inc.**
               **d/b/a HCA Midwest Division, et al.**
               Pending in the United States District Court for the District of Kansas
               Case No. 05-CV-2164 MLB/DJW

Gentlemen:

      I am writing to discuss with you the present discovery dispute regarding the volume, manner and method of producing Plaintiff's remaining electronic mail documents.

      Todd, Pat and I had two productive conversations yesterday. One conversation occurred during the Wheeler deposition, and the other occurred after the deposition. I think the matters at issue can be resolved. The matters at issue are as follows:

      1.     Is Plaintiff conducting a privilege review?

      2.     Is Plaintiff conducting a responsiveness review?

      3.     If Plaintiff is conducting a responsiveness review, how extensive is it? For example, if the responsiveness review is completed and the data set still remains at 950,000 documents, did the responsiveness review consist of an "eyes on" review of all documents, or only a run of search terms and filters against the data set?

CC 1742899v1

Patrick J. Stueve, Esquire
Norman E. Siegel, Esquire
Todd M. McGuire, Esquire
October 6, 2006
Page 2

     4.     What is the manner and type of production proposed on or prior to October 23, 2006?

     5.     Do Plaintiffs intend to supplement those interrogatories to which they have previously responded to by reference to Fed. P. Civ. P. 33(d) by identifying documents or categories of documents by "Bates" range that are responsive to those interrogatories? If so, when will these supplementations be forthcoming?

     6.     Does the data set include documents with the word "United"?

As we discussed these issues it is my understanding that the Plaintiffs answers to the foregoing questions/issues are as follows:

     1.     Plaintiffs are conducting a privilege review. The data set proposed to be produced the Defendants will have been reviewed for privilege.

     2.     Plaintiffs are conducting a responsiveness review. It is my understanding that the Plaintiffs are conducting a responsiveness review by: (a) using searches and filters to eliminate categories of documents that are likely to be spam, junk e-mail, or personal e-mails that are clearly not responsive to any discovery request; (b) Further, individuals (humans, not machines) are conducting an "eyes on" review of documents to further segregate and eliminate nonresponsive documents. In our meeting yesterday, Todd stated that an additional 100,000 documents have been removed from the data set as the result of the continued utilization of these two processes. I took that to mean that there are now approximately 850,000 potentially responsive documents still in the data set. It is also my understanding that both of these processes are continuing and will continue up through the date that production is made. It is Plaintiff's intent to further reduce the volume of documents produced by continuing its responsiveness review process.

     3.     The manner of production is proposed to be a hard drive of .tiff images that have been OCR'd and are fully text searchable.

     4.     In our meeting, Todd stated that the Plaintiffs will supplement their answers to interrogatories which have previously been responded to by reference to Fed. R. Civ. P. 33(d) by identifying documents by "Bates" numbers that are responsive to a particular interrogatory. Todd also stated that Plaintiffs expect Defendants to do the same.

Patrick J. Stueve, Esquire
Norman E. Siegel, Esquire
Todd M. McGuire, Esquire
October 6, 2006
Page 3

     5.      The data set includes documents with the word "United". Todd stated that a search was conducted for United, but Boolean searches with the connector "not" could not be used to delete all documents that contain United with other words, such as United States of America, United Methodist, United Arab Emirates, etc.

     Defendants have considered Plaintiffs' offer and the answers provided above. Contingent upon Todd and Pat's answers to the issues/questions above, Defendants agree that the present discovery dispute can be resolved by production in the manner proposed by Plaintiff, to wit: production of a hard drive consisting of only fully searchable .tiff image documents with OCR text files that are the product of a privilege and responsiveness review. This production is to occur on or before October 23, 2006.

     This resolution is acceptable based upon the statements that Todd and Pat made in our meeting. I have surveyed all of the Defendants and I have obtained an affirmative response that this is an acceptable resolution. This letter has been circulated to all Defendants and an attorney for each Defendant has affirmatively represented to me that he/she agrees with its content and it is the agreement of the Defendant.

     All Defendants remain hopeful that your continued responsiveness review will further eliminate e-mails and attachments that have no connection whatsoever to the discovery requests propounded upon you. We look forward to receipt of these documents.

     Finally, I want to confirm the manner in which the data was searched. My notes of our conversation indicate that Pat stated that shortly after the search terms were agreed to, the Plaintiffs began using the search terms by applying them to the information that was on Plaintiffs' file servers.

     First, those search terms were run against all Microsoft applications on the servers with the exception of e-mail. The result of running the search terms and your conduct of a privilege and responsiveness review was the August production of electronic documents. Is this correct?

     Second, Plaintiffs ran part of the search of terms, the actors human search terms, against the e-mails and thereafter conducted a privilege review and a responsiveness review of the actors human set of e-mails produced. The result of this search and review for privilege and responsiveness was the CD of e-mail that was produced to Defendants on Monday, October 2, 2006. Is this correct?

Patrick J. Stueve, Esquire
Norman E. Siegel, Esquire
Todd M. McGuire, Esquire
October 6, 2006
Page 4

     Finally, the search terms were run against the remaining emails that had not been produced to the Defendants. Thereafter, the process of filtering this result created the 16 gigabyte data set that is in the process of being reviewed for both privilege and responsiveness. Is this an accurate statement of the search and review process used?

                            Sincerely,

                            LATHROP & GAGE L.C.

                  By:                        
                              Richard N. Bien

cc:    All Counsel of Record

CC 1742899v1

## CERTIFICATE OF SERVICE

I certify that on January 16, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ H. Reed Walker