## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HEARTLAND SURGICAL              )
SPECIALTY HOSPITAL, LLC,        )
                                )
                  Plaintiff,    )
                                )
v.                              )          Case No. 05-2164-MLB-DWB
                                )
MIDWEST DIVISION, INC. d/b/a    )
HCA MIDWEST DIVISION, *et al.*, )
                                )
                  Defendants.   )
_____ )

## MEMORANDUM AND ORDER

Before the Court are Plaintiff Heartland Surgical Specialty Hospital LLC's

("Heartland's") motions to compel filed against each remaining Defendant.  (Docs.

382, 383, 386, 387, 388, 389, 392, 393, 396, 397, 398, 399, 400, 401.)[1]

Defendants Aetna Health, Inc. and Aetna Life Insurance Company ("Aetna"),

Board of Trustees of the North Kansas City Hospital ("North Kansas City

Hospital"), Carondelet Health, St. Joseph Medical Center, and St. Mary's Medical

Center ("Carondelet"), Coventry Healthcare of Kansas, Inc., Coventry Health and

---

[1]   After these motions were filed Heartland settled with and dismissed Defendants
Humana (Doc's 559, 563), Blue Cross (Doc's 558, 562) and CIGNA (Doc's 553, 557).
Therefore the motions filed by Heartland directed to those defendants are moot.
Defendant United was dismissed prior to the filing of any motions to compel by
Heartland against it.  (Doc. 439, 491.)

Life Insurance Company, and Southcare PPO, Inc. ("Coventry"), Midwest

Division, Inc. d/b/a HCA Midwest Division ("HCA Midwest"), Saint Luke's

Health System, Inc. ("Saint Luke's"), and Shawnee Mission Medical Center, Inc.

("Shawnee Mission") have filed two Joint Responses to Heartland's motions to

compel.  (Docs. 447, 450.)  In turn, Heartland filed a Joint Reply.[2]  (Doc. 527)

(Sealed).  The nature of the underlying anti-trust litigation is well-known to the

Court and all parties and need not be detailed here.  In its motions, Heartland seeks

the Court's assistance in resolving various discovery disputes.  In ruling on these

motions, the Court has "broad discretion regarding its control of discovery."

*Gaines v. Ski Apache,* 8 F.3d 726, 730 (10th Cir. 1993).  Furthermore, such

discretion is only abused "when a denial of discovery precludes a fair trial."  *Id.*

The Court believes that its rulings, detailed below, further the Court's endeavor to

allow a fair trial to all parties in this case.

## DISCUSSION

### 1.  Burden

All parties initially dispute who has the burden of persuasion in the

---

[2]  Both of Defendants' Joint Responses and Heartland's Joint Reply begin with a table of contents and table of authorities which causes a discrepancy between the page numbers assigned by the parties to the text of their briefs and the page numbers assigned by the CM/ECF system when those documents are filed electronically.  The Court will cite to the page numbers assigned by the CM/ECF system.

following matters.  Discovery requests must be relevant on their face.  *Williams v. Bd. of County Comm'rs*, 192 F.R.D. 698, 705 (D. Kan. 2000).  Once this low burden of relevance is established, however, the legal burden regarding the defense of a motion to compel resides with the party opposing the discovery request.  *See Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 661, 662, 666 (D. Kan. 2004) (stating that the party resisting a discovery request based on overbreadth, vagueness, ambiguity, or undue burden/expense objections bears the burden to support the objections); *Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Caton*, 136 F.R.D. 682, 685 (D. Kan. 1991) (stating that a party resisting a discovery request based on relevancy grounds bears the burden of explaining how "each discovery request is irrelevant, not reasonably calculated to the discovery of admissible evidence, or burdensome").  Unless noted and discussed otherwise, the Court generally finds the discovery propounded by Heartland to be relevant on its face, thereby shifting the burden of persuasion to support their discovery objections to Defendants.

## 2.  Time Frame of Paper Discovery

Heartland seeks responsive discovery of paper documents from Carondelet, Saint Luke's, Aetna, HCA Midwest, and North Kansas City Hospital from January 1, 2000 to present.  Heartland argues that this time frame is reasonable because, in

its Third Amended Complaint (Doc. 249), it alleges anti-competitive conduct beginning "[p]rior to Heartland's inception" in September 2003 (Doc. 249 at ¶ 2), and because Heartland incorporated with the State of Kansas on October 18, 2001. (Docs. 383 at 5; 387 at 5; 389 at 5; 397 at 5; 399 at 5.)  In response to this requested time frame, both Carondelet and Saint Luke's refuse to provide documents prior to January 1, 2002 (Docs. 389 at 7-8; 399 at 7) and Aetna, HCA Midwest, and North Kansas City Hospital refuse to provide documents prior to January 1, 2003 (Docs. 383 at 7; 397 at 7; 387 at 8).

Cases in this District have allowed discovery in anti-trust cases to extend a "reasonable period of time antedating the earliest possible date of the actionable wrong." *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, No. 01-2410-JAR, 2003 WL 21939019, at *3 (D. Kan. July 22, 2003) (quoting *Quonset Real Estate Corp. v. Paramount Film Distrib. Corp.*, 50 F.R.D. 240, 241 (S.D.N.Y. 1970)).  In *B-S Steel*, the magistrate judge allowed discovery into information up to two years before the institution of a Robinson-Patman Act[3] claim because: (1) the information was relevant to the claims made; (2) the two year time frame was a reasonable period; and (3) the discovery would not be unduly burdensome.  *Id.* at

---

[3] The Robinson-Patman Act, 15 U.S.C. § 13(a), prohibits price discrimination that lessens competition, creates a monopoly, or prevents competition.  The statute is part of the overall scheme of "anti-trust" laws.

*4.  Heartland cites additional cases (the cases relied on by **B-S Steel**), but does not expand on its fundamental argument that the information from January 1, 2000, is discoverable because it is relevant.  Specifically, Heartland believes the requested time frame is relevant to: (1) Heartland's allegation in its Third Amended Complaint that anticompetitive behavior by Defendants began prior to Heartland's inception; (2) the barriers to entry Defendants may have erected; and (3) whether Defendants' contracting behavior changed from before Heartland's existence to after Heartland's existence.  (Docs. 383 at 6; 387 at 6; 389 at 6; 397 at 6; 399 at 6.)

    a.    <u>Relevance</u>

Defendants mainly oppose Heartland's position based on relevancy grounds.[4]  (Doc. 447 at 20 ("[Defendants] object on the basis that any such hard-copy documents are not likely to lead to the discovery of admissible evidence.").)  Defendants cite cases stating the general standards of relevancy for discovery.  *See, e.g.*, **Koch v. Koch Indus., Inc.**, 203 F.3d 1202, 1238 (10th Cir. 2000) (affirming district court decision limiting discovery because the expected benefit of the

---

[4]  Defendants also distinguish **B-S Steel** by pointing out that the case was based on the federal price discrimination anti-trust statute, rather than the federal conspiracy antitrust statute.  Defendants do not explain precisely why this is an important factual distinction.  Defendants also point out that the plaintiff in **B-S Steel** was seeking documents from *after* the last injurious event committed by the defendant's pricing behavior, whereas here, Heartland is seeking to determine the beginning date of the alleged injurious events.  (Doc. 447 at 19.)

5

requested discovery was "speculative at best" and because the requested discovery would impose "serious burden and expense" on non-parties); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir. 1995) (noting the broad scope of discovery under the federal rules, that "discovery is not limited to issues raised by the pleadings," and that the court has "wide discretion to balance the needs and rights" of the parties); *Gheesling v. Chater*, 162 F.R.D. 649, 650 (D. Kan. 1995) (noting the broad general discovery guidelines; that the requesting party must specify how the requested discovery is relevant; and that discovery requests should be considered relevant and allowed "if there is any possibility that the information sought may be relevant to the subject matter of [the] action" unless "it is clear that the information sought can have no possible bearing upon the subject matter of the action").

Defendants argue that the requested discovery into documents as of January 1, 2000, is not relevant because: (1) Heartland has not identified any evidence showing that its incorporation in October 2001 triggered activity by Defendants or that Defendants were aware of Heartland's existence; and (2) Heartland has not identified evidence in the documents already produced showing Heartland was targeted by Defendants.  (Doc. 447 at 16-19.)

The cases cited by Heartland and Defendants merely demonstrate that the

scope of discovery pursuant to FED. R. CIV. P. 26(b)(1) extends to "any matter, not privileged, that is relevant to the claim or defense of any party" and that the Court can, for good cause shown, order discovery of any matter relevant to the subject matter of the action.[5]  In deciding what time period is relevant in this case, it is somewhat bothersome to the Court that Defendants seek to limit the temporal scope of discovery sought by Heartland while, at the same time, Defendants are seeking discovery from non-parties that extends farther back in time.  *See e.g.,* Doc.  483, Ex. 2 at 8 ¶ 16 (subpoena issued to Heartland's Founder Physician Owners seeking documents for the period from January 1, 2000);  Doc. 466 at 9 ¶ 13 (*duces tecum* deposition subpoena to Kristy Thompson seeking documents from January 1, 2001)  On the other hand, it is also bothersome that Heartland fails to explain in its Reply why it is seeking a temporal scope for "paper" or "hard copy"

---

[5]  Several of the cases cited by the parties were decided prior to the recent change in wording of Rule 26.  In the 2000 amendments to Rule 26, the scope of party discovery was narrowed to information "that is relevant to the claim or defense of any party," The Court, however, can order discovery "of any matter relevant to the subject matter involved in the action" for good cause shown.  The Advisory Committee Notes indicate that this change was made after many complaints that in some instances, particularly cases involving large quantities of discovery, parties made discovery requests that sweep far beyond the claims and defenses in the case.  192 F.R.D. at 389.  The Committee recognized that the dividing line between information relevant to the claims and defenses and information relevant only to the subject matter of the action cannot be defined with precision.  *Id.*  It is clear, however, that the Court is to determine the actual scope of discovery based on the reasonable needs of the particular action based on the facts and circumstances of each individual case.  *Id.*

documents that stretches back farther in time than it agreed to accept for electronic discovery.[6]

After reviewing the arguments of the parties, the Court concludes that to the extent that Heartland's requests for discovery seek information prior to January 1, 2002, they are not obviously relevant on their face. While this is an antitrust case and courts may allow broad discovery in such cases, a discovery request which seeks information prior to the time that the only plaintiff was incorporated is not "facially relevant."  Therefore Heartland bears the burden of establishing relevance and the Court turns to Heartland's arguments why the information should be considered relevant in this particular case.

