## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| HEARTLAND SURGICAL | ) | |
| SPECIALTY HOSPITAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-2164-MLB-DWB |
| | ) | |
| MIDWEST DIVISION, INC. d/b/a | ) | |
| HCA MIDWEST DIVISION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

Before the Court is Defendants' joint motion to compel compliance with

subpoenas issued to the 29 non-party physician founders ("Founders") of Plaintiff

Heartland Surgical Specialty Hospital, LLC ("Heartland").  (Doc. 671, 692.)  The

Founders, represented by Heartland's counsel, filed a response (Doc. 708).

Subsequently, the Court set oral argument on the motions and provided the parties

with a list of specific questions to be addressed at the hearing.  (Doc. 798.)  Prior to

the scheduled hearing, the Founders filed a Supplemental Memorandum.  (Doc.

827.)  The hearing was held on July 26, 2007 and the matter is now ripe for

decision.  The nature of the underlying anti-trust and tortious interference litigation

is well-known to the Court and all parties and need not be detailed here.

1

## I.  FACTUAL BACKGROUND

The Court has previously outlined the factual background concerning the subpoenas at issue and the Court assumes familiarity with its prior Order on the subject.  *See **Heartland Surgical Specialty Hosp., LLC v. Midwest Division, Inc.**,* No. 05-2164-MLB-DWB, 2007 WL 1112525, at *1-2 (D. Kan. Apr. 11, 2007).  In that Order, the Court resolved the Founders' objection about the issuance of the subpoenas, and modified the subpoenas by eliminating requests 2, 7, 8, 17, and 22, and modifying the text of request 9.  *Id.* at *5.  The Court then directed the Founders to immediately produce all non-objectionable documents requested by the subpoena, as it had been modified by the Court, and further directed the parties to meet and confer regarding the Founders' objections to the subpoenas.  *Id.*  Defendants advise the Court that none of the Founders have provided any additional documents pursuant to the Court's prior Order and the parties were unable to resolve their dispute through the meet and confer process.  Defendants thereafter filed their motion to compel.

### A.    The Motion to Compel.

Defendants' motion to compel seeks compliance with *all* the requests remaining after the Court's modification of the subpoenas, *i.e.*, requests 1, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, and 23.  Defendants also seek

clarification of what they assert is the Founders' general duty to search for and provide responsive e-mails.  (Doc. 692 at 5.)  Defendants, however, discuss as "examples" only requests 1, 3, 9, 11, 12, 13, 14, 15, and 21, citing the Court's page limitation restraint.[1]  (Doc. 692 at 5-7.)

The subpoenas ask for five general categories of documents:

1.    requests where the Founders have privileges (request 1);

2.    patient-centered requests, *e.g.*, patients that would have received treatment at Heartland (request 3), geographic area and service description of patients (request 4), communications with patients regarding insurance (request 5), and reductions in rates offered to patients (request 6);

3.    contract-centered requests, *e.g.*, contracts between the Founders and any managed care Defendants (request 9), advantages of in-network contracts (request 10), and contracts between the Founders and Heartland (request 11);

4.    finance-centered requests, *e.g.*, solicitation of patients (request 12), factors utilized in choosing where to admit a patient to a healthcare facility (request 13) and any resultant financial effect of such choices (request 14), compensation between the Founders and Heartland (request 15), complaints made about Heartland (request 16), and projected or actual financial performance of Heartland (request 18); and

5.    lawsuit-centered requests, *e.g.*, documents provided to Heartland in connection with Heartland's lawsuit (request 19), documents

---

[1]  The Founders contend that because Defendants did not brief the court with respect to all requests, they have waived any motion to compel on the unaddressed requests.  (Doc. 708 at 8.)

3

> concerning communications about the lawsuit (request 20), documents concerning any facts alleged in Heartland's complaint (request 21), and documents concerning competition between Heartland and other healthcare facilities (request 23).

(Doc. 483 Ex. 2.)  The subpoenas originally requested documents from January 1, 2000 to present.  Defendants subsequently limited their request to documents from October 2003 to present.  (Doc. 692 at 13.)

     **B.**    <u>The Founders' Supplemental Memorandum.</u>

As previously noted, shortly before the scheduled argument on this motion, the Founders filed a Supplemental Memorandum wherein they withdrew a portion of their prior objections:

> While non-party physician founders continue to object to identifying the *names* of every patient who would have used Heartland "but for" the conspiracy, the founders withdraw their objection to providing the *quantity* of patients who would have chosen Heartland.  By request of Heartland's damages expert, many founders have created summaries of patient data, which will be produced to Defendants as part of Heartland's expert report on damages.  This patient data (which contain varying levels of detail depending on the data processing systems available at each practice) will allow Defendants to "test" Plaintiff's damages.

(Doc. 827) (emphasis in original).  Heartland indicated that it believed that it did not need to identify the precise names of patients who would have utilized Heartland to establish its damages.  *Id.*

4

**C.**    **The June 26, 2007 Hearing.**[2]

At the hearing and oral argument, counsel for Heartland and the Founders reiterated that the Founders had withdrawn their objection to providing some patient information because Heartland had changed its theory of proving damages in this case.  Previously, Heartland intended to prove that but for Defendants' conduct, Heartland would have operated at full capacity and its damages would be the difference between operations at full capacity versus the reduced revenue actually realized by Heartland.[3]  Now, apparently after consultation with its expert witness on damages, Heartland will attempt to prove how many patients would have been referred to Heartland but for Defendants' conduct; however, this proof will be in the form of testimony from referring doctors (many or most of whom are Founders of Heartland) that a certain percentage or number of their patients would have been referred to Heartland for procedures.

