# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| HEARTLAND SURGICAL SPECIALTY HOSPITAL, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05-2164-MLB-DWB |
| MIDWEST DIVISION, INC. d/b/a HCA MIDWEST DIVISION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff Heartland Surgical Specialty Hospital LLC's ("Heartland's") motion to compel Defendant Midwest Division Inc. d/b/a HCA Midwest Division ("HCA Midwest") to re-produce two employees for depositions. (Doc. 752, 779.)  The nature of the underlying antitrust litigation is well-known to the Court and all parties and need not be detailed here.

In its motion, Heartland seeks an order of the Court compelling HCA Midwest to re-produce Juan Vallarino and Sam Hazen for depositions in Kansas City.  Heartland also seeks its expenses in traveling to Tennessee for the initial depositions and for filing its motion to compel.  HCA Midwest has filed its opposition to the motion (Doc. 795), and the Court is now prepared to rule.

1

## FACTUAL BACKGROUND

On April 4, 2007, Heartland deposed Juan Vallarino, the vice president for managed care for HCA Inc., the parent company of HCA Midwest, in Tennessee. At the deposition, Vallarino was instructed by his counsel not to answer five questions from Heartland.  These questions (and the topics they related to) were:[1]

Question Area 1:

> Q.  What I'm asking is, you asked for the various members on your team to provide you a list of niche facilities in their markets, correct?
>
> A.  That's correct.
>
> Q.  And you believe that that may have been sometime in 2004?
>
> A.  That's correct.
>
> Q.  Who asked you to collect that?
>
> A.  Sam Hazen.
>
> Q.  All right.  And did he explain to you why?
>
> A.  Well, some of it's planning.  Some of it is to understand the market share piece.  A lot of the information provided, we know what our competitive hospitals are doing.  We

---

[1]  The Court quotes lengthy portions of the deposition testimony to place the questions asked in context.  The deposition testimony, although designated as "Confidential - Attorneys Eyes Only," has been included, by mutual consent, by the parties as exhibits to their motions.  *See* Docs. 753, 767, 775 (concerning whether the memorandum and exhibits supporting Heartland's motion should be filed under seal).

may not know what the freestanding centers are doing in terms of volume or who they are or just to get a landscape of what it is we're competing against.

. . .

Q.  All right.  What did you do with the information?

A.  I provided it to legal, along with copies of our contracts to review.

Q.  And why did you do that?

[Counsel]:  Caution the witness not to reveal the substance of attorney/client privilege.

A.  I'll take her advice.

Q.  (By [Heartland Counsel]) You can answer my question.

[HCA Midwest Counsel]:  No, he can't answer the question because it would reveal the question and the subject of attorney/client privilege.

Q.  (By [Heartland Counsel]):  Did Sam Hazen ask you to collect the information with respect to physician-owned hospitals and niche facilities?

A.  Yes.

Q.  All right.  Did he also ask you to collect the contracts –

A.  No.

Q.  – related?  And the – who collected the contracts?

A.  I requested that.

Question Area 2:

Q.  Well, what I'm asking you is, what were the concerns that led you to submit the network configuration clauses that you collected in 2004 to legal?

[HCA Midwest Counsel]:  Limited to what your concern was.

A.  Concern is not the right word.  It is to see, by the way, do I have language in contract A versus contract B that is better versus contract C?  Lawyer, take a look at it and let me know.

Q.  You were - you were interested in strengthening network configuration clauses, their language, to prevent physician-owned facilities from getting in-network contracts, correct?

[HCA Midwest Counsel]:  I caution the witness not to reveal the substance of anything you asked a client - asked a lawyer or anything a lawyer told you in connection with this project.

A.  Okay.  I can't answer that.

[Heartland Counsel]:  Read back my question.  I'm not asking you for the disclosure of any attorney/client privilege communications.  [question read back]

[HCA Midwest Counsel]:  I instruct the witness not to answer that question.

[Vallarino]:  Okay.

Question Area 3:

Q. (By [Heartland Counsel]) Okay.  As part of your efforts

4

to strengthen the network configuration clauses, did you ask for the existing network configuration clauses that were in your markets?

A.  Yes.

Q.  All right.  And did you put that in a book?

A.  No.

Q.  What did you do?

A.  Gave it to legal counsel to review.

. . .

Q.  (By [Heartland Counsel])  Did you compile the network configuration language when you received it?

A.  No.  My lawyer did.

. . .