In its Reply, Heartland sets out a timeline of events which it believes to be important in deciding the temporal scope of discovery.  (Doc. 527 at 9, 13-14) (Sealed). Only two of those events occurred prior to January 1, 2002 – Heartland's Operating Agreement became effective *as of* January 18, 2001, and Heartland was incorporated on October 18, 2001.  *Id.* at 9.  All of the other events and activities occurred some time in 2002 or later.  *Id.* at 9, 13-14, 16-17.  In arguing that

---

[6] Heartland does not refute Defendants' representations (Doc. 447 at 10) that Heartland had agreed to production of electronic documents responsive to Heartland's search terms that dated back to January 1, 2002, and production of electronic documents referencing Heartland dating back to October 18, 2001, the date Heartland was incorporated.

discovery back to January 1, 2000 is relevant, Heartland relies on its Complaint

and allegations that prior to its inception Defendants embarked on a pattern of anti-

competitive conduct designed to prevent Heartland or other niche or speciality

hospitals from successfully entering the market.  (Doc. 249 at ¶ 2.)  However,

Heartland, as a corporate entity, could not recover for any damages related to

conduct occurring prior to its incorporation in October 2001.  Before that date

Heartland simply did not exist.  Moreover, once it was legally formed, Heartland

did not immediately enter the market.  It first sought to solicit additional investors

by means of a prospectus for a private placement which was not dated until

January 10, 2002, and which was not distributed actively to seek additional

investors until January 17, 2002.  *Id.* at 9.  While Plaintiff might conceivably be

able to argue that it took longer to attract a sufficient number of investors to start

up its facility because of some anti-competitive threats[7] by Defendants, none of

those activities could have affected Heartland until *after* it began soliciting

investors in early 2002.  Plaintiff simply has not articulated any basis for finding

---

[7]  Heartland refers to comments by Defendant HCA Midwest which Defendant
Shawnee Mission interpreted as "nuclear warfare and bombs being dropped" when
Shawnee Mission was contemplating building a speciality heart hospital in partnership
with physicians.  (Doc. 527 at 9-10) (Sealed).  Plaintiff provides no dates for these alleged
comments and provides no evidence that any similar comments prevented the Founders of
Heartland from starting or completing (in a timely manner) their solicitation of new
investors.

that information prior to January 1, 2002 is reasonably calculated to lead to the discovery of relevant evidence in this case.

The January 1, 2002 time frame forward, however, is relevant to the anti-trust allegations because it could reasonably lead to evidence showing when the Defendants first became aware of Heartland and how they reacted to that knowledge.  Defendants urge that the managed care organizations did not receive Heartland's form introductory letters until the summer of 2003.  (Doc. 447 at 17.)  However, Heartland cites Coventry documents in November 2002 concerning a request from one of Heartland's founders that *might* have related (at least tangentially) to the new facility Heartland was building.  (Doc. 527 at 13) (Sealed).  In any event, the January 1, 2002 time period would encompass any such contacts.  Documents and information during this time period could also lead to evidence of Defendants' contracting patterns, internal discussions, and use of exclusive contracting terms in their prior relationships.

Finally, the Court has reviewed the cases which have allowed discovery prior to the running of a statute of limitations or prior to the alleged anti-competitive behavior which have been cited by the parties.  None of those cases, however, discusses the relevance of discovery requests which predate the formal organization of the sole corporate plaintiff.  The Court believes that the January 1,

10

2002 time period provides Plaintiff with all relevant information related to its

claims in this case.

      b.    <u>Burdensomeness</u>

      Having now determined that hard copy and paper documents after January 1,

2002 are relevant, the Court turns to Defendants' claims that it would be a

significant burden and expense for them to search for such documents.  (Doc. 447

at 20-23.)  The burden is on Defendants to come forward with evidence to establish

how the requested discovery would be unduly expensive and burdensome to them,

considering the needs of the case, the amount in controversy, the parties' resources,

the importance of the issues at stake in the litigation and the importance of the

proposed discovery in resolving the issues.  FED. R. CIV. P. 26(b)(2)(C).  Bare

assertions are not sufficient, and Defendants must come forward with evidence or

affidavits to show the nature and extent of the burden.  ***Cont'l Ill. Nat'l Bank &***

***Trust Co.,*** 136 F.R.D. at 685; ***Allianz Ins. Co. v. Surface Specialities, Inc.,*** No.

03-2470-CM-DJW, 2005 WL 44534 at * 2 (D. Kan. Jan. 7, 2005).  If Defendants

come forward with sufficient proof of burden, the Court can limit the discovery if

it finds that "the burden or expense of the proposed discovery outweighs its likely

benefit . . . ."  FED. R. CIV. P. 26(b)(2)(C).

      Three of the identified Defendants – Aetna, HCA Midwest and North

Kansas City Hospital – have refused to produce the requested paper documents

prior to January 1, 2003. Except for HCA Midwest, however, these Defendants

have not come forward with evidence to meet their burden of showing that it would

be unduly expensive and burdensome for them to produce documents back to the

January 1, 2002 date identified by the Court.  The bare allegation in the joint

response that all defendants have had to spend large amounts of money on

discovery to date and that searching for pre-2003 hard copy documents is

significant for several defendants (Doc. 447 at 21) is not sufficient to show undue

burden and expense that would be required to comply with the discovery for the

time period established by the Court.  *Horizon Holding, L.L.C. v. Genmar*

*Holdings, Inc.,* 209 F.R.D. 208, 213 (D. Kan. 2002) (the court will not speculate

that the requested discovery causes undue burden where defendants have not

submitted an explanation, let alone an affidavit or other proof, demonstrating the

burden).  Therefore, Aetna and North Kansas City Hospital have not met their

burden and they must produce hard copy or paper documents for the time period

directed by the Court.

      As to HCA Midwest, it has come forward with evidence in the form of a

letter from HCA's counsel to Heartland's counsel prior to the filing of the motion

to compel (Doc. 447, Ex. 10), and a Declaration of James Brown, Supply Chain

CFO of Midwest Division, Inc. (Doc. 447, Ex. 19.)  In the letter, and in the Joint Response, HCA Midwest indicated that it could produce hard copy or paper documents for the year 2002 for two specific employees (Patterson and Munch), but that documents for the only two other employees who might have had responsive documents (Dick Brown, former CEO and Holly King, VP Planning and Analysis) going back to the year 2000 would be difficult to locate in storage.

The Court is not unsympathetic with the task required to search for records among such a large volume of retained and stored documents, particularly those stored off-site.  Nor is the Court unmindful of the fact that HCA Midwest only acquired Health Midwest in April 2003.  (Doc. 447 at 21 n. 15.)  However, while the indices of off-site records may not be capable of being searched electronically, HCA Midwest has not addressed the fact that most storage facilities (on-site or off-site) can usually determine *when* a particular box of records was placed into storage.  While Brown's declaration identifies *all* documents HCA Midwest has placed in off-site storage, it has not stated what time period is represented by this volume of records, nor has it done anything to show the Court which of those stored records were closed *prior* to January 1, 2002, and therefore would not be subject to being searched.  This may significantly reduce the potential universe of records to be searched.  The Court cannot believe that HCA Midwest sends

100,000 boxes of records to off-site storage (or retains them indefinitely in off-site storage), for which it undoubtedly pays a significant storage fee, without some ability to locate and retrieve necessary records.  Therefore HCA Midwest will be required to make a *reasonable* attempt to locate the requested hard copy records for the designated employees and former employees (Brown and King) to January 1, 2002.  This does not mean that the Court is requiring HCA Midwest or its attorneys to look in every file box in off-site storage; however, it must exercise some reasonable method of conducting a search of those records.

As to on-site records, while there may be 5,000 boxes of records and related pages of an indices, again there is no indication of the time period represented by this volume of stored records.  HCA Midwest surely should be able to determine when each box of records was closed for storage and this may well reduce the universe to be searched.  Also, the Court assumes that the records retained in on-site storage are ones that HCA Midwest might reasonably believe it would need to access more often than records sent to off-site storage, and therefore the indices for these records should be more detailed and useful in organizing the required search. HCA Midwest must conduct a reasonable search of those records after January 1, 2002.

Finally, HCA Midwest will be required to provide the records which it

14

admittedly has available for the year 2002 for employees Patterson and Munch.
(Doc. 447, Ex. 10.) Those records shall be provided forthwith.

Therefore, Heartland's motions to compel Aetna, Carondelet, HCA
Midwest, North Kansas City Hospital, and Saint Luke's to produce hard copy or
paper documents back to January 1, 2000 are DENIED, but the motions are
GRANTED as to such information from January 1, 2002. Defendants will produce
any such hard copy or paper documents on or before April 30, 2007.[8]

## 3. Sufficiency of Interrogatory Responses

Heartland seeks "full and complete" answers to interrogatories served on
Defendants, pursuant to Rule 33(b). Each Defendant's responses to interrogatories
are discussed in turn.[9]

---

[8] Defendants have suggested that if they are required to search for earlier records,
they "likely will need to seek an extension of the discovery period. . . . " (Doc. 447 at 21).
*See also* Doc. 450 at 29. Beginning early in this case, all parties requested that the Court
stay the provisions of D. Kan. Rule 37.1(b) that requires motions to compel to be filed
within 30 days of default or service of the discovery response or objection at issue, and
the Court acquiesced in these requests. *See* Docs. 200, 245 and 319. At the same time,
the parties have been on notice since May 2006 that the trial date of April 1, 2008 was
"set in stone" (Doc. 436 at 58-59), and the deadlines set in the First Revised Scheduling
Order (Doc. 242) were coordinated with that date. To the extent that discovery problems
may now result from the delayed filing of motions to compel, this will not justify a
change in the schedule which has been set leading up to trial.