In order to establish the entire universe of patients treated by these Founders to which such percentages can be applied, Heartland has obtained and will furnish

---

[2] *See* Doc. 829 (Transcript of Status Hearing held June 26, 2007).  This transcript was filed electronically on June 27, 2007, and remote public access to the transcript is restricted for a period of 90 days.  *See* "Notice for Members of the Bar on Electronic Availability of Transcripts," www.ksd.uscourt.gov/attorneys/transcripts/index.php.

[3] This theory of damages was stated as recently as May 4, 2007, in the Founders' opposition brief concerning these subpoenas.  (Doc. 708 at 12-13.)

to its damage expert an identification of all patients treated by the Founders from September 2003 to date.  This patient information is being provided by the Founders but it comes from the medical practices for whom the various Founders are employed.  (Doc. 827 at 1; Doc. 820 at 20.)  It appears that this information is gathered from computer billing and/or claims records of the various medical practices which contain: (1) the name or identification number of the patient; (2) a description of the procedure or treatment for the patient, perhaps by specific code; (3) where the procedure was performed; and (4) the payor for the treatment.[4]

In explaining Heartland's revised theory of proving damages, counsel for Heartland (and the Founders) emphasized that none of the testifying Founders will identify any *specific patients* of theirs who might have been treated at Heartland but for the conduct of Defendants.  Therefore, the Founders assert that there are no documents which would be specifically responsive to request 3.[5]

_____

[4]  At the hearing, counsel for the Founders did not identify specifically what information was available in computer format from each of the medical practices where the Founders practice. ( Doc. 820 at 20-21.)  The clear implication was that some practices have much more information available in computer format than the four categories enumerated by counsel.  (Doc. 829 at 12) ("some of them actually contain more data").

[5]  Request 3 asks for documents "sufficient to identify each patient whom you believe would have received medical care at Heartland but for the conduct of the defendants alleged in Heartland's Complaint."  (Doc. 483 Ex. 2 at 3.)  "Identify" is defined, when referring to a person, to require the person's full name, address and place of employment.  (Doc. 483 Ex. 2 at 7.)

The information provided by the Founders to Heartland's damage expert would, however, satisfy most of the elements of request 4.[6]  As noted in the Supplemental Memorandum, the Founders continue to object to giving Defendants the actual names of the patients they have treated since 2003, arguing that there is an indication that Defendants will attempt to contact these patients.  The Founders believe such contact would be inappropriate.

At the hearing, Defendants were outraged that Heartland was now providing to its damage expert the very type of information Defendants have been requesting from the Founders for months.  They emphasize that during meet and confer sessions Defendants made it clear that they needed the patient records and information from the Founders in order to dispute Heartland's damage calculations and to cross examine any damage witnesses, including any of the Founders who might testify at trial.  They further argue that the Founders' prior objections that they could not produce patient information because it was not in their custody and control, but was information controlled solely by the practice groups for whom they provide services, was either not true or was at least misleading.  Obviously,

_____

[6] Request 4 asks for documents "sufficient to show the geographic areas from which You draw patients for each service You offer, including but not limited to the home address (including zip code) of each patient to whom You have provided medical care, and for each such patient, a description of all services provided to that patient (including dates, DRGs and CPT codes for each admission, and the name of the facility at which the services were provided).  (Doc. 483 Ex. 2 at 3.)

because the Founders have now provided that information to Heartland's damage

expert, they could just as easily have obtained that information earlier and provided

it in response to the subject subpoenas.  Defendants further argue that the limited

extent of the patient information selected by the Founders to be provided to

Heartland's damage expert is not sufficient for Defendants to be able to effectively

contest Heartland's damage theory and testimony because it does not disclose other

important and possible determinative information such as the patients' general

health.  Defendants state that Heartland was not equipped to treat patients with

serious health conditions and would only treat the healthiest patients who had no

severe systemic disease.  Finally, Defendants strenuously argue that because

discovery is now closed and they cannot effectively depose the Founders to expose

potential flaws in their assumptions of which patients could have been referred to

Heartland for procedures, the only remedy is to preclude Heartland from using that

patient information while still requiring that it be produced to Defendants.[7]

## II.  DISCUSSION

---

[7]  Defendants also go far afield from the specific issues in the present motion by arguing that Heartland has breached its obligation to supplement its disclosures under Fed. R. Civ. P. 26(e) and under the First Revised Scheduling Order (Doc. 242), concerning damages previously disclosed under Fed. R. Civ. P. 26(a)(1)(D) (which requires a computation of any category of damages claimed and making available for inspection and copying under Rule 34 any documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based).

## A.    Whether Founders Should Be Treated As Parties.

As an initial matter, the Court must resolve Defendants' challenge to the status of the Founders as non-parties.  Generally, non-parties answering a Rule 45 subpoena are offered heightened protection from discovery abuse.  *See, e.g.*, FED. R. CIV. P. 45(c)(1) (requiring a party serving a subpoena to take "reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena" and imposing mandatory sanctions if this directive is not followed); ***Hefley v. Textron, Inc.***, 713 F.2d 1487, 1497 n.2 (10th Cir. 1983) (recognizing, in *dicta*, that "discovery from non-parties is often more inconvenient and expensive than it is from parties" but that "the same type of information can still be obtained"); ***Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.***, 211 F.R.D. 658, 663 (D. Kan. 2003) ("Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure.").   The Founders are, to be certain, non-parties to this litigation and, in fact, could not be parties.  *See, e.g.*, ***Jones v. Ford Motor Co.***, 599 F.2d 394, 397 (10th Cir. 1979) ("It is settled law that shareholders and employees do not have standing to sue for antitrust violations that injure a corporation.").