Q.  Did you make changes to network configuration clauses after legal counsel reviewed them?

A.  I'm not going to answer that.

Question Area 4:

Q.  All right.  And then you state, We need to revisit our contracting strategy, with the guidance of strong legal advice, and develop and deploy tactics that protect our hospitals from this trend.

And one of the ways that you would protect the hospital from this trend is through these exclusivity provisions that would prevent these new facilities from

getting contracts?  Fair enough?

[HCA Midwest Counsel]:  I caution the witness not to reveal the substance of any attorney/client advice.

A.  I can't answer that.  I cannot answer that.  That would be disclosing legal advice, as clearly stated in the last sentence.

Q.  (By [Heartland Counsel])  I'm not asking for legal advice.  I'm asking you that what you meant by develop and deploy tactics that protect our hospitals from these specialty – physician-owned specialty hospitals, one of the tactics was through exclusivity provisions that would prevent these facilities from getting in-network contracts?

[HCA Midwest Counsel]:  Can you answer that without revealing the substance of the advice you were given?

A.  I would say potentially, subject to legal advice.

<u>Question Area 5</u>:

Q.  Those were provided to legal counsel?

A.  Uh-huh.

Q.  I'm not asking you for any legal advice.  What I'm asking you is, after that process was done going forward in 2005 and in 2006, is it now your policy to have your negotiators run by the network configuration language, run it by legal counsel for antitrust-related issues?

A.  May I have a side bar with you?

[HCA Midwest Counsel]: You can say whether or not your policy is to seek legal counsel with respect to the network. You can answer that question.

A.  There are guidelines based on –

[HCA Midwest Counsel]:  No, no.  Don't go into that.

[Vallarino]:  Okay.  I can't.  Okay.

[HCA Midwest Counsel]:  You can answer a question yes or no.  Do you – since then do you have a policy of showing network configuration clauses to counsel?

A.  It varies by market.

Q.  (By [Heartland Counsel])  What about the Kansas City market.

[HCA Midwest Counsel]:  I'm afraid if he answers that question –

[Vallarino]:  I can't answer.

. . .

What I'm asking you, though, is specifically with respect to the Kansas City market, is it - is it the policy that you've communicated to your folks in Kansas City, specifically Patrick Patterson, that any exclusivity provisions that he negotiates must be reviewed by legal counsel?

[HCA Midwest Counsel]:  I cannot have him answer the question.

A.  I can't answer that.

[HCA Midwest Counsel]:  Direct the witness not to answer.

(Doc. 779 Ex. 1.)

On May 15, 2007, Heartland deposed Sam Hazen, the president of HCA Inc.'s western group, in Tennessee.  Prior to the deposition, Heartland's counsel informed HCA Midwest that it believed HCA Midwest's assertions of attorney/client privilege in response to Heartland's questions of Vallarino were improper.  (Doc. 779 at 5.)  At Hazen's deposition, HCA Midwest's counsel instructed the witness in the following manner:

> Q.  (By Heartland Counsel]):  And I'm asking him, do you recall that the contract language from the various HCA contracts were collected and provided to legal counsel for legal counsel's review?
>
> A.  No.
>
> Q.  Mr. Vallarino testified that you in fact participated in meetings with legal counsel after these contracts were collected and discussed the topic of network configuration clauses.  Do you recall those meetings?
>
> [HCA Midwest Counsel]:  Well, I'm going to instruct him not to answer on that because that would be clearly attorney/client communications.
>
> [Heartland Counsel]:  I'm entitled to know whether he attended the meetings in which the subject matter of network configuration clauses were discussed.
>
> [HCA Midwest Counsel]:  Not in my view you're not.  We're not going to talk about what lawyers and clients talk about.
>
> [Heartland Counsel]:  I'm not asking for the disclosure of the communication.

> Q.  (By [Heartland Counsel]):  I am asking did you meet - did you participate in a meeting in - after September 2004 with Mr. Vallarino and legal counsel in which the subject matter of the network configuration clauses that were collected as a result of this email were discussed?
>
> [HCA Midwest Counsel]:  Pat, my position is, and it's going to be that way until hell freezes over, or until the judge or magistrate tells me I'm wrong, but that the subject of that – between a lawyer and the client is privileged, the subject that they talk about.
>
> [Heartland Counsel]:  I'm entitled to know what the subject matter, the topic is, because that's the only way I can determine whether or not there is a basis for asserting the attorney/client privilege.  I'm not asking for the disclosure of the specifics of the communication.  Whether or not that topic was discussed, I'm allowed to know that.
>
> [HCA Midwest Counsel]:  Well, we disagree.  And I am instructing him not to answer.