[9] Of course, in addition to the discussion below, to the extent each Defendants'
responses fail to provide information from January 1, 2002 to present based on
Defendants' time frame objection, the Interrogatories must be supplemented since
Heartland raised the time frame issue in its motions as to *all* discovery requests. *See e.g.,*
Doc. 383 at 5; Doc. 387 at 5; Doc. 397 at 5; and Doc. 399 at 5.

a.  Aetna (Doc. 383 at 13-15; Exh. 3 at 4-10.)

Heartland claims Aetna failed to provide adequate answers to five interrogatories.  The Court notes that one of Aetna's claims is that it provided all the information that was available to it at the time the interrogatory was answered, and argues that it should not have to answer further in light of the information which Heartland has obtained through subsequent document production and Rule 30(b)(6) depositions of Defendant.  (Doc. 447 at 26.)  While Heartland may have ultimately received this information, it is still entitled to a full and complete answer to its interrogatories.  Those interrogatory answers may later be used to support or oppose dispositive motions or may be offered in evidence at trial.  Thus, to the extent that an interrogatory was not fully answered, that interrogatory answer must be "supplemented"[10] as indicated below.

Interrogatory 1 requests Aetna identify "each" individual participating in decisions on Heartland's request for contracts with Aetna.  Interrogatory 1 then seeks certain information about the individual's listed.  Aetna answered Interrogatory 1 by listing the "principal"[11] participants and giving all requested

_____

[10]  The Court uses the word "supplemented" to mean a full answer must be provided and is not addressing the separate obligation of parties to supplement discovery as required by Fed. R. Civ. P. 26(e)(2).

[11]  Throughout discovery, the parties have argued about discovery requests that seek "each and every" piece of information about a case and whether such a request can

16

information about the individuals *other than* providing the requested "description of the individual's role."  Aetna then merely stated that documents have been or will be produced which reflect information sought in the interrogatory.

Aetna must supplement its response to Interrogatory 1 by providing a description of the role of each named individual in the contracting decisions.  A general reference to responsive documents is not sufficient.[12]  ***PulseCard, Inc. v. Discover Card Servs.***, No. 94-2304-EEO, 1996 WL 397567, at *3 (D. Kan. July 11, 1996) ("An answering party cannot simply refer to a mass of documents."); ***DIRECTV, Inc. v. Puccinelli***, 224 F.R.D. 677, 680-81 (D. Kan. 2004) (stating that a plaintiff "may not merely refer Defendants to other pleadings or its disclosures

---

be limited to the "principal" pieces of information.  *See **Allianz Ins. Co. v. Surface Specialties, Inc.***, No. Civ.A.03-2470-CM-DJW, 2005 WL 44534, at *9 (D. Kan. Jan. 7, 2005) ("As a general rule in this District, interrogatories seeking 'each and every fact' *and which blanket the entire case* are objectionable. . . .  The court will generally find them overly broad and unduly burdensome on their face to the extent they ask for 'every fact' which supports identified allegations or defenses.  Interrogatories may, however, properly ask for the 'principal or material facts' that support an allegation or defense." (emphasis added)).  Here Aetna provided the names of persons who "principally participated" and Heartland did not specifically raise this issue in its motion to compel. (Doc. 383 at 13-16.)  Therefore this issue is not properly before the Court as to these interrogatories.

[12]  While an interrogatory may be answered by producing business records as outlined in FED. R. CIV. P. 33(d), in order to use this section the answering party must "specify the records from which the answer may be derived or ascertained."  Here, no such specification was made as to documents that had already been produced, and obviously no specification could have been made for any documents not yet produced. Defendant has not complied with the requirements of Rule 33(d).

hoping that Defendants will be able to glean the requested information from them"). The fact that the documents are equally available to both parties does not relieve Aetna of its burden. *See Hoffman v. United Telecomms., Inc.*, 117 F.R.D. 436, 438 (D. Kan. 1987) (stating that the court would not require one party to fathom what another party may elect to contend as claims from the documents that had been produced, even when the data was equally available to both parties).

Interrogatories 2, 3 and 4 seek information regarding contacts between Defendants about Heartland, other doctor-owned facilities, or actual or threatened competition in the Kansas City market. Aetna responded, but Heartland believes the responses are not adequate because they "do not contain an adequate description of the responsive information." The Court has reviewed Aetna's responses to Interrogatories 2 and 4 and finds that they are inadequate in their description of the requested communication, particularly when they answer the Interrogatories with the statement (in Interrogatory No. 2 and incorporated into Interrogatory No. 4) that "Aetna has produced or will produce documents which reflect such communications." In each instance where Aetna has made such a statement, Aetna shall either state a more detailed description of the communication or shall identify the specific documents which would provide this information to Heartland by Bates Number. *See Johnson v. Kraft Foods of N.*

18

*Am.*, 236 F.R.D. 535, 541 (D. Kan. 2006) (requiring party responding to discovery with assertion that responsive documents have been or will produced to supplement the response by identifying the documents by Bates Numbers).  As to Interrogatory No. 3, describing the nature of the discussion as "briefly mentioned speciality hospitals" does not adequately describe the substance of the discussion and Aetna shall provide a more detailed description of the discussion.

Interrogatory 5 seeks identification of individuals with relevant information as to facts concerning Heartland's allegations or Defendants' answers or defenses. Aetna responded by referring Heartland to its Rule 26(a)(1) disclosures, the Rule 26(a)(1) disclosures of other defendants, and responses to previous interrogatories. The law in this district is clear that in most instances such a reference is insufficient. *Allianz Ins. Co. v. Surface Specialties, Inc.*, No. Civ.A.03-2470-CM-DJW, 2005 WL 44534, at *4 (D. Kan. Jan. 7, 2005); FED. R. CIV. P. 33(d) (answering interrogatories by specifying responsive business records is permissible but "specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained").  If Interrogatory No. 5 sought precisely the same information as had been required from Aetna by Rule 26(a)(1), the response might have been adequate.  However, Rule 26(a)(1) requires only the names, addresses

and telephone numbers of persons likely to have discoverable information "that the disclosing party may use to support its claims or defenses . . . ."  Interrogatory No. 5 seeks broader information concerning other parties and is not limited to persons who Aetna may use to support its claims and defenses.  In addition, it asks for a description of the individual's knowledge.  Aetna has not answered this Interrogatory by referring to other Rule 26 disclosures and its previous answers to interrogatories.  Aetna must supplement its answer to provide the requested information.  Because of the broad scope of the interrogatory, however, Aetna will be required to provide the requested information for those individuals who "principally" have such knowledge rather than "each individual" as requested by Heartland.  See *supra* note 11.

   b.  HCA Midwest (Doc. 397 at 9-12. Exh. 4 at 3-7.)

   Heartland claims HCA Midwest failed to provide adequate answers to four interrogatories.  The Interrogatories and objections largely mirror the Interrogatories and objections concerning Aetna, discussed above.  The Court has reviewed HCA Midwest's responses to Heartland's Interrogatories 1 through 4 and, in accordance with the discussion directly above, finds them incomplete in the following manner: (1) As to Interrogatory 1, the Court reads the answer (that HCA Midwest "cannot recall any specific discussions regarding Heartland or the

development of speciality hospitals") to mean that no communications described in the interrogatory took place; however, the statement that HCA Midwest "will produce responsive, non-privileged documents . . . that reflect Midwest Division personnel's communications with Managed Care Defendants" leaves the Court uncertain as to whether there were or were not discussions of the type specifically outlined in this interrogatory.  If there are any such communications, HCA Midwest shall answer the interrogatory with the named individuals' email address, dates, form, and description of any communications discussing contracts with Kansas City specialty hospitals, and if it seeks to rely on documents to provide any of the requested information it shall provide Bates Number for such responsive documents; (2) Interrogatory 2 shall be supplemented to provide the information requested by subparts (c) and (d), to the extent known by HCA Midwest, and any reference to documents as part of the answer shall identify the documents by Bates Number; (3) Interrogatory 3 shall be supplemented by identification of responsive Bates Numbered documents; and (4) Interrogatory 4 shall be supplemented by specifically providing the information requested without generic reference to prior Rule 26(a)(1) disclosures.

### c.  North Kansas City Hospital (Doc. 387 at 13-15; Exh. 4 at 2-6.)[13]

Heartland claims North Kansas City Hospital failed to provide adequate answers to four interrogatories.  Again, the Interrogatories largely mirror the Interrogatories previously discussed as previously noted.  The Court has reviewed North Kansas City Hospital's responses to Heartland's Interrogatories 1 through 4 and, in accordance with the discussions above, finds them incomplete in the following manner: (1) As with HCA Midwest's answer to the same Interrogatory 1, here the Court is left with uncertainty as to whether there were any communications that come within the scope of the interrogatory or not because the answer both states that North Kansas City Hospital "cannot recall any specific mention of Heartland during these discussions" and also states that it will produce business records responsive to the interrogatory.  Also, the answer is vague about who would have had any such communications.  The answer states only that a named individual "is the person responsible for approving NKCH's involvement in any Provider Networks."  The Court does not read this to mean that this person is the only one who might have had requested communications.  Therefore, if there

---

[13]  There is some suggestion that some of the interrogatory issues concerning North Kansas City Hospital may be moot because it agreed to supplement its answers.  (Doc. 447 at 25 n. 19.)  Heartland, however, does not agree that the issues are resolved because when it filed its Reply it had not yet received the supplemented answers.  (Doc. 527 at 29 n. 15) (Sealed).  If the parties have resolved those issues, they may disregard the Court's ruling on those matters.

are any communications that fall within the scope of the interrogatory, North

Kansas City Hospital  shall answer the interrogatory with the named individuals'

email address, dates, form, and description of any communications discussing

contracts with Kansas City specialty hospitals, and if it seeks to rely on documents

to provide any of the requested information it shall provide Bates Number for such

responsive documents; and finally North Kansas City Hospital shall clarify

whether it was involved in any specified communications involving not just

Heartland, but any specialty hospital in the Kansas City area as requested in the

interrogatory; (2) Interrogatory 2 shall be supplemented with the information

requested by subparts (c) and (d), to the extent known by North Kansas City

Hospital, and any reference to previous productions shall be supplemented by

identification of Bates Numbered documents; (3) Interrogatory 3 shall be

supplemented by identification of responsive Bates Numbered documents; and (4)

Interrogatory 4 shall be supplemented by specifically providing the information

requested without generic reference to prior Rule 26(a)(1) disclosures.

 d.  Saint Luke's (Doc. 399 at 15-17, Exh. 4 at 5-8.)