Defendants, however, argue that because the Founders have a significant

financial stake in the outcome of the underlying litigation as investors in Heartland, the Founders should have a greater responsibility in responding to the subpoenas. Defendants cite cases holding that the expense of production in response to a subpoena to a non-party who was substantially involved in the subject transaction can be shared between the non-party and the requesting party.  *See, e.g.*, ***In re First Am. Corp.***, 184 F.R.D. 234, 241-42 (S.D.N.Y. 1998) ("Where a non-party was 'substantially involved in the underlying transaction and could have anticipated that [the failed transaction would] reasonably spawn some litigation,' expenses should not be awarded.") (citations omitted); ***In re Exxon Valdez***, 142 F.R.D. 380, 383-84 (D.D.C. 1992) (requiring a non-party with an interest in the outcome of the litigation to share production expenses for a subpoena based on Rule 45(c)(2)(B)). These cases discuss Rule 45(c)(2)(B) which states that "an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded." FED. R. CIV. P. 45(c)(2)(B).  Both cases discuss the issue in connection with whether the requesting party should be required to pay the non-parties' costs in responding to the subpoena, and hold that because the non-party had some significant involvement in the litigation, the expenses should be shared.  This is a slightly different issue than determining whether the individuals producing

pursuant to a subpoena should be treated as non-parties in the first instance.  While

the Founders definitely have a financial stake in the outcome of this litigation, the

Court concludes that the Founders are non-parties and treats the issues discussed

*infra* accordingly.

### B.   Objections Raised.

Rule 45 governs the issuance of subpoenas to non-parties.  Rule 45(c)(2)(B)

states that if objection is made to a subpoena, the party serving the subpoena

cannot proceed other than through a motion to compel.  In their opposing

memorandum, the Founders restate their broad and general objections[8] to the

subpoenas based on the grounds of undue burden and expense, overbreadth,

privacy and confidentiality, duplicity, that the subpoenas improperly request the

creation of documents rather than mere production, relevancy, and that the

subpoenas request documents beyond the Founders' possession, custody and

---

[8]  A copy of the Founders' Objections to the subpoenas was attached to the prior
memorandum they filed concerning whether the subpoenas were served only by the
United Defendants or were served on behalf of all Defendants.  (Doc. 515 Ex. 1.)  These
objections were general and all-encompassing in nature and did not identify the
objections that might be applicable to each specific request in the subpoena.  For
example, the Founders objected to the subpoenas *"to the extent that the document
requests"* are "vague, ambiguous, overly broad, unduly burdensome or oppressive,
require speculation, or are not reasonably likely to lead to the discovery of information
relevant to the subject matter or any claim or defense in the underlying litigation."  (*Id*. at
¶ 2.)  Many of the objections were stated in this "to the extent" format.  (*Id.* at ¶¶ 1, 2, 3,
4, 5, 8, 9, and 11.)

control.  (*See* Doc. 708.)

"Whether a subpoena imposes an undue burden upon a respondent raises a case-specific inquiry.  It turns on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."  ***Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.***, 211 F.R.D. 658, 662 (D. Kan. 2003).  A court is to balance the relevance of the information sought against the burden imposed.  *Id.*;  ***In re Coordinated Pretrial Proceedings in Petroleum***, 669 F.2d 620, 623 (10th Cir. 1982);  ***In re Subpoena Duces Tecum Directed To RCA Group,*** No. 06-MC-230-JWL-GLR, 2006 WL 3844791, at *3 (D. Kan. Dec. 28, 2006).  The ***Goodyear Tire & Rubber Co.*** case goes on to describe the concept of relevancy:

> Relevancy is broadly construed, and a request for discovery should be considered relevant if there is "any possibility" that the information sought may be relevant to the claim or defense of any party.  A request for discovery should be allowed "unless it is clear that the information sought can have no possible bearing" on the claim or defense of a party.  When the discovery sought appears relevant on its face, the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Rule 26(b)(1), or (2) is of such marginal relevance that the potential harm the discovery may cause would outweigh the presumption in favor of broad disclosure. Conversely, when relevancy is

>not apparent on the face of the request, the party seeking
>the discovery has the burden to show the relevancy of the
>request.

211 F.R.D. at 663 (internal citations omitted).  A subpoena that is overly broad,

irrelevant, or duplicative would create undue burden and expense and can be

quashed.

The Founders object that the subpoenas "would require them to search

through virtually every document in their possession."  (Doc. 708 at 5.)  By way of

example, the Founders point the Court to request 4, which the Founders argue

would require them to produce the records (including home address, diagnoses,

services rendered and facility where services were provided) for every patient each

Founder treated from October 2003 to date.  Similarly, request 3 requires

documents identifying each patient treated by each Founder that could have been

treated at Heartland but for the conduct of Defendants as alleged in Plaintiff's

complaint.  (Doc. 708 at 5-6.)  The Founders also point to requests 3, 4, and 21 as

overly broad and irrelevant.  (Doc. 708 at 10.)

The Founders further argue that Defendants' request for additional

production of documents by searching personal e-mail accounts would be unduly

burdensome.  The Founders state that Heartland has already produced all

responsive electronic documents from all Heartland servers and all Heartland e-

mail accounts, as well as any relevant e-mails authored by, sent to, copied to, or blind-copied to any non-Heartland e-mail accounts utilized by Dr. Reed. (Doc. 708 at 2-3.) As a result, any relevant e-mail communication from an individual Founder to a Heartland account and any relevant e-mail communication from a Heartland account to an individual Founder has already been produced. The Founders argue that it is highly unlikely that any relevant information would be found beyond this production. (Doc. 708 at 6-8.)

Finally, the Founders argue that many of the requests are duplicative of discovery already propounded. The Founders point to request 9 which asks for "all documents concerning negotiations and/or contracts between Heartland or any Heartland Physician and any Managed Care Defendant." The Founders inform the Court that they have told Defendants that Defendants have already been given all documents regarding Heartland's negotiations and/or contracts with any managed care Defendant. (Doc. 708 at 9.) The Founders therefore argue that the portion of request 9 seeking production of Heartland documents is duplicative. In addition, the Founders argue that request 4 is partially duplicative because Heartland has already produced documents concerning the patients that have been treated at Heartland and is also duplicative of information the Managed Care Defendants have for their own customers who have been treated by any of the Founders. (Doc.