(Doc. 779 Ex. 2.)  After a phone conference in which HCA Midwest informed Heartland that it intended to stand on its objections and instructions not to answer (Doc. 779 at 6), Heartland filed the present motion to compel.

## DISCUSSION

The Federal Rules of Civil Procedure govern claims of privilege in response to discovery.  Rule 26(b)(5)(A) states:

> When a party withholds information otherwise discoverable

9

> under these rules by claiming that it is privileged . . ., the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

This Rule is further supplemented by local deposition guidelines which state that, in a deposition, "[w]hen privilege or work product immunity is asserted, the witness is nevertheless required to answer questions relevant to the existence, extent, or waiver of the privilege/immunity, such as the date of a communication, who made it, to whom it has been disclosed, and its general subject matter."  D. KAN. DEPOSITION GUIDELINES ¶ 5(b).[2]

As an initial matter, Heartland claims HCA Midwest did not adequately support its objections of attorney-client privilege in compliance with these guidelines.  The Court, however, finds that HCA Midwest has provided sufficient information for Heartland to evaluate HCA Midwest's claims and make its motion to compel.

Federal Rule of Evidence 501 governs the issue of privilege in federal courts.  In this case, plaintiff asserts both federal antitrust claims and pendent state

---

[2]  Available on the Court's public website at http//www.ksd.uscourts.gov/attorneys/depositionguidelines.pdf.

law claims.  The Tenth Circuit has made it clear that in this situation, a court is to consider both federal and state law of privilege to see if there is any conflict between the two.  ***Sprague v. Thorn Americas, Inc.,*** 129 F.3d 1355, 1369 (10th Cir. 1997); *see also* ***Marten v. Yellow Freight Sys., Inc.***, No. 96-2013-GTV, 1998 WL 13244, at *3 (D. Kan. Jan. 6, 1998).   This court agrees with the court in ***Marten*** that there is no conflict between federal and Kansas law concerning the attorney-client privilege and it generally makes no difference which law is applied. *See* ***Marten,*** 1998 WL 13244, at *4-5 (comparing the elements of attorney-client privilege under federal law and Kansas law).

The burden for establishing the attorney-client privilege is well-known:

> Parties objecting to discovery on the basis of the attorney-client privilege bear the burden of establishing that it applies.  They must make a "clear showing" that the asserted objection applies.  To carry the burden, they must describe in detail the document or information to be protected and provide precise reasons for the objection to discovery.  They must provide sufficient information to enable the court to determine whether each element of the asserted privilege is satisfied.

***ERA Franchise Sys., Inc. v. N. Ins. Co. of New York***, 183 F.R.D. 276, 278-79 (D. Kan. 1998) (internal citations omitted); *see also* ***United States v. Lopez***, 777 F.2d 543, 552 (10th Cir. 1985); ***Williams v. Sprint/United Mgmt. Co.***, No. 03-2200-JWL-DJW, 2007 WL 445201, at *2 (D. Kan. Feb. 7, 2007); ***IMC Chemicals, Inc.***

*v. Niro Inc.*, No. 98-2348-JTM, 2000 WL 1466495, at *10-11 (D. Kan. July 19, 2000); *Boyer v. Bd. of County Comm'rs of County of Johnson*, 162 F.R.D. 687, 688-89 (D. Kan. 1995).

The attorney-client privilege applies to communications between a client and an attorney, made in confidence, under "circumstances from which it may reasonably be assumed that the communication will remain in confidence." *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (citing *Lopez*, 777 F.2d at 552). The privilege applies to communications from the client to the attorney and from the attorney to the client. *Lintz v. Am. Gen. Fin., Inc.*, No. 98-2213-JWL, 1999 WL 450197, at *3 (D. Kan. Jun. 24, 1999) (stating that the attorney-client privilege is triggered by a client's request for legal, as opposed to business, advice and communications from an attorney to a client). Privileges are to be strictly construed and narrowly applied. *See Trammel v. United States*, 445 U.S. 40, 50 (1980) (stating that "testimonial exclusionary rules and privileges . . . must be strictly construed"); *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (stating that although privileges are to be decided on a case by case basis, the Court was disinclined to "exercise this authority expansively"); *United States v. Nixon*, 418 U.S. 683, 710 (1974) (exceptions to the demand for every man's evidence are not to be expansively construed because they are in derogation of the search for the

12

truth).