 Heartland claims Saint Luke's failed to provide adequate answers to four

interrogatories.  Again, the Interrogatories largely mirror the Interrogatories

previously discussed as previously noted.  The Court has reviewed Saint Luke's

responses to Heartland's Interrogatories 1 through 4 and, in accordance with the discussions above, finds them incomplete in the following manner: (1) Interrogatory 1 appears to state that no communications took place concerning Heartland or development of speciality hospitals, therefore the answer appears to be adequate; (2) Interrogatory 2 shall be supplemented to identify the individuals and give complete identifying information for the "[r]epresentatives of the MCOs" that attended the specified meetings; in addition, the interrogatory answer shall be supplemented to describe the substance of the comments made in the January 27, 2005 meeting by the representatives of North Kansas City Hospital and Saint Joseph Health Center; (3) Interrogatory 3 shall be supplemented to the extent Interrogatory 2 is supplemented; and (4) Interrogatory 4 shall be supplemented by specifically providing the information requested without generic reference to prior Rule 26(a)(1) disclosures.

## 4.  Production of Joint-Defense Agreement

Heartland seeks production of the joint-defense agreement entered into by all Defendants to this litigation.  Alternatively, Heartland requests the Court to compel Defendants to produce the joint-defense agreement to the Court for *in camera* inspection.  Heartland believes the joint-defense agreement furthers the alleged conspiracy by Defendants to restrain competition and prohibits individual

Defendants from settling without other Defendants' permission.  Heartland does

not state an evidentiary basis for these beliefs.  (Docs. 383 at 17-18; 387 at 17-18;

389 at 11-12; 393 at 6-7; 397 at 12-13; 399 at 17-18; 401 at 6-7.)

Defendants respond that the joint-defense agreement is protected from

disclosure by the joint-defense privilege.  Defendants state that, although Heartland

is apparently arguing for some exception to the joint-defense privilege, Heartland

has not identified the basis for any such exception and has not stated any factual

support for such an exception to justify *in camera* inspection.  (Doc. 447 at 29-30.)

In its Joint Reply, Heartland recognizes the applicability of the joint-defense

privilege, but argues that because it disputes the accuracy of Defendants'

characterization of the joint-defense agreement, its request for *in camera*

inspection is appropriate.  (Doc. 527 at 52) (Sealed).

To establish a joint-defense privilege, the proponent of the privilege must

first establish either the attorney-client or work-product privileges, and then must

also demonstrate: (1) the documents were made in the course of a joint-defense

effort; and (2) the documents were designed to further that effort.  ***In re Grand

Jury Proceedings***, 156 F.3d 1038, 1043 (10th Cir. 1998).  Defendants assert the

applicability of the joint-defense privilege to the joint-defense agreement itself

because the agreement is a document made by counsel for Defendants in

25

furtherance of Defendants joint defense of Heartland's allegations.  (Doc. 447 at 29.)  Heartland does not appear to dispute this characterization.  (*See* Doc. 527 at 51) (Sealed).

Heartland offers no basis for why or how the joint-defense privilege has been waived.  Absent waiver of a privilege, a properly asserted privilege protects the document from being disclosed.  ***Static Control Components, Inc. v. Lexmark Int'l, Inc.***, No. 06-cv-02182-JLK-BNB, 2007 WL 219955, at *3 (D. Colo. Jan. 25, 2007) ("The joint defense privilege preserves the confidentiality of communications and information exchanged between two or more parties and their counsel who are engaged in a joint defense effort.  Waiver of the joint defense privilege requires the consent of all parties participating in the joint defense.").

Further, Heartland has cited no evidentiary authority for requiring *in camera* inspection of the joint-defense agreement.  The Court notes that Heartland's proposition that the joint-defense agreement furthers the alleged conspiracy because it prohibits settlement by individual Defendant's is no longer tenable as four former Defendants have settled with Heartland since the filing of the present motions.  *See supra* note 1.  The Court will not undertake an *in camera* review of the joint-defense agreement when the applicability of the privilege is clear to the Court and Heartland has stated no basis for review.  *See **United States v. Zolin**,*

491 U.S. 554, 572 (1989) (stating that before a court conducts an *in camera* review of privileged documents to determine the applicability of the crime-fraud exception to the privilege, the party seeking the review must show a factual basis for the application of the exception and then the court is left, in its discretion, to determine if an *in camera* review is necessary based on, among other factors, the likelihood that the exception does apply).  Heartland's motions in this regard are therefore DENIED.

**5.  Documents Relating to Defendants' Net Worth**

Heartland seeks annual reports and/or financial statements from Aetna from January 1, 2002 to present identifying Aetna's net worth and/or financial condition based on Heartland's claims for punitive damages and the general allegations from Defendants that Heartland has harmed traditional healthcare in the Kansas City healthcare market.  (Doc. 383 at 8-9.)  Heartland makes the same request to Saint Luke's (Doc. 399 at 13-15), Shawnee Mission (Doc. 401 at 4-5), and Coventry (Doc. 393 at 5).  Because of a prior ruling in this matter, Heartland is prohibited from seeking punitive damages against North Kansas City Hospital and, therefore, Heartland seeks financial data from North Kansas City Hospital solely on the basis that North Kansas City Hospital "has placed its financial status at issue . . . by arguing that specialty hospitals harm it and other traditional hospitals financially."

(Doc. 387 at 11.)  In each of its initial briefs in support of these motions to compel, Heartland's argument about whether the defendants have placed their financial status at issue consists of a single sentence with no citation of authority.  It is only in its Joint Reply that Heartland finally fleshes out its argument on this issue. (Doc. 527 at 20-22) (Sealed).

Aetna opposes Heartland's request because it believes the disclosure of financial information is premature until a ruling has been made on the viability of Heartland's punitive damages claims.  Saint Luke's and Shawnee Mission responded to Heartland's request in like manner as Aetna.  (Docs. 399 at 5; 401 at 5.)  Coventry agreed to produce its most recent financial information, but not its information from earlier years.  (Doc. 393 at 5.)

In their joint response, Defendants argue that punitive damages are to be tried under a bifurcated procedure and are therefore premature.  (Doc. 450 at 9-11.) Alternatively, if no bifurcated procedure is used, Defendants claim Heartland has not made the required showing for punitive damages by showing that its claims are not spurious.  (Doc. 450 at 11-13.)  Regarding Heartland's request for historical financial data, Defendants argue that historical financial data is irrelevant to a claim for punitive damages.  Defendants do not address Heartland's request for historical financial data based on Heartland's claim that the data is relevant to

28

defenses Defendants have propounded, other than to say that North Kansas City Hospital did not make an allegation putting its historical financial data at issue. (Doc. 450 at 14.)[14]

### a.  Historical Financial Data

Rule 26(b)(1) permits discovery into "any matter, not privileged, that is relevant to the *claim* or *defense* of any party."  (emphasis added)  The Rule also permits the Court to order discovery into any matter relevant to the "subject matter involved in the action" for "good cause."  FED. R. CIV. P. 26(b)(1).  Therefore, the Federal Rules broadly define the scope of discovery.  A matter is discoverable if it is relevant to a claim or defense, or if it relates to the general subject matter of the action and good cause has been shown.

From a review of the pleadings, the following allegations might be construed to bring into play the Defendants' financial condition:  Doc. 268 at ¶ 128 (Thirty Fourth Defense) ("All the actions taken by [North Kansas City Hospital] were for the purposes of furthering its own welfare. . . ."); Doc. 267 at ¶ 111 (Affirmative Defenses and Denials) ("[Saint Luke's] acted in good faith to promote and protect its ability to provide healthcare to all segments of the public and community it

---

[14]  North Kansas City Hospital also states that Heartland already has documents detailing the financial condition of North Kansas City Hospital and has produced such financial records for the years 2003-2005.  (Doc. 450 at 14 n. 18.)

serves."); Doc. 272 at ¶ 105 (Objections and General/Affirmative Defenses)

("[Shawnee Mission's] actions were privileged or justified under the circumstances

attendant to Plaintiff's claims."); Doc. 290 at ¶ 101 (Affirmative Defense)

("Plaintiff's claim for tortious interference is barred because any refusal by

[Coventry] to enter into a contract with Plaintiff served to protect [Coventry's]

reasonable economic interest and relationships and is therefore privileged."); and

Doc. 265 at ¶ 8 (Affirmative Defense) ("Aetna's conduct was privileged, justified

and/or the exercise of an absolute right.").  Heartland's Reply also points the Court

to documents including press releases, articles and Rule 30(b)(6) testimony

providing support for Heartland's contention of relevance of financial information

of Defendants.  (*See, e.g.*, Doc. 527 at 21) (Sealed) (discussing Shawnee Mission

and North Kansas City Hospital).       While the degree of specificity in each

pleading varies, a liberal construction of the language of Defendants' answers as

quoted above, would indicate that these defendants are attempting to raise

justification as a defense or affirmative defense.  Justification is a recognized

defense to a claim of tortious interference under Kansas law, PATTERN

INSTRUCTIONS KANSAS 3ᴿᴰ, CIVIL, § 124.93, and it must be affirmatively pled.

***Burrowwood Assocs., Inc. v. Safelite Glass Corp.,*** 18 Kan.App. 2d  396, 853 P.2d

1175 (1993).  If these defendants have raised such a defense, they would place

their financial condition in issue, and some discovery about that would therefore be relevant.