708 at 2.)[9]  The Founders state that additional production with regard to request 1 (concerning where the Founders have privileges) is duplicative because the Founders who have responsive documents have already produced such documents. (Doc. 708 at 12.)  Finally, the Founders point to requests 11 (concerning the Founders' financial interests in Heartland), 12 (concerning solicitation of patients), and 15 (concerning compensation by Heartland) as duplicative.  The Founders inform the Court that Heartland has already produced documents responsive to these requests and if any Founder had additional information, it has also been produced.  (Doc. 708 at 10.)

Defendants counter that at least some of the Founders have testified that they never saw the subpoena, never did anything to gather documents in connection with the case or provide them to Heartland's lawyers, never instructed their staff to assist legal counsel in gathering personal files in connection with Heartland, and

_____

[9]  At the hearing, several counsel for Defendants noted that their clients either had not treated patients of the Founders at their particular hospitals or that patients of Founders were not members of their managed care networks.  *See e.g.,* Doc. 829 at 45 (Carondelet Defendants – "those patients were not coming to our hospitals whatsoever"); Doc. 829 at 80 (Aetna Defendants – Aetna was not a provider for Dr. Reed's practice group for the time period involved).  Also, counsel for HCA Midwest Defendant pointed out that the Founders may have sent many of their patients to other facilities for treatment and those other facilities – for example, KU Medical Center, Olathe Medical Center and Childrens Mercy Hospital – are not defendants in this case therefore any information the other facilities may have about the Founders' patients is not available to Defendants.  (*See* Doc. 829 at 99.)

never discussed the subpoena with Heartland's CEO, Ms. Holley.  (Doc. 692 at 4; Ex. B) (Mar.15, 2007 Depo. of Thomas P. Laughlin, M.D.).  *See also* Doc. 483 at 9-11 (discussing Dr. Ananth, Dr. Anderson and Dr. Petelin).  The Founders respond that Ms. Holley did, in fact, discuss the subpoenas with either the Founders or their staff in the process of finding any responsive documents.  (Doc. 708 Ex. 2) (Declaration of Mary Nan Holley.)

### C.    Matters Resolved At The June 26 Hearing.

A few of these disputes were settled at the hearing.  As to request 1, the Founders agreed to produce a list of the facilities where the Founders have privileges, to the extent that this information has not previously been provided either by a prior document production or through a deposition.[10]  The Court directed that this information be provided within ten days of the hearing.  (Doc. 829 at 146.)

As to requests 3 and 4, Heartland is producing the patient information identified at the hearing to Defendants.  The Court directed that this information be provided within ten days of the hearing.  (Doc. 829 at 145.)  This patient

---

[10]  At the hearing it was confirmed that fourteen of the Founders had been deposed by Defendants: Dr.'s Amundson, Ananath, Bailey, Blatt, Charapata, Ciccarelli, Edwards, Eubanks, Gillen, Gonzalez, Gupta, Hoehn, Hopkins, Laughlin, Moore, Petelin, Reed, Roh and Storm.

information identifies the universe of patients treated by the Founders from

September 2003 to date, the services provided to the patient, and the name of the

facility where the patient was treated, all as requested in request 4 (although it is

not clear whether this information will include the address and ZIP code for each

patient).  As previously noted, however, the Founders have represented to the court

that no documents exist which will identify the *specific patients* who the Founders

contend could have been treated at Heartland as defined in request 3.  Because no

such document exists, the Founders cannot produce such in response to the

subpoenas.

Also, counsel for the Founders stated that they would go back with the

Founders who were deposed and if a particular Founder had indicated during the

deposition that he would provide or search for additional documents, those would

be produced.  (Doc. 829 at 26-27.)  As to any Founder who was deposed and who

agreed during the deposition to do additional searches for records, that

commitment shall be honored and completed forthwith.

### D.    Additional Patient Information Sought By Defendants.

There is a continuing dispute about whether the Founders are required to

produce additional patient information from documents which exist in the records

of the Founders or their medical practices.  Defendants essentially contend that

request 4 is broad enough, perhaps in conjunction with request 21 (concerning any facts alleged in the complaint), to require the Founders to produce the entire medical records of all patients they have treated since September 2003. They allege that this was clearly understood by the Founders' attorneys through discussions at the meet and confer sessions. To show this, Defendants cite the Founders' own memorandum, where the Founders state that Defendants have claimed that "these physicians must therefore produce all information on each patient that have treated since 2003" which would "require[] each of these non-party physicians to sift through each and every single patient chart for more than four years." (Doc. 708 at 11.)

The Founders argue that to require them to perform such a search do so would be unduly burdensome. Counsel for the Founders noted that, at least as to some of the medical practices, the full information sought be Defendants would only be found in patients' original files which are in paper format and which may have been sent to off-site storage. (Doc. 829 at 18-19.) The Founders' counsel was unable to tell the Court at the hearing how many patients were treated by the Founders for the period from 2003 to date, but characterized the number as several

thousand.[11]  In response to this specific motion to compel, the Founders presented

no detailed information in the form of affidavits as to the time and cost that would

be involved in producing these patients' medical records.[12]  Defendants concede

that it would be expensive and time-consuming to search for and produce all of

these patients' medical charts or records, but argue that these records are critical to

Defendants' ability to dispute the method and basis for Heartland's claimed

damages of several million dollars.