Finally, the attorney client privilege protects only disclosure of *communications* between the attorney and client, and does not protect disclosure of *underlying facts* by those who communicated with the lawyer. This distinction was discussed by the Supreme Court in **Upjohn Co. v. United States**, 449 U.S. 383, 395-96 (1981):

> The [attorney client] privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney:
>
> > '[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to your attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney. *Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (ED Pa. 1962).'

See also **Mackey v. IBP, Inc.,** 167 F.R.D. 186, 200 (D. Kan. 1996); **Casson Const. Co., Inc. v. Armco Steel Corp.,** 91 F.R.D. 376, 384 (D. Kan. 1980).

HCA Midwest supports its claim of attorney-client privilege by arguing that the questions asked sought the disclosure of HCA Midwest's communications with legal counsel, and legal counsel's advice to HCA Midwest, and therefore were

13

aimed at soliciting privileged communications.  (Doc. 795.)  Initially, HCA

Midwest states as a controlling rule of law that "where the communication contains

inextricably intertwined facts and legal advice, the attorney-client privilege

applies."  (Doc. 795 at 5.)  HCA Midwest cites two cases in support of this

statement: *SEC v. Brady*, 238 F.R.D. 429, 438-39 (N.D. Tex. 2006) and *Florentia*

*Contracting Corp. v. Resolution Trust Corp.*, No. 92 Civ. 1188(PKL), 1993 WL

127187, at *6-7 (S.D.N.Y. Apr. 22, 1993).

In *SEC v. Brady*, 238 F.R.D. 429, 438-39 (N.D. Tex. 2006), the court

reviewed claims of privilege in connection with the production of documents.  The

party opposing the assertion of attorney-client privilege argued that the documents

rendered business advice, rather than legal advice.  *Id.* at 438.  The party asserting

the privilege argued that although the documents include some business

communications, the documents were legal advice regarding allegations of

accounting improprieties and threats of litigation, and therefore privileged.  *Id.* at

439.  After completing an *in camera* review of the documents, the court found that

they were "laced with underlying facts, legal opinions, and business advice" and

resulted from confidential communications between the party and its counsel,

ultimately finding the documents privileged.  *Id.*

In *Florentia Contracting Corp. v. Resolution Trust Corp.*, No. 92 Civ.

14

1188(PKL), 1993 WL 127187, at *6-7 (S.D.N.Y. Apr. 22, 1993), the court

reviewed, in the context of a motion for sanctions, three documents claimed as

privileged and not produced in response to discovery requests.  The court made the

initial finding that the party had properly supported its assertion of privilege

through its answers to the discovery and affidavit.  *Id.* at *6.  The court then

reviewed the documents, which had been submitted for *in camera* review, and

concluded that all three were privileged.  As to the third document, an "analysis

and legal opinion" requested by the party with respect to a settlement agreement,

the Court noted that the facts relied on by the attorneys in providing the attorneys'

legal advice were not privileged, but declined to "reach out" to suggest to the party

opposing the privilege other methods of gaining the information, through

deposition questions or otherwise, because the party had not pursued such

discovery.  *Id.*

  Neither case is helpful to the Court in resolving the parties' dispute.  In ***SEC***

***v. Brady***, the court did not address any attempts by a party to discover the facts

underlying the privileged communications in the documents.  The court also did

not address the discovery of the factual predicate leading to the confidential

communications between counsel and client and the resultant production of the

document.  In ***Florentia Contracting Corp.***, the court noted that, although the

15

party could not discover the documents giving legal advice from counsel to client, the party could use alternate discovery methods to gain the desired factual information.  This is what Heartland has attempted to do through deposition of Vallarino and Hazen.  Heartland is not seeking confidential communications made between Vallarino and Hazen and HCA Midwest's legal counsel.  Heartland is attempting to discern the factual predicate surrounding those meetings.

HCA Midwest argues that <u>all</u> the privilege assertions are justified, citing *Boyer v. Bd. of County Comm'rs of County of Johnson*, 162 F.R.D. 687, 690 (D. Kan. 1995); *Fleet Bus. Credit Corp. v. Hill City Oil Co.*, No. 01-02417 MAV, 2002 WL 31741282 (W.D. Tenn. Dec. 5, 2002); and *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355 (10th Cir. 1997).