The Court is concerned, however, about the paucity of discussion on this topic by all parties.  As noted above, there is only one sentence raising the issue in each of Heartland's initial briefs and only one sentence refuting the issue in Defendants' Joint Response.  The argument is only addressed in some detail in Heartland's Joint Reply.  (Doc. 527 at 20-22) (Sealed).  This is not a proper use of a rebuttal or reply brief.  ***Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.,*** 45 F. Supp.2d 1164, 1168-69 n. 1 (D. Kan. 1999) (where issues are only "summarily advanced" in an initial brief but then are discussed in detail in a reply brief, "[t]his sort of pleading, which leaves virtually all of the argument until the reply brief, denying the nonmovant any chance to respond, is not consistent with any proper rebuttal.").

Because the issue of whether Defendants have placed their financial condition in issue by pleading the defense or affirmative defense of justification was not adequately raised and briefed by the parties, it should not be decided based solely on arguments in a reply brief.  Therefore, the Court will DENY Heartland's motion on this ground, without prejudice to renewal if it is determined that Defendants are relying on the affirmative defense of justification, as the Court

suspects, and if the parties are unable to reach agreement on this issue after they have met and conferred again on this topic. If the motion to compel on this issue is renewed, any supporting and response briefs shall be limited to ten (10) pages in length, and no rebuttal briefs will be allowed.[15]

### b. Financial Data Relevant to Punitive Damages

As previously noted, Heartland also seeks the financial information from defendants Aetna, Saint Luke's, Shawnee Mission and Coventry in connection with Heartland's claim for punitive damages related to the state law claims of tortious interference and civil conspiracy.[16] These defendants oppose Heartland's request for their financial information because: (1) the data is highly confidential;

---

[15] A motion to strike was filed with regard to this section of Heartland's Reply by North Kansas City Hospital. (Doc. 485.) The parties have fully briefed the motion to strike, which refers to only one sentence in Heartland's brief. Both Heartland and North Kansas City Hospital have filed motions for leave to file under seal the response and reply to the motion to strike. (Docs. 526, 532.) Both of those motions for leave to seal are hereby GRANTED and these pleadings will be temporarily sealed. The Court has been provided copies of those pleadings via e-mail, however, and has reviewed them prior to the entry of this Memorandum and Order. The question of whether Heartland's statement that North Kansas City Hospital has entered into contacts which "specifically bar Plaintiff from these networks" is an interpretation of evidence or a misrepresentation does not bear on the issue before the Court. The parties are arguing the weight and interpretation of the "evidence" produced in the litigation to date, an endeavor that is currently not necessary and is completely collateral to the discovery issues before the Court in these motions. Therefore, the Court DENIES the motion to strike.

[16] Heartland does not dispute defendants' argument that punitive damages are not authorized under the Sherman Act. (Doc. 450 at 9) (citing *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1332 (10th Cir. 1996); 15 U.S.C. § 15(a)).

(2) Heartland has not shown its punitive damages claims are not spurious, which is a prerequisite to the discovery of financial information for punitive damages claims; (3) Heartland's request is premature because the Court should bifurcate the issue of punitive damages; and (4) the historical financial information requested by Heartland is not relevant because only current financial information is relevant to a claim for punitive damages.[17]  (Doc. 450 at 9-13.)

The Court takes these arguments in turn.  First, the Court notes that any fear over the confidentiality of the financial records being lost is overstated.  As the parties are well aware, they are subject to a protective order that maintains the confidentiality of documents the parties designate as confidential.  That Defendants' financial records are confidential is no different than any other confidential information currently being protected from disclosure by the protective order (Doc. 170), and Defendants could designate these records as Confidential Information - Attorneys Eyes Only.  Defendants have stated no reason why this procedure would not adequately protect the confidentiality of this information.

---

[17]  Heartland has represented that during the meet and confer sessions with Coventry prior to filing the motion to compel, Coventry agreed to produce its most recent annual financial information (apparently for the year 2005), but would not produce any earlier financial information.  (Doc. 393 at 5.)

Second, the Court need only find that the claims for punitive damages are not spurious in order for discovery to proceed. *See **Mid Continent Cabinetry, Inc. v. George Koch Sons, Inc.***, 130 F.R.D. 149, 152 (D. Kan. 1990) (holding that it was not necessary for plaintiff to make a *prima facie* showing of its entitlement to punitive damages, rather, plaintiff must only show that its claim for punitive damages is not spurious). The Court finds that Heartland's claims for punitive damages as to the claims for tortious interference and civil conspiracy are not spurious. Count IV, alleging a cause of action for tortious interference with prospective business relationships against Managed Care Defendants, and Count V, alleging civil conspiracy against all Defendants, both seek punitive damages against defendants. (*See* Doc. 249.) Punitive damages are recoverable for claims styled in this manner. *See **Somnograph, Inc. v. Rodman***, No. 94,533, 2007 WL 518857, at *5-6 (Kan. Ct. App. Feb. 16, 2007) (recognizing claim for punitive damages for a tortious interference with prospective business relations claim); ***York v. InTrust Bank, N.A.***, 265 Kan. 271, 306-07, 962 P.2d 405, 429 (Kan. 1998) (recognizing claim for punitive damages for a civil conspiracy claim). Heartland has made allegations sufficient to support these punitive damages claims. (*See generally* Doc. 249.) Thus, Heartland meets the threshold requirements for discovery of the requested financial data.

34

Third, regarding defendants' argument that the request is premature, the Court notes that the federal courts in Kansas have sometimes delayed discovery of financial information in support of a punitive damages claim until after a jury determines liability for the underlying claim. *See, e.g., **Am. Maplan Corp. v. Heilmayr***, 203 F.R.D. 499, 503 (D. Kan. 2001) (Lungstrum) (finding financial information not relevant until trier of fact determines liability for punitive damages); ***Ramirez v. IBP, Inc.***, No. 94-4101-SAC, 1996 WL 455022, at *2 (D. Kan. July 3, 1996) (Crow) (following same practice). Other cases in this District allow early discovery of financial information. ***Aerotech Res., Inc. v. Dodson Aviation, Inc.***, No. 00-2099-CM, 2001 WL 3953979, at * 2 (D. Kan. Apr. 11, 2001) (Murguia) (finding financial information relevant to punitive damages without need for the trier of fact to first determine liability for punitive damages); ***Roberts v. Shawnee Mission Ford, Inc.***, No. 01-2113-CM, 2002 WL 1162438, at *4 (D. Kan. Feb. 7, 2002) (Waxse) (same).

The Court realizes that the varied practice utilized within this District is the source of the present dispute. Some judges have held that if the facts at trial support a submission of punitive damages to the jury, a plaintiff has a right under the Seventh Amendment of the U.S. Constitution and under FED. R. CIV. P. 38(a), to a jury determination of the amount of punitive damages. ***Vance ex. rel. Wood v.***

*Midwest Coast Transport, Inc.,* 314 F. Supp.2d 1089, 1093 (D. Kan. 2004)

(Brown, J.) (reviewing cases in this District which allow the jury to decide the

amount of punitive damages and cases which hold that the court should follow

K.S.A. 60-3702(a) and have the judge set the amount of punitive damages). Which

procedure is followed may well dictate the timing of any production of financial

information since it would be unrealistic to bifurcate the punitive damages issue if

the jury is to decide the amount of such damages.

The undersigned magistrate judge will not predict how the trial judge in this

case will decide to handle the determination of punitive damages. However,

because it is possible that this issue may be submitted to the jury for determination,

the court cannot simply agree to delay production of financial information

indefinitely with the assumption that there will be a bifurcated trial. Instead, the

Court will find that some of defendants' financial information is relevant on the

issue of punitive damages, but the Court will stay the production of that

information until later in the proceedings. For this reason, the court will GRANT

the motion to compel the production of financial information required by K.S.A.

60-3702, but will STAY the requirement that the documents be provided until it is

determined if the claim for tortious interference and civil conspiracy and/or the

claim for punitive damages survives any dispositive motion. Therefore, defendants

36

will not be required to produce the financial records required by K.S.A. 60-3702

until the *earliest* of the following dates: (1) fifteen (15) days following a ruling by

the trial court which denies a dispositive motion concerning the claims for tortious

interference and conspiracy and/or a dispositive motion concerning the claim for

punitive damages; or (2) fifteen (15) days following the deadline for filing

dispositive motions *if* there has been no dispositive motion directed to the tortious

interference and conspiracy claims or to the claim for punitive damages.

The parties also disagree on the scope of financial information which is

allowable in cases involving punitive damages under Kansas law.  Defendants

claim that the request for financial information back to January 1, 2002 is too

broad because, under K.S.A. 60-3702(b)(6), the issue is a party's "financial

condition" not their financial history.  (Doc. 450 at 13.)  However, the only case

defendants cite in support of their position (Doc. 450 at 13) has nothing to do with

the relevance of financial information in a claim for punitive damages.  *See **Jones***

***v. Commander, Kansas Army Ammunitions Plant,*** 147 F.R.D. 248, 252 (D. Kan.

1993) (granting a protective order barring discovery concerning the sexual

preference of a terminated employee's supervisor in a sexual harassment case as

irrelevant).  The scope of relevant financial information was discussed, however, in

***Audiotext Communications Network, Inc. v. US Telecom, Inc.,*** No. 94-2395-

GTV, 1995 WL 625962 at * 3 -4 (D. Kan. Oct. 5, 1995):

> The court finds the current information of plaintiffs' net worth or financial condition relevant to the issue of punitive damages. *See Industrial Elec. Engineering & Testing Co. v. Dynalectric Co.,* No. 87-2555-V, 1990 WL 80411, at *1 (D. Kan. May 18, 1990). The most recent annual reports and current financial statements of plaintiffs suffice to determine punitive damages. *Watie v. Fredericks of Hollywood Stores, Inc.,* No. 87-2118-O, 1988 U.S. Dist. LEXIS 9923, at *2 (D. Kan. Aug. 24, 1988). All other financial information is irrelevant to determining punitive damages. *See id.; Industrial Elec. Engineering & Testing Co.,* 1990 WL 80411, at *1. "The relevant request is for the current financial status of [plaintiffs]." *Industrial Elec. Engineering & Testing Co.,* 1990 WL 80411, at *1.