The Founders also raised another reason for not producing the patients'

medical records.  They claimed that these records were not in the Founders'

custody or control, but were in the custody and control of the medical practices for

whom the Founders worked.  The Founders supported this allegation, however,

---

[11]  Dr. Reed did produce information concerning the volume of patients seen by him and by the three other physicians in his practice group, Heartland Hand & Spine Orthopaedic Center, P.A. (HHSOC) in connection with the motion to compel the additional subpoenas issued to him and his practice group.  (*See* Doc. 733 Ex. 3) (Declaration of Cindy Barrack).  Barrack is the Executive Administrator for HHSOC and she stated that HHSOC schedules more than 400 patients per week.  The Court notes, however, that these are patient appointments scheduled at HHSOC's offices, and do not necessarily represent patients who are to receive procedures of the type that might have been performed at Heartland. Also, it is possible that one patient might have multiple appointments concerning a single procedure or treatment.  Therefore, this number of appointments does not necessarily equate to the number of patients treated by these physicians.

[12]  As previously noted, the Affidavit of Cindy Barrack (made in connection with another motion to compel) does outline the costs and burdens that would be imposed on Dr. Reed and HHSOC if they were required to provide all medical records of patients treated since 2003.  (Doc. 733 Ex. 3.)

with specific evidence as to only one practice group – Pain Management

Associates.  (*See* Doc. 708 Ex. 3) (Declaration of Todd M. McGuire).  That

practice group includes eight of the Founders – Dr.'s Aks, Burfiend, Chaplick,

Charapata, Edwards, Israel, Laughlin, and Scowcroft.  *Id.*  On the other hand,

Defendants did not come forward with any evidence in support of their motion to

show who these medical practices are or the nature of the relationship between

each Founder and the facility in which they practice and whether the physician

would have effective custody or control over records of his/her treatment of

patients.  As a result, Defendants would normally have failed to carry their burden

of showing how these patient-centered documents are within the possession and

control of the Founders.  *See, e.g.*, ***Super Film of Am., Inc. v. UCB Films, Inc.***,

219 F.R.D. 649, 651 (D. Kan. 2004) (stating that "the party seeking production of

the documents bears the burden of proving that the opposing party has the control

required" and setting out multiple factors to determine if control is present); *see*

*also* ***Heartland Surgical Specialty Hosp., LLC v. Midwest Division, Inc.***, No. 05-

2164-MLB-DWB, 2007 WL 950282, at \*16-20 (D. Kan. Mar. 26, 2007) (applying

the ***Super Film*** case).  However, in this case, where it now appears that every

Founder has provided patient data to Heartland which came from their medical

practice for use by Heartland's expert damages witness, the Court can readily

20

conclude that these Founders did have sufficient control over the records

maintained by their medical practices to acquire the documents requested by

Defendants.

Finally, the Founders argue in their Supplemental Memorandum that Tenth

Circuit case law, ***Presbyterian Healthcare Services v. Brown***, 101 F.3d 1324,

1330-31 (10th Cir. 1996) and ***Reazin v. Blue Cross and Blue Shield of Kansas,***

899 F. 2d 951, 971-72 (10th Cir. 1990), sets the evidentiary standard for proof of

damages in antitrust cases, and that the testimony presented by the Founders

concerning the number of patients that would have been referred to Heartland but

for Defendants' conduct exceeds that standard.  That argument, however, fails to

acknowledge the difference between the evidentiary standard at trial versus the

discovery standard presented by the present motion.  Even if Heartland is correct

that testimony from the Founders which is non-specific as to which particular

patient might have been referred to Heartland for treatment is sufficient to support

its burden at trial to prove damages, this does not mean that the Founders can

refuse to produce documents which could lead to relevant evidence that would be

admissible on cross examination of the Founders.

In considering all of these arguments and responses, the Court has some

initial concern with whether request 4 can reasonably be read to be a request for all

21

medical records and charts of all patients treated by the Founders.  Instead, it only asks for documents which show certain specific things:  (1) the geographic areas from which Founders draw patients, including home address and ZIP codes; and (2) for each such patient, (a) a description of all services provided to that patient (including dates and codes), and (b) the name of the facility at which the services were provided.  Defendants also argue that perhaps request 21 might be read to require full patient records because it asks for "[a]ll documents concerning any of the facts alleged or communications referenced in Heartland's Complaint."  The Court does not believe that such a broad request can be interpreted to require all patient records.  While the Court is not unsympathetic to Defendants' position that Founders knew all along that Defendants wanted the full medical records of all of Founders' patients, that is not what the subpoena specifically requests.  Defendants prepared the subpoena and must live with the language they used to describe the requested documents.  These subpoenas were issued a year ago and if disputes developed about the breadth of the requests, Defendants surely could have amended the subpoenas to clarify specifically what documents were being requested.[13]  Moreover, Defendants effectively disregarded the requirements of D.

---

[13]  Interestingly, one of the requests that was deleted from the subpoena after United settled with Heartland was request 22 which sought "[a]ll documents concerning any loss or damage that Heartland has suffered as a result of any act or omission of

Kan. Rule 37.2 which requires a party to file a motion to compel within 30 days of any default in the discovery responses.  For whatever reason, Defendants did not vigorously pursue a motion to compel after reviewing what now appears to be a somewhat meager production by Founders in July and again in October, 2006.  Had they done so, this issue could have been resolved while discovery was still open.

On the other hand, Plaintiff's last-minute change in its theory of proving damages in this case gives the Court some serious concern.  This change was not announced until after discovery had concluded, thus effectively preventing Defendants from submitting additional discovery requests to Heartland or the Founders in order to obtain additional facts to contest those claims.  While Defendants seek to characterize this action as blatant disregard for proper discovery procedures, the Court is not willing to necessarily agree with this view.  It is true, however, that the Founders have seemed to consistently drag their feet concerning compliance with these subpoenas.[14]  The discovery which was initially

United."  While very broad, this request would have more accurately have encompassed all patient records, particularly now that Heartland is using at least a part of those medical records to support its damage claims and calculations.