HCA Midwest cites *Boyer* as a case that denied a motion to compel "answers to deposition questions that would reveal the 'substance of communications' by a client."  (Doc. 795 at 4 (quoting *Boyer*)).  HCA Midwest fails to note, however, that the court in *Boyer* specifically held that the "inquiry of plaintiff's counsel had nothing to do with the underlying facts of the case but rather seeks communications between the witness and counsel during the private conference [held between defense counsel and the witness immediately prior to the deposition]."  *Boyer*, 162 F.R.D. at 690.  *Boyer* went on to state:

16

> Specifically, the inquiry requests the substance of all communications by the witness to the attorney. Considering the principles reviewed in *Upjohn*, the status of the employee, and the context of the communications, the court determines that the communications are privileged. Plaintiff is entitled to inquire concerning the facts of the case. Inquiry concerning communications with the attorney are privileged.

*Id.* This case does not help the Court delineate between deposition questions which seek "the underlying facts of the case" as compared to questions which seek "communications between the witness and counsel during [a] private conference." *see also* **Berroth v. Kan. Farm Bureau Mut. Ins. Co**, 205 F.R.D. 586, 592 (D. Kan. 2002). **Boyer** and **Berroth** are factually inapposite because the questions being asked in those cases were direct questions as to what the witness communicated to the attorney. *See* **Boyer**, 162 F.R.D. at 689 (questions regarding what the witness talked about with her attorney); **Berroth**, 205 F.R.D. at 589 (three of four challenged questions regarding what the witness told his attorney and what the attorney told the witness in response and neither party challenged the applicability of the privilege).

Next, HCA Midwest cites **Fleet Business Credit Corp. v. Hill City Oil Co.,** No. 01-02417 MAV, 2002 WL 31741282 (W.D. Tenn. Dec. 8, 2002), for the proposition that communications from an attorney to a client are "protected by the privilege even when its disclosure would only '*indirectly* reveal the substance or

17

tenor of a confidential communication.'" (Doc. 795 at 4 (citing **Fleet Bus. Credit Corp.** (supplying emphasis))). The full quote of the law cited in **Fleet Business Credit Corp.** is:

> Attorney communications to the client are also protected, but only to the extent that they are 'specifically based upon a client's confidential communications or would otherwise, if disclosed, directly or indirectly reveal the substance or tenor of a confidential communication.'

2002 WL 31741282, at *3 (quoting **Bryan v. State**, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992)). The case quoted and relied upon, **Bryan**, is a criminal appeal where the court was considering application of the privilege "[i]n the context of criminal issues, given an accused's constitutional rights against compulsory self-incrimination and to the effective assistance of counsel, [where] the attorney-client privilege becomes tied to an accused's constitutional protections." 848 S.W.2d at 79. This is inapposite of the general rule concerning privileges, where a court is to apply the privilege narrowly. See **Qwest Commc'ns Int'l Inc.**, 450 F.3d at 1185 ("[P]rivileges 'must be strictly construed and accepted only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" (quoting **Trammel v. United States**, 445 U.S. 40, 50 (1980))); see also **Sanchez v. Matta**, 229 F.R.D. 649, 656 (D.N.M. 2004) (calling the attorney-client

18

privilege narrow).

Finally, HCA Midwest cites *Sprague v. Thorn Americas, Inc.* in support of the proposition that the Tenth Circuit has "upheld instructions not to answer deposition questions where doing so would reveal the substance of counsel's advice to a client." (Doc. 795 at 7.)  In *Sprague*, the court simply held that legal advice given by an attorney to his client (in *Sprague*, the attorney happened to be in-house legal counsel and the client happened to be the corporation) was protected by the attorney-client privilege, regardless of whether that legal advice rested upon confidential matters earlier revealed by the client.  129 F.3d at 1369.  *Sprague* protected the *actual communication*, a memorandum document, and did not discuss what deposition questions were asked about that document.  *Id.* at 1372.