Plaintiff counters by citing four cases where financial information for a number of years was allowed.  However, none of those cases specifically discusses the scope of financial information allowed pursuant to K.S.A. 60-3702, and one case, ***Sonnino v. Univ. of Kan. Hosp. Auth.,*** 220 F.R.D. 633, 654 (D. Kan. 2004), involved punitive damages under Title VII rather than K.S.A. 60-3702.  There are other provisions of K.S.A. 60-3702 which might support discovery of additional financial information in certain cases, *see e.g.*, K.S.A. 60-3702(a)(3) ("the profitability of the defendant's misconduct"), but Heartland has not argued that as a basis for discovery of the requested financial information.[18]

---

[18]  K.S.A. 60-3702(e) & (f) refer to a defendant's "highest gross annual income earned for any one of the five years immediately before the act for which such damages

Based upon the holding in ***Audiotext Communications Network, Inc.,*** the Court will therefore limit the financial information required from defendants concerning the issue of punitive damages to the most recent annual reports and current financial statements of the defendants measured at the time set above for defendants to produce such information.  The Court further notes that by delaying the production of this financial information to a point closer to trial, the information produced will, in fact, be more "current" than information that would be produced now.  Furthermore, Heartland will not be prejudiced by this delay and will have the information in ample time to prepare for trial on the issue of punitive damages.

**6.  Production of Anti-Trust Complaints**

Heartland seeks to discover "other litigation" materials from Aetna. Heartland initially sought "all documents evidencing any complaint, allegation, inquiry or investigation against [Aetna] arising out of or related to any claim of violation of any state or federal antitrust law at any time from 1995 to present." Subsequently, Heartland narrowed its request to "copies of petitions/ complaints/

---

are awarded" and "the profitability of defendant's misconduct [that] exceeds or is expected to exceed" other specific statutory  limitations.  However, those sections set *limitations* for recovery rather than a *grounds* for recovery and therefore it would appear that they are applicable only to a defendant who seeks to limit the other statutory caps on punitive damages.

charges filed against the two Aetna Defendants . . . alleging anticompetitive refusals to deal or anticompetitive concerted action" from 1995 to present. (Doc. 383 at 10-12.) Aetna has objected to Heartland's request on the following grounds: (1) Heartland has reneged on a prior agreement to withdraw the interrogatory and propound a narrowed interrogatory; (2) the request seeks irrelevant information; and (3) complying with the request would be unduly burdensome. (Doc. 450 at 14-22.)

Regarding Aetna's first objection, Aetna has produced no evidentiary support for its claim that Heartland has entered into some sort of binding agreement with it related to this discovery. The Court will not presume the existence of a contract without evidentiary support. The propounded discovery is the issue before the Court, not the parties understandings during the meet and confer negotiations on the propounded discovery.

Regarding Aetna's second objection, the Court finds that a request for Aetna's "other litigation" could reasonably lead to the discovery of relevant evidence. Heartland asserts that "Aetna's previous anticompetitive concerted actions or refusals to deal with competitors certainly are relevant to Plaintiff's claims that this is how Aetna deals with competitive threats in the marketplace." (Doc. 527 at 31-32) (Sealed). Heartland's Complaint also makes this allegation.

40

(Doc. 249 at ¶¶ 39-49 (alleging a conspiracy in response to a competitive threat).)
As stated above, the Federal Rules of Civil Procedure permit a broad definition of
relevance.  *See* FED. R. CIV. P. 26(b)(1).

A relevant discovery request can be unduly burdensome, however, and may
be limited when "the burden or expense of the proposed discovery outweighs its
likely benefit."  FED. R. CIV. P. 26(b)(2)(C)(iii).  Therefore, after reviewing the
submissions, the Court finds that the propounded discovery is relevant, but as
requested is unduly burdensome.  Aetna is a large corporate entity and requiring it
to produce all anti-trust litigation materials filed against it, nationwide and over the
previous twelve years, is excessive.  The Court therefore limits the propounded
discovery to all petitions/complaints/charges filed[19] against Aetna alleging
anticompetitive refusals to deal or anticompetitive concerted action, between
January 1, 2002[20] and April 26, 2005, the date of filing of this lawsuit.

---

[19]  Because the Court has narrowed the request to just the copies of any
complaints/petitions/charges that have been filed, Aetna's argument and concerns about
attorney-client privilege, work product protection, confidentiality agreements and
documents "evidencing any" complaints, and the "millions of pages of pleadings and
other documents" in the Florida case all become moot.

[20]  *See* the Court's discussion above regarding the relevant time frame of
Heartland's discovery in this litigation, *supra* at 3-11.  The court further notes that since
this information is based upon when the complaint, petition or charge is *filed*, the actual
conduct which resulted in the filing of such complaints, if any, would presumably have
occurred some time earlier.

Furthermore, the request is limited to those petitions/complaints /charges arising out of conduct alleged to have occurred in the Kansas City metropolitan area.  The parties shall meet and confer, if necessary, over Aetna's compliance with this narrowed discovery request.[21]

## 7.  Non-Party Documents

Heartland alleges certain Defendants have failed to search, and therefore, produce, responsive documents from certain non-party entities allegedly under Defendants' control.  Specifically, Heartland makes this allegation against North Kansas City Hospital with regard to two surgery centers North Kansas City Hospital "owns" (Doc. 387 at 8-11); against Saint Luke's with regard to its surgery centers and specialty hospitals, including Kansas City Orthopaedic Institute (Doc. 399 at 8-10, 11); and against Carondelet with regard to the alleged parent corporation of Carondelet[22] (Doc. 389 at 8-11).

_____

[21]  Presumably the parties will be able to agree on a definition of "Kansas City Metropolitan Area" so the Court is not required to delineate the area by reference to each Kansas and Missouri county, federal court district, etc.

[22]  Initially, Heartland's motion against Carondelet also discussed surgery centers allegedly owned by Carondelet.  In an email communication to the Court sent February 21, 2007, Carondelet stated that "the issue of the production of documents from non-parties between Plaintiff and Carondelet is moot as to the production of records from Carondelet's 51% owned surgical centers. . . ."  Heartland was copied on this email communication and has not notified the Court that it disputes this contention.  Therefore, the Court assumes Heartland's motion with respect to Carondelet's surgery centers is moot, absent a contrary notification from Heartland.  *See also* Doc. 450 at 31 n. 40 & 49.

The Federal Rules of Civil Procedure require production of documents "which are in the possession, custody or control of the party upon whom the request is served." FED. R. CIV. P. 34(a). Heartland alleges that documents at these non-party entities are within Defendants' control and should be produced. Several cases within this District have addressed closely-related issues. In *Starlight International v. Herlihy*, 186 F.R.D. 626 (D. Kan. 1999), the Court stated: "Courts have universally held that documents are deemed to be within the possession, custody or control if the party has actual possession, custody or control or has the legal right to obtain the documents on demand." 186 F.R.D. at 635 (internal quotations, citations, and alterations omitted). The *Starlight* Court found that control had been shown with respect to a joint venture between the party and the non-party. *Id.* In *Cotracom Commodity Trading Co. v. Seaboard Co.*, 189 F.R.D. 655, 663 (D. Kan. 1999), the Court found that a wholly-owned subsidiary of a parent corporation satisfied the "control" requirement of Rule 34(a). In *American Maplan Corp. v. Heilmayr*, 203 F.R.D. 499, 502 (D. Kan. 2001), the Court found that a shareholder did not have the legal right under Texas law to obtain documents from the non-party corporation (although he did have the practical ability to obtain the documents) and therefore the shareholder did not have the requisite control contemplated by Rule 34(a).

43

In a more recent case, however, the Court stated:

> Control comprehends not only possession but also the right, authority, or ability to obtain the documents. Therefore, Rule 34(a) enables a party seeking discovery to require production of documents beyond the actual possession of the opposing party if such party has retained any right or ability to influence the person in whose possession the documents lie.

*Super Film of Am., Inc. v. UCB Films, Inc.*, 219 F.R.D. 649, 651 (D. Kan. 2004) (internal quotations, citations, and alterations omitted).  The *Super Film* Court also stated that "the party seeking production of the documents bears the burden of proving that the opposing party has the control required" under Rule 34(a).  *Id.* at 653.  In *Super Film,* the Court set out the broad discovery permitted under Rule 34(a):

> Control may be established where the corporations in question share a common ownership or management structure.  Courts have also found one corporation to control another where one is the alter ego of the other corporation. . . . Among the factors used by the courts to determine whether one corporation may be deemed under control of another corporation are: (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement by the non-party corporation in the transaction, and ([e]) involvement of the non-party corporation in the litigation. These factors focus on the other corporation's actual control or inferred control . . . .

*Id.* at 654-55 (internal citations omitted).  **Super Film** found this to be satisfied with respect to two distinct entities who had acted closely together ("as one") to carry out a transaction, and the court directed the defendant corporation to produce the documents held by the other corporation which were central to the sale and transaction which was the subject of the action.  *Id.* at 656.

Defendants generally contend that Heartland cannot prove the Defendants have "control" over the requested documents as contemplated by Rule 34(a) and, therefore, Heartland can only obtain discovery from the non-party entities through a Rule 45 subpoena.[23]  (Doc. 450 at 22-37.)  The Court applies the **Super Film** factors to each Defendant in turn.

### a.  North Kansas City Hospital

Heartland alleges North Kansas City Hospital "owns" two surgery centers. Heartland requested any managed care contracts (and all documents regarding the negotiation and interpretation of the contracts) between the surgery centers and Defendants and documents regarding North Kansas City Hospital's "decision to

---

[23] The Court does not agree with Defendants' argument (Doc. 450 at 23) that Heartland cannot file a motion to compel Defendants to produce documents pertaining to a non-party pursuant to Fed. R. Civ. P. 34, until Heartland has attempted to obtain those documents by means of a subpoena to the non-party under FED. R. CIV. P. 45.  Where Heartland has some evidence that would indicate that a party has "control" over documents of a non-party, even though the non-party has actual possession of the documents, Heartland can proceed under Rule 34 if it can meet the burden of proving that the Defendants do have the requisite "control" of the documents.

invest in these centers." (Doc. 387 at 9.) Heartland states that North Kansas City Hospital acquired ownership of the two surgery centers in 2005. (Doc. 387 at 10.)