[14]  The recent Supplemental Memorandum announcing Heartland's change in its damages theory was the second abrupt change in position concerning compliance with the subpoenas.  When United initially settled and was dismissed from the case, the Founders were actively discussing with Defendants what documents could be produced and how to

produced in July and October 2006 was, in many instances, virtually non-existent and constituted a total of 1,765 pages for all of the 29 Founders.[15]  As noted during the hearing, documents produced for three of the Founders totaled 16 pages (FNDR0000744 to FNDR0000759) of which all but one page (listing places where the doctors had privileges) was merely a copy of the subpoena itself.  (Doc. 829 at 39-40.)  At the hearing, Founders' counsel conceded that the initial production of documents mainly included information about where the Founders had privileges with some limited documents about patients that might have been treated at Heartland, some limited financial information and (at least as to one Founder) some limited documents about efforts to refer patients to Heartland and complaints about Heartland or competing medical facilities.  (Doc. 829 at 28-29.)  Only when it became beneficial to Heartland to provide some of the requested patient information for use by its damages expert were Founders suddenly able to magically obtain some of the requested information from their medical practices so it could be produced.

———————————

resolve some of their objections.  At the last minute, the Founders changed position and argued that they would not comply with the subpoenas at all because United had issued the subpoenas and was no longer a party.  (*See e.g.*, Doc. 483 at 4-5.)

[15]  The largest volume of production was from Dr. Reed who produced 139 pages of documents (FNDR0000760-898) (Doc. 483 Ex. 3) together with approximately 19,000 pages of emails (Doc. 829 at 129).

After considering all the arguments concerning the issue of patient information, the Court concludes that this is a case where the subpoenas should be enforced, but only as modified. *Cf. **In re Subpoena Duces Tecum Directed To RCA Group,** No. 06-MC-230-JWL-GLR, 2006 WL 3844791, at *4 (D. Kan. Dec. 28, 2006). As an initial matter, the Court will construe request 4, which seeks documents that include a "description of all services provided to that patient (including dates, DRGs and CPT codes for each admission)" to require, in <u>addition</u> to the information Founders are producing to Heartland's damage expert, more complete patient information related to their treatment. Because Defendants could not agree what specific additional patient information is necessary or precisely where that information would normally be found,[16] the Court will require the

_____

[16] At the June 26, 2007 hearing, Defendants could not agree on the exact patient information they needed from the Founders. Defendant Aetna requested only the operative discharge summaries. Certain Defendants also argued for production of "ASA codes" that would identify the general health status of patients. Defendant Saint Luke's requested the full patient record so that Defendants could ascertain whether there are any notes in the records about discussions between the Founders and the patients about treatment at Heartland, and whether that treatment would be based on an in-network or out-of-network rate. (Doc. 829 at 11-12.) Counsel for the Founders indicated that some of this information, for example, the ASA codes, would probably not be in the Founders' facilities' records because that information is prepared and maintained by anesthesiologists. (Doc. 829 at 112.) Because the parties can reach no agreement on the necessary scope of the request, the Court is left to formulate the appropriate scope on its own.

production of the patient record for patients listed by the Founders in the materials

being produced to Heartland's expert damages witness.  While it is possible that

these patient records may be available from some of the medical practices

electronically, if the patient records are available only in hard-copy format, the

Founders will still be required to produce them.

This interpretation of the breadth of the subpoena, however, requires the

Court to consider the magnitude of burden placed on the Founders to comply with

the subpoena.  In so doing, the Court can, pursuant to Fed. R. Civ. P.

45(c)(3)(A)(iv) further modify the subpoena if it would subject a person to undue

burden.  Likewise, Fed. R. Civ. P. 26(b)(2) authorizes the court to limit the

discovery allowed under the rules where the burden or expense of the proposed

discovery outweighs its likely benefit, taking into account the needs of the case, the

amount in controversy, the parties' resources, the importance of the issues at stake

in the litigation and the importance of the proposed discovery in resolving the

issues.

Because of the apparently large universe of patients treated by Founders for

the period September 2003 to date, the Court will modify the temporal scope of

this request of the subpoenas to cover only patients listed by the Founders in the

materials being produced to Heartland's expert damages witness who were treated

by each Founder during the period March 1, 2005 through May 31, 2005.  This will provide Defendants with an adequate "sampling" of the patients' data to obtain information necessary for cross-examination of both the Founders and Heartland's damages expert.[17]  The Court has selected this particular time period for several reasons.  First, it encompasses a time period both before and after the filing of the Complaint in this case; second, it includes some of the same time period during which Heartland maintained records to show why patients who had been referred to Heartland for procedures decided not to have the procedure done at Heartland, *see* Vincent Depos. Ex. 95; and finally, it covers a period after Heartland had been in operation for over a year rather than an earlier start-up period.  By using only a three-month period, the Court believes that it has properly balanced Defendants' need for the requested patient information against the burden on the Founders of complying with the subpoena.[18]

---

[17]  *See e.g.*, MANUAL FOR COMPLEX LITIGATION (2004 Ed.), § 11.493 regarding the use of sampling to estimate the characteristics of a "population" or "universe" of events or transactions by observing characteristics in a relative small segment or sample of the defined population.

[18]  The Court is mindful of the Founders' argument that many of the patients who they treated and whose records will be produced were either treated at one of the Defendant hospitals or were a member of the network of one of the Managed Care Defendants in this case and, as a result, those specific Defendants would already have records for those patients.  The Court does not believe that this precludes the production of the data required by this modified subpoena from the Founders.  At least some Defendants never had these Founders' patients for treatment in their hospital nor were

While the Court is treating the Founders as non-parties, it can consider, and has considered, their significant involvement and financial interest in the affairs of Heartland, and the fact that they are a very significant source of patient referrals to Heartland. Under these conditions, and because it has significantly reduced the scope of the request for patient information, the Court does not believe that cost-sharing is appropriate between Defendants and Founders concerning the modified discovery allowed by this Order. The Founders will therefore be required to make available the patient records described in this Memorandum and Order for examination by Defendants at the Founders' own cost and expense. If, after review of the patient records, Defendants designate any portions of those records for copying, those copies shall be made at Defendants' cost and expense.