Heartland relies on a single case to support its claim that the questions did not seek privileged communications: *IMC Chemicals, Inc. v. Niro Inc.*, No. 98-2348-JTM, 2000 WL 1466495, at *9 (D. Kan. July 19, 2000).  In *IMC Chemicals*, the Court was asked to determine if an attorney-deponent had waived the attorney-client privilege with respect to deposition testimony concerning language in a contract.  In resolving whether the communications at issue were protected by the attorney-client privilege and therefore subject to waiver, the court stated:

> The fact that a party had communications with its attorney is not privileged.  Revelation of the 'general topic of

19

> discussion' between attorney and client, furthermore, does not waive the privilege, unless such revelation also reveals the substance of a protected communication.  In addition, the privilege does not protect 'the activities of an attorney' as they are not communications.

*Id.* at *11 (citing ***Burton v. R.J. Reynolds Tobacco Co.***, 177 F.R.D. 491, 499 (D. Kan. 1997)).  The court found the attorney-deponent had revealed his legal advice to the plaintiff-client which was confidential and privileged and therefore found a waiver had occurred.  *Id.* at *12.

The case of ***Burton v. R.J. Reynolds Tobacco Co.***, 177 F.R.D. 491 (D. Kan. 1997) is also helpful on the issues presented here.  In ***Burton***, the court determined that a document was not privileged where it indicated the general topic of discussion at a meeting between counsel and client but did not "reveal the substance of any communications between counsel and client."  *Id.* at 499-500.  The court additionally determined that the activities of an attorney are not protected by the attorney-client privilege.  *Id.* at 500.

Finally, another case from this district is also helpful:  ***Kansas Wastewater, Inc. v. Alliant Techsystems, Inc.***, 217 F.R.D. 525 (D. Kan. 2003).  In that case, a witness was asked for his understanding and knowledge concerning the status of certain agency actions.  The objecting party argued that the attorney-client privilege applied because the witness' understanding and knowledge came from an

20

attorney.  The court found these questions did not seek privileged information because they sought factual details.  *Id.* at 529.  The court made the same finding with regard to questions about why an action was not taken and who made the decision to not take that action.  *Id.* at 530-31.  Finally, the court made the same finding with regard to a question about why the witness and his attorney drafted a document.  *Id.* at 531.

With this background, the Court addresses the specific deposition questions in dispute in this case.  Heartland's first question of Vallarino – why Vallarino provided lists of niche facilities to in-house counsel after Hazen directed him to gather the lists – does not seek attorney-client privileged information and does not seek attorney-client communications.  Vallarino does not contend he was directed in his actions by counsel and states that Hazen (a non-lawyer) directed him to gather the lists.  The question seeks only Vallarino's intent in performing an action that happened to be directed at legal counsel – why he delivered the lists to legal counsel.  Vallarino's intent is not shielded by the attorney-client privilege.  In fact, it is a critical question bearing on the issue of attorney-client privilege.  If Vallarino was seeking mainly business advice from the attorneys, then the communications would not be privileged.  *See e.g., **Burton v. R.J. Reynolds Tobacco Co., Inc.**, 170 F.R.D. 481, 484 (D. Kan. 1997), *aff'd in part and rev'd in*

*part*, 177 F.R.D. 491 (D. Kan. 1997) (distinguishing between business or technical advice as compared to legal advice, and noting that legal advice must predominate, rather than be merely incidental to business advice, in order to be covered by the attorney-client privilege). Heartland's motion to compel with respect to this question is granted.

Similarly, Heartland's second question of Vallarino – did Vallarino submit network configuration clauses to in-house counsel because he was interested in strengthening network-configuration clauses to prevent physician-owned facilities from getting in-network contracts – also does not seek attorney-client privileged information. The question again seeks only Vallarino's internal thought process which was not in any way related to attorney-client communications. The privilege does not apply. Both questions one and two are similar to the question posed in **Kansas Wastewater, Inc.**, where the witness was asked why an action was not taken, a question that was found not to seek attorney-client privileged information. 217 F.R.D. at 531. Heartland's motion to compel with respect to this question is also granted.[3]

---

[3] The record indicates that HCA Midwest's concerns about the scope of the deposition questions stemmed in part from the Court's prior ruling that CIGNA had waived attorney-client privilege concerning information from its attorney by specifically telling third parties what their attorney had said. *See Heartland Surgical Specialty Hosp., LLC v. Midwest Div.,* No. 05-2164, 2007 WL 437791 (D. Kan. Feb. 6, 2007). While HCA Midwest is right to be cautious about possible waiver of its privilege, the