In its Response, North Kansas City Hospital provided the affidavit of David Carpenter, President and Chief Executive Officer of the Board of North Kansas City Hospital, concerning the following facts:

- In June 2005, North Kansas City Hospital acquired a 50% interest in a limited liability company (the " LLC") which then acquired an interest in the two surgery centers.

- As of January 1, 2007, North Kansas City Hospital's interest in the LLC became 50.1 %.

- The LLC wholly owns another entity which has "an interest" in the first surgery center at issue, the Briarcliff Ambulatory Surgery Center.

- The LLC wholly owns a separate entity which holds "an interest" in the second surgery center at issue, the Liberty Ambulatory Surgery Center.

- North Kansas City Hospital performs no day-to-day management for the surgery centers and does not receive a management fee from the surgery centers.

- North Kansas City Hospital does not communicate with managed care companies on behalf of the surgery centers.

- North Kansas City Hospital does not exchange documents directly with the

46

surgery centers or maintain documents on behalf of the surgery centers in the

ordinary course of business.

(Doc. 450 at 25-27, Exh. D.)  In its reply, Heartland does not controvert these facts

but only points the Court to documents previously produced in this litigation

referencing the surgery centers where North Kansas City Hospital refers to its

investment in a "joint venture."  (Doc. 527 at 43-44) (Sealed).  Heartland also

argues that the surgery centers "inevitably benefitted" from North Kansas City

Hospital's allegedly anti-competitive conduct by attracting patients who were

unable to go to Heartland and went to the surgery centers instead.  (Doc. 537 at 40

(Sealed).)  This argument, however, is supported by no factual evidence, and is

merely conjecture by Heartland.

Heartland argues that the absence of evidence on other *Super Film* factors

"raises questions" about the true control able to be exercised by North Kansas City

Hospital.  (Doc. 537 at 40 (Sealed).)  Heartland misunderstands the burden with

regard to this issue, however.  It is Heartland that must show the Court how North

Kansas City Hospital controls the surgery centers.  *Super Film*, 219 F.R.D. at 653.

Heartland has not done so and, at most, has pointed the Court to one *Super Film*

factor in its favor.  Heartland's motion in this regard is DENIED.

b.  Saint Luke's

Heartland alleges Saint Luke's has a "relationship" with surgery centers and specialty hospitals, including Kansas City Orthopaedic Institute.  (Doc. 399 at 9.) Defendant Saint Luke's Health System, Inc. (hereafter Saint Luke's) presented the affidavit of Jama L. Johnson, Chief Financial Officer of Saint Luke's Hospital (hereafter Hospital), concerning the following facts with regard to Kansas City Orthopaedic Institute:

● Hospital is a "member" of Saint Luke's Health System.

● Hospital, not Saint Luke's itself, owns 40% of the Kansas City Orthopaedic Institute.

● Neither Saint Luke's nor Hospital, manages Kansas City Orthopaedic, and Saint Luke's has no overlapping officers, directors or employees of the Kansas City Orthopaedic Institute.

● There is no regular exchange of business-related communications between Saint Luke's and the Kansas City Orthopaedic Institute.

(Doc. 450 at 27, Exh. G.)  In its Reply, Heartland points the Court to deposition testimony of Saint Luke's showing that Saint Luke's is the sole shareholder of the "member" (Hospital) that owns the 40% interest in Kansas City Orthopaedic Institute.  (Doc. 527 at 46-47) (Sealed).  Heartland also notes the following: (1) a deposition exhibit from Saint Luke's deposition states that Saint Luke's "provides

48

management services and acts as an agent" for the "member" (Hospital) with the

40% interest in Kansas City Orthopaedic Institute; (2) the "member's" (Hospital's)

Chief Financial Officer serves on the board of the Kansas City Orthopaedic

Institute; and (3) documents previously produced in this litigation refer to the

Kansas City Orthopaedic Institute as a "joint venture."  (Doc. 527 at 47) (Sealed).

Regarding its ambulatory surgery centers (ASC's), Saint Luke's states the

following, although it does not support these statements with evidentiary support:

- The areas of documentation sought by Heartland with respect to the ASC's
  are operated centrally and records of the individuals in the groups which
  operate those functions (contracting, communication with managed care
  organizations and market analysis) have already been search for documents
  by Saint Luke's.

- No responsive documents are located at the ASC facilities.

(Doc. 450 at 30.)  In its reply, Heartland does not controvert these statements, and

mistakenly states that Saint Luke's failed to address its surgery centers in its

Response. (Doc. 527 at 46 n.21) (Sealed).

Again, as discussed above, Heartland has not made the requisite showing on

the *Super Film* factors with respect to Kansas City Orthopaedic Institute.  At best,

Heartland has shown a commonality of ownership and some intermingling of

49

directors, officers, or employees, but even this connection is attenuated and

Heartland has made no showing at all with respect to the remaining factors.  It is

Heartland's burden to show control and it has not done so.  Heartland's motion in

this regard is DENIED.  In addition, Saint Luke's has stated it has complied with

Heartland's requests with respect to Saint Luke's surgery centers.  Heartland has

not challenged this statement.  Heartland's motion in this regard is DENIED.

c.  Carondelet

Heartland alleges Carondelet is a member of, and has executives who

directly report to, Ascension Health, an entity that is described only as an

"organization" by Heartland.  (Doc. 389 at 10.)  Heartland claims Ascension

Health formulates "national policies" which control Carondelet's decisions.  (Doc.

389 at 11.)

Carondelet presents the affidavit of Steven R. Cleary, Chief Financial

Officer for Carondelet concerning the following pertinent facts with regard to

Ascension Health:

● Ascension Health is a Catholic, nonprofit health system that sponsors

"health ministries" one of which is Carondelet which includes various other

entities, all referred to as Carondelet.

● Ascension Health provides "oversight and structure" to Carondelet to ensure

50

Carondelet provides healthcare services in a manner consistent with Ascension's Catholic values.

- Ascension is not involved in the day-to-day operations of Carondelet, does not set managed care contracting requirements for Carondelet, and does not negotiate, approve, or execute managed care contracts on Carondelet's behalf.

- Ascension Health's representatives do not serve on Carondelet's board and are not officers of Carondelet.

(Doc. 450 at 31-37, Exh. E.)  In its reply, Heartland states the following: (1) Ascension Health's website states that it and its members share services and participate in system-level performance targets; (2) deposition testimony of Carondelet shows that Ascension Health is the "sole member" of Carondelet, Ascension Health is involved in the business and operations of Carondelet, Ascension Health provides general oversight to Carondelet, Carondelet's Chief Information Officer is an employee of Ascension, and Carondelet's Chief Executive Officer reports directly to the president of Ascension Health; and (3) deposition testimony and exhibits show that Ascension Health discussed the competitive threat of Heartland with Carondelet.  (Doc. 527 at 48-50) (Sealed).

Although a closer showing has been made, Heartland's assertions again do

51

not meet the burden required to show the requisite control contemplated by Rule 34(a). With regard to the ***Super Film*** factors, Heartland has established only a "membership" and one intermingled employee. Heartland hints at involvement by Ascension in Carondelet's alleged anticompetitive conduct, but its supporting citations do not definitively establish the same. The remaining factors have not even been addressed. As a result, Heartland has failed to meet its burden of showing Carondelet's "control" with respect to the documents it seeks. Heartland's motion in this regard is DENIED.

## 8. Reasonableness of Search/Production of Documents

### a. North Kansas City Hospital

Heartland asserts North Kansas City Hospital failed to respond to discovery requests regarding its lobbying efforts and its communications regarding the development of specialty hospitals. Five requests for production of documents are at issue, in which Heartland asked for documents concerning: (1) efforts to "influence or in any manner control or regulate the development of new specialty hospitals or regulate the operation of existing specialty hospitals;" (2) "efforts to influence Congress' enactment (or continuation) of legislation that imposed a moratorium on the development of new specialty hospitals;" (3) "internal communication or analysis concerning the development of specialty hospitals;" (4)

52

"communication with any of the [Defendants] concerning the development of specialty hospitals;" and (5) communication with any third party (other than [Defendants]) concerning the development of specialty hospitals."  (Doc. 387 at 11.)  North Kansas City Hospital responded to these requests with the same objections: (1) the term "specialty hospital" is vague and ambiguous; (2) documents "may be protected" by the attorney-client privilege or work-product privilege; and (3) the requests are unduly burdensome because the documents would be irrelevant.  Heartland asserts, in its motion, that North Kansas City Hospital's objections are unfounded because the propounded discovery is relevant to the issue of whether North Kansas City Hospital has acted in opposition to the development of specialty hospitals and North Kansas City Hospital has produced no evidence of burden.  (Doc. 387 at 11-12.)

In the Court's review of North Kansas City Hospital's Response, the Court can only find one paragraph that could be read to address this portion of Heartland's motion.  North Kansas City Hospital merely states:

> As it has in prior communications with [Heartland], [North Kansas City Hospital] states (again) that, subject only to two exceptions, it has produced all documents within its possession, custody or control that are responsive to [Heartland's] requests for production. The only documents excepted from production are those regarding [North Kansas City Hospital's] net worth, and hard copy documents (not including contract-related documents)

dated between January 1, 2000 to January 1, 2003.

(Doc. 450 at 50 (internal footnotes omitted).)  The Court finds that North Kansas City Hospital's initial objections are unfounded.  *See **Johnson v. Kraft Foods of N. Am., Inc.***, 238 F.R.D. 648, 655 (D. Kan. Nov. 14, 2006) ("A party responding to discovery requests 'should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in interrogatories.'"); ***Sonnino v. Univ. of Kan. Hosp. Authority***, 221 F.R.D. 661, 668-69 (D. Kan. 2004) (stating that a party withholding information or documents based on claims of attorney-client or work-product privileges must "describe in detail the documents or information sought to be protected.  The objecting party must also provide sufficient information to enable the court to determine whether *each element* of the asserted objection is satisfied."); ***Hoffman v. United Telecomms., Inc.***, 117 F.R.D. 436, 438 (D. Kan. 1987) (stating that an interrogatory creates an undue burden only when the burden to the interrogated party outweighs the benefit to the discovering party of having the information).  North Kansas City Hospital shall comply with Heartland's requests in this regard forthwith (if it indeed has not already done so).[24]  Heartland's motion in this regard is GRANTED.