Finally, while the Founders continue to object to the production of specific patient names, the Court will require the records to include the patient's name. The production will be made as "Confidential-Attorneys Eyes Only" materials pursuant to the provision of the Protective Order in this case as it has been modified. This

---

they members of the managed care networks of some Defendants. *See* note 9 *supra*. Other Defendants have settled, and there is some suggestion that the settlement agreements prohibited those settling parties from voluntarily providing records and documents to the remaining Defendants.

should adequately protect the confidentiality of patient medical information.[19]

**E.      Founders' Search For Documents – Particularly Personal E-Mails.**

Another bone of contention between the Founders and Defendants was the question of whether the Founders complied with the subpoenas by searching for electronic documents and whether some electronic documents might have been destroyed or overwritten after Founders (as members of Heartland) voted to file the present action.  The evidence is conflicting as to precisely what each Founder did when served with the subject subpoenas.  The Court does not discount the testimony of some of the Founders that they had never seen the subpoena and had never searched for the requested records themselves nor instructed their staff to search for those records.  *See e.g.,* Doc. 692 at 3-4; Doc. 483 at 9-11.  On the other hand, the Declaration of Mary Nan Holley states that she helped coordinate with each Founder or that Founder's staff to search for requested documents.  (Doc. 708, Ex. 2.)  Recognizing that the Founders are undoubtedly busy physicians who are engaged in daily activities that require their full attention, it is not unreasonable to conclude that they may have not recalled or remembered specifically what was

---

[19]  Whether a particular Defendant has the legal right to contact any specific patient of a Founder who was treated at that Defendant's hospital or is a member of that Defendant's managed care program, is not before the Court and the Court expresses no opinion on that issue.

done about the subject subpoenas.  The Court does not find from the record before

it that Founders have intentionally failed to comply with the subpoenas or have

acted in a grossly negligent manner.

The Court is concerned, however, about the dearth of materials that were

produced by many of the Founders in their initial productions in July and October

2006.  While some of the same materials may have been produced by Heartland in

earlier document productions, this alone does not relieve Founders of the

obligation to search for and produce the requested documents if the documents are

in their custody or control.  Sometimes it is crucial to know whether a particular

person had possession of a specific document at a specific time.  Thus, as to the

requests discussed below where the Court is requiring additional production, the

Founders will be obligated to search their own records, including the records of

their medical practices, for the existence of such documents.[20]

Defendants' main complaint is that many Founders did not search their

personal e-mail accounts for document that were responsive to the subpoena.  In

their initial objections, the Founders argued, albeit in a general manner, that the

subpoena was an undue burden in part because it sought voluminous documents

---

[20]  This requirement relates to paper documents or electronic documents other than
e-mail for the reasons set forth later in this Memorandum and Order.  Also, this
requirement does not require a search of the individual patients' records.

that Defendants already had in their possession.  (Doc. 515, Ex. 1 at ¶¶ 5-6.)

Particularly as to e-mail searches, this again brings into play the balancing test of

Fed. R. Civ. P. 26(b)(2) which authorizes the court to limit the discovery allowed

under the rules where the burden or expense of the proposed discovery to the

responding party outweighs its likely benefit.  In this case, all of the Founders had

e-mail addresses (@hssh.org) through the Heartland email server.  Heartland has

already produced all e-mails sent from or to any other @hssh.org e-mail address, as

well as any e-mails copied or blind-copied to those addresses.  In addition,

Heartland has produced all e-mails sent by Dr. Reed from any of Dr. Reed's other

e-mail addresses, *i.e.*, non-@hssh.org addresses, to anyone with a @hssh.org

address.

From the discovery disclosed to the Court, including the infamous Farrell-

Evans letter (Doc. 819 Ex. 21) (Sealed), it appears that Dr. Reed was the major

communicator to other Founders concerning Heartland business.  However, while

it is acknowledged that other Founders also had separate non-@hssh.org e-mail

addresses at their homes or offices,[21] it is bothersome to the Court that no attempt

---

[21]  For example, during the hearing, Defendants referred to an e-mail produced by Heartland which had been sent by Dr. Reed to numerous addressees, including several of the Founders.  (Doc. 829 at 68; Vincent Ex. 104.)  The e-mail forwarded copies of the May 18, 2004 Minutes of the Founders Meeting and was sent to e-mail addresses of the Founders <u>other than</u> their @hssh.org addresses (such as @kc.rr.com, @aol.com, and @msn.com).  Thus it would be inaccurate to say that communications with the Founders

at all was made by some of the Founders to search, even on a random basis, their

personal or office e-mails.  At the hearing, Counsel advised the Court that some

Founders did search their other e-mail addresses (Doc. 829 at 77) and found no

relevant documents, while yet others testified during depositions that they did not

believe that any such documents would be located on their other e-mail addresses.

(Doc. 708 at 7; Doc. 829 at 77.)