Heartland's third question of Vallarino – did Vallarino make changes to network-configuration clauses after legal counsel reviewed them – is a closer argument than questions one and two.  As to this question, the Court concludes that HCA Midwest has met its burden of showing the applicability of the attorney-client privilege.  The question as phrased implies a clear "cause and effect" situation – legal advice was sought from an attorney and immediately there were changes made in the network-configuration clauses.[4]  This is impliedly asking why the changes were made and the answer presumably would be because the attorney advised that changes should be made.  Clearly, the HCA Midwest attorney could not be required to disclose what advice he gave about changes in the clauses, and the present question seeks basically that same information, albeit in a round-about way.  Therefore, while certainly in one of those gray areas of privilege, this question seeks to indirectly obtain the advice of counsel which is privileged and Heartland's motion to compel with respect to this question is denied.

Heartland's fourth question of Vallarino appears to have been answered by

_____

factual circumstances between CIGNA's disclosure and the first two deposition questions in dispute here are totally different.

[4]  HCA Midwest notes that the question, as phrased, was not limited to establishing a factual time frame, and "[i]f Heartland was concerned about the date and time [when changes were made to the network configuration clauses] it could have asked *those* questions."  (Doc. 795 at 12-13) (emphasis in original).

Vallarino and was not blocked by HCA Midwest's counsel.  HCA Midwest is

correct in asserting that the portion of the deposition transcript cited by Heartland

does not give the full testimony of Vallarino with respect to Heartland's question;

namely, were exclusivity provisions one of the tactics Vallarino intended to

develop and deploy to protect HCA Midwest from niche hospitals.  After receiving

direction from his attorney to take care not to disclose attorney-client privileged

communications, Vallarino testified: "I would say potentially, subject to legal

advice."  (Doc. 795 Ex. 1 at 36.)  HCA Midwest characterizes this testimony as

Vallarino responding that he could potentially answer Heartland's question, subject

to legal advice.[5]  (Doc. 795 at 14 n.2.)  Heartland ultimately received an answer to

its question because Vallarino later testified regarding the Kansas City negotiator's

strategy of using exclusivity language, that a primary reason for his work on

gathering information on network configuration and specialty hospitals was to

prevent new physician facilities from getting in-network contracts, and that the

reason he asked for a report on niche providers was because he viewed physician-

owned facilities as a significant threat to HCA Midwest hospitals.  Nowhere in this

---

[5]  The Court notes that the testimony could also be read as a direct answer to
Heartland's question, *i.e.*, exclusivity provisions were one of the potential tactics being
considered as a means of preventing niche facilities from getting in-network contracts,
subject to legal advice.  Regardless of the characterization of Vallarino's testimony in this
regard, the record does not show that Vallarino refused to answer a question posed by
Heartland.

exchange did HCA Midwest counsel object on the basis of attorney-client privilege or instruct Vallarino not to answer a question from Heartland.  Therefore, Heartland's motion to compel with respect to this question is denied.

Heartland's fifth question of Vallarino – does the policy by which Vallarino directed Patrick Patterson require that any exclusivity provisions be reviewed by legal counsel – does not seek information protected by the attorney-client privilege. The question does not ask for the communications underlying the formulation of any policies, which, assuming those communications were made with legal counsel would be protected by the attorney-client privilege.  The questions seek only Vallarino's actions in following a company policy.  The fact that the policy was directed by legal counsel is no different than many other policies in the workforce and does not shield Vallarino's actions.  Heartland's motion to compel with respect to question five of Vallarino is granted.

Finally, Heartland's question of Hazen – whether Hazen participated in meetings with Vallarino and legal counsel regarding network configuration clauses after collection of those clauses by Vallarino – does not seek attorney-client privileged information.  This question is similar to a question in ***Berroth*** – in ***Berroth*** the witness was asked if he had spoken to legal counsel about an affidavit – and the answer to the question was found to be shielded by the attorney-client

privilege.  205 F.R.D. at 589.  However, the Court finds the ***Burton*** case more

persuasive wherein the court found that the statement of the general topic of

discussion at a meeting does not receive the protection of the attorney-client

privilege.  177 F.R.D. at 499;[6] *see also* **IMC Chemicals, Inc.**, 2000 WL 1466495,

at *9 ("The fact that a party had communications with its attorney is not

privileged.").  The question asked by Heartland does not seek attorney-client

communications but just the fact of who participated in the meeting about a

"general subject matter" – here network configuration clauses.  Heartland's motion

to compel with respect to this question is granted.