---

[24]  It appears from North Kansas City Hospital's response that it has complied and withheld only documents concerning its financial condition and hard-copy documents prior to January 1, 2003.  (Doc. 450 at 50.)  Both of those topics are covered by this Order

b.  Saint Luke's

Heartland asserts Saint Luke's failed to respond to requests for production of lobbying documents it received from the Kansas Hospital Association ("KHA"). (Doc. 399 at 12.)  Saint Luke's refused to produce these documents, relying on the First Amendment privilege and the attorney-client privilege.  The Court has already addressed the privileged status of these documents in its Memorandum and Order dated March 16, 2007 (Doc. 549).  The Court found that documents regarding KHA's lobbying strategies are subject to the First Amendment privilege. The right found to be held by KHA is equally assertable by KHA's members.  *See NAACP v. Alabama*, 357 U.S. 449, 459 (1958) (holding that an association can assert the First Amendment rights *of its members*); *McCormick v. City of Lawrence, Kan.*, No. 02-2165-JWL, 2005 WL 1606595, at *8 (D. Kan. Jul. 8, 2005) (noting the difference between an association asserting the rights of its members and an individual asserting individual constitutional rights); *Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) (stating that the "First Amendment's protection 'extends not only to the organization itself, but also to its staff, members, contributors, and others who affiliate with it'" (quoting *Int'l*

---

and it would seem that when North Kansas City Hospital complies with the requirements of this Order it will have fully complied with Heartland's discovery requests.

*Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978)).

The Court's ruling that KHA documents relating to its lobbying strategy are protected by the First Amendment privilege applies here with equal force. Therefore, documents in Saint Luke's possession related to KHA's lobbying strategy are not subject to disclosure. The Court cannot determine, however, which specific documents Saint Luke's claims are privileged because no privilege log has been provided to the Court. Obviously, to the extent that Saint Luke's is claiming a First Amendment privilege for the same documents identified on KHA's privilege log (Doc. 404, Ex. 3) (identifying 47 specific documents claimed as privileged under the First Amendment), the privilege would apply. However, in order to determine this issue, Saint Luke's should produce a privilege log to Heartland detailing the application of the First Amendment privilege to any documents not covered by KHA's privilege log (if it has not already done so). The parties should note the heightened standard of relevance applicable to documents protected by the First Amendment privilege. *See Austl./E. USA Shipping Conference v. United States*, 537 F. Supp. 807, 810, 812 (D.D.C. 1982) (a greater showing of relevance and need is required where First Amendment issues are at stake in order to give more protection to First Amendment values); *Wyoming v.*

***United States Dep't of Agric.***, 239 F. Supp. 2d at 1241 (when a claim of First

Amendment associational privilege is asserted, the relevance standard is more

exacting than the minimal showing of relevance under Rule 26(b)(1), and the

information must go to the heart of the matter).  If, after an appropriate meet and

confer process, the parties still dispute Saint Luke's assertion of the privilege, the

parties may each submit a supplemental brief on this issue which shall not exceed

ten (10) pages in length.  No rebuttal briefs will be allowed.

Heartland next asserts that Saint Luke's failed to fully search for, and

therefore did not fully respond to, requests for documents from all its employees

and all its "locations."  (Doc. 399 at 9, 10-11).  Heartland generally states that

Saint Luke's has: (1) unilaterally narrowed the types of employees it will search

for specific documents; and (2) unilaterally limited its search for documents related

to specialty hospitals but refused to search for documents relating to surgery

centers.  (Doc. 399 at 10-11.)  Heartland does not specifically identify the

propounded discovery at issue and implies that its contentions relate to all of its

requests for production.

In its Response, Saint Luke's seems to assert a vagueness objection, but

states only that Heartland's "request is vague" and makes no showing of how

Heartland's propounded discovery was vague.  Saint Luke's then makes an undue

burden objection and states that it employs "nearly 8000 employees system wide" but does not state how Heartland's propounded discovery would be burdensome or cost prohibitive. Saint Luke's goes on to state the discovery (and cost) of its production to date but does not justify its decision to limit the employee's who were searched or the limitation to specialty hospitals and not surgery centers. (Doc. 450 at 47-48.) Heartland's Reply is similarly unhelpful. (Doc. 527 at 38) (Sealed).

The Court is bothered by the position the parties have put the Court in on this point. Neither party has addressed the issue before the Court in a meaningful manner and the Court, in accordance, similarly refuses to address the issue. *See Sonnino*, 221 F.R.D. at 670-71 (stating that a party that does not support an objection to a discovery request in response to a motion to compel has abandoned that objection; however, the moving party must first address the objection in its motion to compel). Heartland's motion in this regard is therefore DENIED.

## 9. Confirmation of Responsive Document Production

Finally, Heartland asks the Court to compel Aetna and North Kansas City Hospital to confirm whether they have "fully responded" to each of Heartland's discovery requests. (Docs. 383 at 16-17 (Aetna); 387 at 16-17 (North Kansas City Hospital).) In their Response, Aetna and North Kansas City Hospital state they

"are not withholding any documents based on objections except those documents which have been extensively discussed between these parties and [Heartland] and upon which the parties have reached an agreement."  (Doc. 450 at 49.)

The Court believes no more can be expected of Aetna and North Kansas City Hospital and the case Heartland cites to the contrary is not applicable.  *See Johnson v. Kraft Foods of N. Am., Inc.*, 236 F.R.D. 535, 541 (D. Kan. 2006) (holding that "general objections" do not preserve asserted challenges to production and that a party cannot assert a relevancy objection merely by stating that it has produced or will produce all relevant, non-privileged documents); *see also Swackhammer*, 225 F.R.D. at 660-61 (ruling that "to the extent" general objections are disapproved and "worthless" and therefore overruling the objection). Aetna and North Kansas City Hospital did initially make "general objections" to Heartland's discovery, but they now state through officers of the Court that they are not resting on any objections Heartland is not fully aware of.  The parties, of course, should realize their continuing obligations to supplement discovery under the Federal Rules.  FED. R. CIV. P. 26(e)(2) ("A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect

incomplete or incorrect and if the additional or corrective information has not

otherwise been made known to the other parties during the discovery process or in

writing.").  Heartland's motion in this regard is DENIED.


## AWARD OF MOVANT'S EXPENSES

In each of its motions, Heartland asks the court for an award of its

"reasonable expenses in making [its] motion, including its attorney's fees."

Heartland did not expand on this request until its reply brief to the court, in which

it stated it was seeking fees under Rule 37(d) or, alternatively, under Rule

37(a)(4)(c).  (Doc. 527 at 54) (Sealed).  Rule 37(d) provides for sanctions for

failure to serve answers to interrogatories or respond to requests for inspection.

FED. R. CIV. P. 37(d) ("If a party . . . fails . . . to serve answers or objections to

interrogatories . . . or to serve a written response to a request for inspection . . ., the

court in which the action is pending on motion may make such orders in regard to

the failure as are just.").  Rule 37(d) is not applicable as Defendants have not

wholesale failed to respond to Heartland's propounded discovery.

Rule 37(a)(4)(c) provides for sanctions when a motion to compel discovery

is granted in part and denied in part, as the Court has done within this

Memorandum and Order.  Rule 37(a)(4)(c) states that a court "may" apportion the

reasonable expenses incurred in such a motion "in a just manner."  The Court finds

that the just resolution of Heartland's request for attorneys' fees, given the Court's

decision to grant in part and deny in part the motions, is to have each party bear

their own expenses and fees in relation to these motions.  Heartland has not

pursued unfounded discovery requests and Defendants have not exercised bad faith

in pursuing their objections.  Each party will be responsible for their own expenses

and fees in regard to Heartland's motions to compel Defendants.

## CONCLUSION

Heartland's motions to compel (Doc's 382, 386, 388, 392, 396, 398, 400)

are GRANTED IN PART and DENIED IN PART as set out in this Memorandum

and Order.  Heartland's requests for its expenses in making its motions, including

attorneys' fees, are DENIED.

North Kansas City Hospital's motion to strike (Doc. 485) is DENIED.

The motions by Heartland (Doc. 526) and North Kansas City Hospital (Doc.

532) for leave to seal response and reply briefs concerning the motion to strike are

GRANTED temporarily, and those pleadings shall be filed under seal forthwith.

The motion by Blue Cross and Blue Shield of Kansas City (Doc. 565) for

extension of time to file a response brief concerning the two motions for leave to

seal briefs related to North Kansas City Hospital's motion to strike is DENIED AS

MOOT since the Court in this Order has granted those motions.[25]

**IT IS SO ORDERED**.

Dated at Wichita, Kansas on this 26th day of March, 2007.

  s/  Donald W. Bostwick     
DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE

---

[25]  Blue Cross and Blue Shield of Kansas City has been dismissed from this case, *see infra* at page 1 n. 1, but in its motion expresses concern because the briefs which are the subjects of the motions for leave to file under seal mention documents which BCBSKS considers Confidential Information-Attorneys Eyes Only under the terms of the protective order entered in this case.  (Doc. 565 at ¶ 3.) (*presumably* documents which were produced by BCBSKS).  Since the Court is granting the motions to have these briefs filed under seal, there is no reason to delay the entry of this Memorandum and Order where BCBSKS's interests in confidentiality are already being protected.  This does raise an issue, however, which should be addressed at the status conference on March 27, 2007 – the right of dismissed parties to file additional pleadings in this case for reasons such as protection of their interests under the protective order (Doc. 170), and the appropriate procedure which should be followed for the filing of any such pleadings.  Closely related is the issue of whether counsel for a dismissed party should be automatically terminated from electronic receipt of further pleadings in the case through the CM/ECF system and whether they should continue to be able to view documents filed under seal in the case.