    Many of the types of documents described in the remaining requests which

are in dispute are not the type of documents that could reasonably be expected to

be found through an e-mail search.  This includes the requests for documents

concerning charges at Heartland being based on "in-network" rates (request 6),

requests for contracts between Heartland and any managed care Defendants,

documents concerning advantages of accepting in-network contracts with a

managed care organization, and documents concerning a Founder's financial

interest in Heartland, including any contracts with Heartland (requests 9-11), and

all of the finance-related requests (requests 12-16 and 18).  The Court therefore

concludes that it is unlikely that a search of the Founders' non-@hssh.org e-mail

accounts would produce relevant documents described in the subpoenas that have

---

was always sent to their @hssh.org e-mail address.  However, because this document was
produced by Heartland, it obviously was sent from a Heartland address and Heartland has
searched for and produced all such e-mails.

not already been produced by Heartland or Dr. Reed.  Balancing the burden on the

Founders of conducting full e-mail searches of their non-@hssh.org e-mail

accounts against the likelihood that such searches would recover few, if any,

additional documents not already produced by Heartland, the Court will not require

the Founders to conduct any searches of their personal e-mail accounts in

responding to the subpoenas.

## F.      Miscellaneous Additional Requests.

After careful review of the remainder of the requests (*i.e.*, requests other

than requests 1, 3, and 4 which have been resolved *supra*), and the standards

outlined above, the Court makes the following findings:[22]

1.      As to requests 5 and 6, Defendants have provided at least one

brochure or flier from the Heartland document production which appears to be

directed to referring physicians and which specifically addresses how Heartland

will charge patients who are members of commercial PPO Plans vis-a-vis in-

network vs. out-of-network charges.  (Doc. 829 at 93-93; Anath Depos Ex. 172.)

This is a topic that is clearly relevant to Heartland's claims in this case and to

---

[22]  From arguments in the briefs and arguments made during the June 26, 2007 hearing, the Court is of the definite impression that the above issues concerning patient records and e-mail searches were the most significant disputes between Defendants and the Founders.  Very little argument was presented on the remaining requests.

Defendants' defenses.  Therefore, the Founders will be required to search their records and the records of their medical practices to ascertain whether any such documents exist.  This does not require the Founders to search their personal e-mail addresses or to search though all individual patients charts or records for these types of documents.

2.      As to the contract-centered requests (requests 9, 10, and 11), these are unduly burdensome because the documents they request have either already been produced by Heartland or are already in the possession of Defendants.  No further production is required.

3.      As to the finance-centered requests (requests 12, 13, 14, 15, 16, and 18), these are unduly burdensome for the same reasons and, in addition, the Founders report to the Court that any responsive documents that they possessed have already been produced.  As to documents concerning how doctors are compensated for services rendered at Heartland or documents concerning projected or actual financial performance of Heartland, those documents have already been produced by Heartland.  No further production is required.

4.      As to requests 19 and 20, while these are overly broad in scope and therefore may be considered unduly burdensome, the Founders indicated at the hearing that they were producing documents covered by these requests by

34

producing the patient information previously discussed.  (Doc. 829 at 102-03.)  As a result, no further production is required.

5.      As to requests 21 and 23, these requests are overly broad in scope and are therefore are unduly burdensome.  It appears to the Court that these requests in the subpoenas seek to make the individual Founders participate in discovery as if they were a party to this litigation.  The subpoena requests seek broad categories of documents, are far-reaching in scope, and do nothing to tailor Defendants' supposed needs versus the voluminous discovery already completed in this litigation.

## III.  AWARD OF SANCTIONS

The Founders ask the Court to sanction Defendants, including lost earnings and attorneys' fees, pursuant to Rule 45(c)(1).  Rule 45(c)(1) requires the Court to enforce the duty of the attorney issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to [a] subpoena."  Once the Court has determined that an attorney has violated Rule 45(c)(1), the imposition of sanctions is mandatory.

It is important to remember that the subject subpoenas were served over a year ago – May 26, 2006.  At that time, Defendants had not had the opportunity to

depose most of the Founders and may not have fully completed their review of Heartland's document production.  Thus, while it now appears that several of the requests are duplicative of documents already produced, and therefore the expense of that production may outweigh its benefit, that determination was not as easily made in May 2006.

Finally, a significant part of the delay and expense concerning these subpoenas was self-imposed by the Founders.  They are the ones who refused to comply with the subpoenas after United settled, thus requiring an initial round of briefing as to whether the subpoenas were enforceable by the remaining Defendant. After the Court ruled that the subpoenas were enforceable by the remaining Defendants and the Founders were ordered to produce any non-objectionable documents, no further documents were produced.  The Founders continued to assert their objections to Defendants during the court-ordered meet and confer session held on April 23 and 25, 2007, which was immediately before the court-imposed deadline for filing a motion to compel regarding the subpoenas.  (Doc. 671 Ex. A. at ¶ 7.)  Then, in a Supplemental Memorandum filed on June 25, 2007, Founders completely reversed course as to the most important category of the subpoenas – patient information –  and withdrew their objection concerning at least some of the requested information. As a result, and considering all the

circumstances, the Court finds that Defendants did not breach their duty to avoid imposing undue burden and expense on the Founders, and the Founders request for sanctions is denied.[23]

## IV.  CONCLUSION

Defendants' motion to compel is GRANTED IN PART and DENIED IN PART, for the reasons discussed herein.  Unless otherwise stated in this Memorandum and Order, any action required by this Memorandum and Order shall be completed within thirty (30) days of the filing of this Memorandum and Order. The Founders' request for sanctions is denied.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas on this 20th day of July, 2007.

      s/ DONALD W. BOSTWICK
DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE

---

[23]  During the June 26, 2007 hearing, Defendants' counsel argued that because discovery was now closed and the Founders had not yet produced patient information, the only meaningful sanction that could be imposed against the Founders was to find that the requested patient materials could not be used by Heartland at trial.  (Doc. 829 at 66-67, 81.)  The motion to compel the Founders to comply with the subpoenas did not request an award of sanctions. *See e.g.*, Doc.'s 671, 672.  Furthermore, the type of sanction proposed by Defendants – preclusion – is more appropriately considered in connection with Fed. R. Civ. P. 37(c) rather then in connection with a motion to compel under Fed. R. Civ. P. 37(a).  The Court therefore refuses to consider Defendants' oral request.