## AWARD OF MOVANT'S EXPENSES

Heartland requests the Court compel HCA Midwest to re-produce Vallarino

and Hazen for continued depositions in Kansas City.  Heartland also requests HCA

be ordered to pay Heartland's expenses in traveling to Tennessee and taking the

previous depositions of Vallarino and Hazen.  Finally, Heartland requests award of

its expenses in filing its motion with this Court.  (Doc. 779 at 10.)

———————————————

[6] The magistrate judge in **Burton v. R.J. Reynolds Tobacco Co., Inc.**, 170 F.R.D. 481, 484 (D. Kan. 1997), *aff'd in part and rev'd in part*, 177 F.R.D. 491 (D. Kan. 1997), noted: "The subject matter of meetings with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are not protected by the privilege." (citing **United States v. Pappadio,** 346 F.2d 5 (2nd Cir. 1965)).

Because the Court is granting in part and denying in part Heartland's motion to compel, the Court may apportion expenses pursuant to Rule 37(a)(4)(C). The Court grants Heartland's request that continued depositions be allowed (but only as allowed by this Order), but declines Heartland's request for its expenses in the previous depositions. HCA Midwest did not pursue its objections in bad faith and the law of attorney-client privilege has been called "'one of the most complex and therefore, litigated principles.'" *IMC Chemicals, Inc.*, 2000 WL 1466495, at *6 (quoting Paul R. Rice, *Attorney-Client Privilege: Continuing Confusion About Attorney Communications, Drafts, Pre-Existing Documents, and the Source of the Facts Communicated*, 48 AM. U. L. REV. 967, 968 (1999)). Furthermore, the questions in dispute were but a small part of these two depositions and it would be inappropriate to assess all of the costs concerning the prior depositions to HCA Midwest.

Heartland's request that HCA Midwest bring the two witnesses to Kansas City for the continued deposition is denied. While Heartland asserts that it needs these depositions "to fully explore the questions at issue in this Motion," Doc. 779 at 10, the Court contemplates that the witnesses responses to the few questions at issue will not be lengthy. There is no need to bring the witnesses to Kansas City for such a short continued deposition, and any continued deposition shall be taken

27

by telephone.  The Court is only allowing Heartland to obtain answers to the three

questions of Vallarino and one question of Hazen identified by the motion and by

this Memorandum and Order, and any additional follow-up questions should be

significantly limited in nature.[7]  Therefore the telephone depositions shall be

limited to 20 minutes for each of the two witnesses.

The Court also declines Heartland's motion for its attorneys' fees in making

its motion to compel.  This general issue arose at Vallarino's deposition which was

held on April 4, 2007.  While these objections were discussed between counsel

prior to Hazen's deposition, nothing was done to secure a ruling on the issue prior

to Hazen's deposition, and the motion to compel was not filed until May 23, 2007

– approximately seven weeks after Vallarino's deposition, and after the discovery

cut-off had passed.  Under the circumstances presented, both sides should bear

their own costs in connection with the present motion to compel.

---

[7]  It would appear to the Court that "follow-up" questions would only be appropriate in connection with two of the original questions.  Heartland could: (1) ask Vallarino the date changes were made to the network configuration clauses, *see supra* note 4; and (2) ask Hazen follow–up questions about any meetings with legal counsel and Vallarino concerning the general subject matter of network configuration clauses.  In particular, regarding the telephone deposition of Hazen, follow-up questions should be limited to the topics identified by the Court in ***Burton v. R.J. Reynolds Tobacco Co., Inc.***, 170 F.R.D. 481, 484 (D. Kan. 1997), *aff'd in part and rev'd in part*, 177 F.R.D. 491 (D. Kan. 1997), *i.e.,* the persons present at the meeting, the location of the meeting, or the persons arranging the meeting.

CONCLUSION

Heartland's motion to compel HCA Midwest is GRANTED in part and DENIED in part for the reasons stated herein.

HCA Midwest is ordered to produce Vallarino and Hazen for a continued deposition, by telephone, pursuant to this Court's findings above.

Heartland's request for expenses in traveling to Tennessee for the previous depositions, and its request for its expenses in making its motion to compel, are DENIED.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas on this 25th day of July, 2007.

   s/  DONALD W. BOSTWICK
DONALD W. BOSTWICK
U.S. MAGISTRATE JUDGE