## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

HEARTLAND SURGICAL SPECIALTY          )
HOSPITAL, LLC,                        )
                                      )
                    Plaintiff,        )    **CIVIL ACTION**
                                      )
v.                                    )    No. 05-2164-MLB
                                      )
MIDWEST DIVISION INC. d/b/a           )
HCA MIDWEST DIVISION, et al.,         )
                                      )
                    Defendants.       )
_____)


### MEMORANDUM AND ORDER

     This matter comes before the court on defendants' joint motion

to exclude the expert testimony of one of plaintiff's expert witnesses

on damages, Troy Clark.[1]   (Doc. 952.)   The motion has been fully

_____

     [1]   Defendants also filed a joint motion to exclude the expert
testimony of Christopher Pflaum, another of plaintiff's damages
experts. (Docs. 947, 953.) Plaintiff responded (Doc. 987) and the
court held a Daubert hearing on the motion on December 6 and 7, 2007.
Pflaum intended to testify regarding Heartland's foregone opportunity
of expansion of Heartland's facility, opining that Heartland suffered
damages approximating $26 million in this regard. (Doc. 953 Exh. 4
at 4.)
     Shortly after the Daubert hearing, plaintiff withdrew Pflaum as
an expert for its case (see Letter from Patrick Stueve, plaintiff's
counsel, to Judge Belot (Dec. 12, 2007)), rendering defendants' joint
motion moot. The court applauds plaintiff's counsels' foresight and
candor. It was abundantly clear from Pflaum's testimony at the
Daubert hearing that Pflaum failed to "employ[] in the courtroom the
same level of intellectual rigor that characterizes the practice of
an expert in the relevant field," Kumho Tire Co., 526 U.S. 137, 152
(1999), thus rendering his testimony inadmissible.
     Pflaum turned out to be a textbook example of a professional
witness who, despite having an extensive CV and an impressive-sounding
report, made fundamental, serious mistakes which rendered his opinion
unreliable. Based upon Pflaum's testimony on cross-examination,
jurors would not have found him to be credible and therefore his
testimony would not have been helpful. Fortunately, the Daubert
hearing brought out the flaws in Pflaum's methodology and reasoning,
thus saving many hours of testimony at trial which would have been
required to hear Pflaum's testimony and that of the witnesses called

briefed[2] and is ripe for decision. (Doc. 1008.) The motion to exclude Clark's testimony (Doc. 952) is DENIED with respect to Clark's testimony on past damages and GRANTED with respect to Clark's testimony on future damages.

## I.  INTRODUCTION

This is a Sherman Act antitrust, tortious interference, and civil conspiracy case brought by plaintiff Heartland Surgical Specialty Hospital, LLC ("Heartland") against two "groups" of defendants - Hospital Defendants[3] and Managed Care Organization ("MCO") Defendants.[4] Highly summarized, Heartland alleges an agreement

by defendants to rebut his opinions.

[2] The motions, memoranda, and exhibits regarding Clark and Pflaum were filed under seal. (See Docs. 950, 951 (granting motions to seal).) The parties are directed to the court's conclusion for the court's ruling on the continued maintenance under seal of the briefing supporting these motions.

[3] The original Hospital Defendants were: Midwest Division, Inc. d/b/a HCA Midwest Division ("HCA Midwest"); Saint Luke's Health System, Inc. ("Saint Luke's"); Carondelet Health, St. Joseph Medical Center, St. Mary's Medical Center (collectively "Carondelet"); the Board of Trustees of the North Kansas City Hospital ("North Kansas City Hospital"); and Shawnee Mission Medical Center, Inc. ("Shawnee Mission Medical Center"). Since this suit was originally filed, Heartland settled its claims against North Kansas City Hospital (see Docs. 582, 586), HCA Midwest (see Docs. 1021, 1024), and Carondelet, and only Saint Luke's and Shawnee Mission Medical Center remain as Hospital Defendants.

[4] The original MCO Defendants were: Aetna Health Inc. and Aetna Life Insurance Company (collectively "Aetna"); Coventry Health Care of Kansas, Inc., Coventry Health and Life Insurance Company, and SouthCare PPO, Inc. (collectively "Coventry"); United Healthcare of the Midwest, Inc. and United Healthcare Insurance Co. (collectively "United"); Cigna Healthcare of Ohio, Inc. d/b/a Cigna Healthcare of Kansas/Missouri ("Cigna"); Blue Cross and Blue Shield of Kansas City ("Blue Cross"); and Humana Health Plan Inc. and Humana Insurance Company (collectively "Humana"). Since this suit was originally filed, Heartland settled its claims against United (see Docs. 439, 491), Cigna (see Docs. 553, 557), Blue Cross (see Docs. 558, 562), Humana (see Docs. 559, 563), and Aetna (see Docs. 990, 991), and only

amongst defendants to effectuate a boycott to keep it from obtaining in-network status with MCOs.  For the motion now under consideration by this court, all defendants jointly move.

The court previously granted in part and denied in part defendants' summary judgment motions on the issues of the existence of an antitrust agreement and the viability of plaintiff's tort claims against the MCO Defendants.  In that order, the court granted summary judgment on Heartland's tortious interference claims against Aetna and Coventry, granted summary judgment on the horizontal Sherman Act claims against Carondelet, and denied summary judgment on all other bases which were the basis of defendants' motion.  (See Doc. 949.)

Defendants now move to exclude the expert testimony of one of Heartland's experts on damages.  Clark, Heartland's expert regarding past and future damages, opines that Heartland has suffered financial damages for past and future periods approximating $95 million.  (Doc. 952 Exh. A at 13.)  Defendants' motion argues that Clark's opinions are irrelevant and unreliable because they are based on speculation, rely on factually flawed assumptions, fail to account for necessary factors, use unsupported benchmarks, are biased, and are based on data that is too broad.  (Doc. 952.)

The court held a hearing on the motion and took testimony from Clark.  After consideration of that testimony, and the parties' briefing, the court is prepared to rule.[5]

_____

Coventry remains as an MCO Defendant.

   [5] Heartland moved for leave to identify a rebuttal expert to one of defendants' experts, Richard Rapp.  (Doc. 1004.)  Rapp's expert report had been used, in part, by defendants in their motion to strike Clark's testimony.  The court previously determined that rebuttal

## II.   ANALYSIS

In reviewing defendants' motion to strike expert testimony, the court has considered Federal Rules of Evidence 403, 702 and 703, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) and applicable Tenth Circuit decisions.  On December 6, 2007, the court took Clark's testimony as contemplated by Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003) and Goebel v. Denver and Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000).

## A.   General Standards Under Daubert

"Rule 702 sets forth the standard for admission of expert testimony," United States v. Fredette, 315 F.3d 1235, 1239 (10th Cir. 2003), and assigns "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The standards embraced by Rule 702 and Daubert apply equally to scientific testimony and other testimony of a technical nature. Kumho Tire Co., 526 U.S. at 147-48. "Fulfilling

---

experts would not be allowed absent a showing by the moving party of adequate justification.  The court found that such justification had not been shown, and denied the motion.  (Doc. 1018.)

the gatekeeper duty [imposed by Rule 702 on the trial court] requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts." Goebel, 346 F.2d at 991-92.

The Tenth Circuit recently summarized the law regarding admission of expert testimony:

> In reviewing whether an expert's testimony is reliable, the trial court must assess the reasoning and methodology underlying the expert's opinion. An expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation. The Supreme Court in Daubert listed four nonexclusive factors that a trial court may consider in making its reliability assessment: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community.
> Assuming this reliability prong is met, the court will still consider other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility. In essence, the question is whether the reasoning or methodology properly can be applied to the facts in issue.

United States v. Rodriguez-Felix, 450 F.3d 1117, 1122-23 (10th Cir. 2006) (internal footnotes, quotations, and citations omitted). The Daubert standard therefore ensures that the proffered evidence is both reliable and relevant. Daubert, 509 U.S. at 589. In assessing reliability under Daubert, the purpose of the inquiry is always the

-5-

same: "[t]o make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

In analyzing defendants' motion under these standards, Heartland, as proponent of its expert's testimony, has the burden of establishing admissibility. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001). Under Daubert, however, a disagreement with an expert's conclusion is not grounds for exclusion. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Goebel, 346 F.3d at 994.

## B.  Plaintiff's Expert Troy Clark

Clark, a consultant specializing in hospital management, has bachelors and masters degrees in accounting and is a certified public accountant.  Clark's essentially unchalleneged relevant professional experience includes determining the financial profitability of acquiring healthcare facilities, which either involved: 1) analyzing those facilities' historical data to determine future profitability or 2) determining future profitability by interviewing physicians regarding anticipated projected volume, determining the appropriate projected reimbursement rates, and then using those figures to determine revenue, which was reduced by anticipated expenses to determine profitability.  Clark also has healthcare facility management experience, some of which occurred at physician-owned healthcare facilities. Clark previously served as Heartland's interim

-6-

chief executive officer, and as an independent consultant to Heartland.

Clark gives two opinions regarding Heartland's damages from the defendants' alleged conduct. Regarding past damages, Clark opines that Heartland's barrier from insurance contracts caused $47,872,979 in damages. Clark arrived at this calculation by asking Heartland's physicians to project the anticipated volume of patient procedures they would have performed at Heartland if "there were no restrictions based on [Heartland's] lack of in-network managed care contracts." Clark projected average reimbursement rates by service type for the projected volume and then determined revenue by multiplying the projected volume by the projected reimbursement rate. Clark evaluated Heartland's capacity to ensure it could accommodate the projected increased volume. Clark then projected expenses for the increased volume. Finally, Clark determined Heartland's past damages by subtracting projected expenses from the projected revenue, and then comparing this "but for" number to the actual net income received by Heartland. Clark validated his damages calculations by ensuring they were comparable to: 1) the results Heartland had experienced in the three months it had obtained in-network contracts with two of the former MCO Defendants; and 2) to the profit margins of other similar facilities.

Regarding future damages, Clark opines that Heartland will continue to be damaged in the amount of $47,475,042. Clark arrives at this calculation by subtracting the projected future net income without in-network contracts from the projected future net income with in-network contracts (based on the same methodology utilized in

-7-

determining past damages). Clark carried forward the future damages calculation to 2012.[6]

Defendants challenge Clark's testimony on several fronts. Defendants argue that Clark's opinion regarding past damages is irrelevant and unreliable because it is based on speculation, relies on factually flawed assumptions, fails to account for necessary factors, uses unsupported benchmarks, is biased, and is based on data that is too broad. Defendants argue that Clark's opinion regarding future damages is speculative. (Doc. 952.) Heartland responds that defendants' motion improperly challenges the weight and credibility to be given to Clark's testimony, that Clark appropriately relied on Heartland's physicians' volume data, that the data gathered was not overbroad, that defendants' challenge to Clark's "stacking" analysis is misplaced, that Clark utilized appropriate financial data, that Clark appropriately accounted for "lawful competition" in preparing his opinion, that Clark's projection of future damages through 2012 was consistent with industry practice, and that Clark's validation method was appropriate.[7] (Doc. 1008.)

---

[6] This is merely a summary of Clark's report, which is, of course, more detailed that the brief synopsis given here. When additional details from Clark's report are relevant, they will be discussed below.

[7] For brevity's sake, the court has summarized Heartland's response here, rather than in response to each of defendants' arguments discussed below. The court understands, of course, that it is Heartland's burden to establish the admissibility of its expert's testimony. See Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (stating that the proponent of expert testimony carries the burden of establishing its admissibility).

It should also be noted that defendants do not challenge Clark's qualifications as an expert. See Fed. R. Evid. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education"). Clark is amply qualified both through his education in

**C.  Defendants' Challenges to Clark's Testimony**

1.  Volume

Defendants' first argument for exclusion of Clark's testimony is that Clark's past damages calculation is speculative because Clark's projections regarding volume are "based solely on guesses provided by the physician founders who have a financial interest in the outcome of the litigation." (Doc. 952 at 20.)  Defendants argue that the volume projections are biased because they came from the owners and are unverified and unsubstantiated. (Doc. 952 at 24.)  Defendants contend that Clark's entire report is speculative because it "relies on unreasonable and unfounded assumptions and unreliable data, both as to expected volume of patients and the revenue they might generate." (Doc. 952 at 22.)  Defendants also claim that Clark is a biased expert. (Doc. 952 at 30-31.)

"The Supreme Court has made clear that 'where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.''" <u>Goebel</u>, 346 F.3d at 991-92 (quoting <u>Kumho Tire Co.</u>, 526 U.S. at 149).  The court is confident that Clark's proposed testimony on past damages is neither speculative nor biased.

Clark obtained each physician's projected volume calculation by asking the physician to self-report the number of cases they would

---

accounting and through his prior experience working in the healthcare industry, much of which is based in physician-owned facilities like Heartland.

have performed at Heartland had there been no restriction on referrals based on in-network status.  Clark attended the meeting where those projections were given by the physicians, and directed the survey methodology by which that question was asked.[8]  Clark then compared those projections to historical data from the physicians' practices, to ensure they were within the maximum number of cases performed by the physician.  Clark also had follow-up discussions with the physicians who had questions.  Clark made no adjustments to the projected volumes, adjustments were made only by the physicians. Clark's testimony, therefore, is not based on "subjective belief or unsupported speculation." Rodriguez-Felix, 450 F.3d at 1122 (internal quotations omitted); contra Norris v. Baxter Healthcare Corp., 397 F.3d 878, 886 (10th Cir. 2005) ("Although 'trained experts commonly extrapolate from existing data,' neither Daubert nor the Federal Rules

---

[8]     Defendants also argue that the question Clark asked Heartland's physicians regarding projected volume on his survey was the "wrong question" (see Doc. 952 at 26; 36-38) and that Clark did not account for lawful competition in his volume projections (see Doc. 952 at 30-31).  Defendants contend that Clark should have limited the physicians to the procedures they could not perform at Heartland on patients insured by the MCO Defendants only.  Heartland responds that Clark did account for lawful competition in his report by excluding cases the physicians identified as not being transferable to Heartland.  Clark also justified the survey question by noting that the six MCO Defendants account for approximately ninety percent of all MCO payors in the Kansas City metropolitan area.  Clark further justified his volume projection based on "stacking," discussed in more detail infra.

It appears that Clark relied on the best data available, making his testimony relevant to this case.  See Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1121 (10th Cir. 2004) (regarding relevancy of expert testimony, stating that "[a] trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact").  Defendants' proposed alternate data (from defendants' own patient records) is underinclusive, because it does not encompass all healthcare facilities at which Heartland's physicians performed procedures.

of Evidence 'require a district court to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert.' 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" (quoting <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997))).

This methodology had been previously used by Clark in his prior experience as a consultant who projected the profitability of proposed healthcare ventures.  Clark found in his previous work that utilizing physicians for projected volume data was most accurate because of the intimate physician-patient relationship, and physicians' understanding of their patients' clinical needs and their own referral practices. An expert "may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely in forming opinions." <u>Ramsey v. Culpepper</u>, 738 F.2d 1098, 1101 (10 th Cir. 1984) (citing Fed. R. Evid. 703).  In addition, Clark had worked with Heartland's physicians as the interim chief executive officer of Heartland, so he had knowledge of the physicians' practices and referral patterns.  While the method used by an expert may be one that is not understood by a layperson, if the method is the same utilized by all other appraisers then it is reliable.  See <u>Ramsey v. Culpepper</u>, 738 F.2d 1092, 1101 (10th Cir. 1984).

It appears to the court that defendants are challenging the results of Clark's analysis.  See <u>United States v. Lauder</u>, 409 F.3d 1254, 1264 (10th Cir. 2005).[9]  This is not an appropriate <u>Daubert</u>

---

[9]   "By its terms, the <u>Daubert</u> opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion.  <u>Daubert</u> generally does not, however, regulate the underlying facts or data that an expert relies on when

challenge, and is a practice best reserved for cross-examination of Clark at trial.  See Goebel, 346 F.3d at 994 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

    2.  Rate

    Defendants next argue that Clark's rate analysis is flawed because Clark used 2007 reimbursement rates (from the Blue Cross and United settlements that yielded in-network contracts for Heartland) for his rate calculations.  In his revenue calculation, Clark applied these reimbursement rates to the "but for" volume of cases extending to 2003.  (Doc. 952 at 22.)

    The court is satisfied, however, that the rates used by Clark were relevant and reliable.  At the Daubert hearing, Clark testified that he had to estimate the reimbursement rates for the incremental volume by using the blended average from the Blue Cross and United

---

forming her opinion."  Lauder, 409 F.3d at 1264 (internal citations and footnote omitted).  The court in Lauder held that a defendant's challenge to the evidence-gathering equipment used to generate the fingerprints relied on by a fingerprint expert was not a proper Daubert challenge, but a question of foundation, i.e., "an authentication question unaffected by Daubert."  Id.
    In Lauder, the Tenth Circuit also noted that "'[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.'"  Id. (quoting Fed. R. Evid. 703).  The Lauder court stated that Rule 702's formulation of the requirements for the admissibility of expert testimony (i.e., a qualified expert may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case") calls for "a quantitative rather than qualitative analysis" for "subpart (1)'s reference to 'sufficient facts or data.'"  Id. at 1264 n.5 (citing Fed. R. Evid. 702 and Advisory Committee Notes to the 2000 Amendments).

-12-

contracts because it was the best available data he was able to obtain. This certainly appears to the court to be the case. The Blue Cross and United rates are a good indicator of what the major MCOs in the Kansas City metropolitan area are reimbursing physician-owned specialty hospitals. Calculating damages in a "but-for" world is, of course, an approximation, and the data relied on by Clark is the closest possible approximation.

3.   Expenses

Defendants next argue that Clark overstated his "but for" profit by understating expenses. (Doc. 952 at 23.) Defendants, however, never allege how Clark understated Heartland's expenses, neither in their motion nor at the Daubert hearing. Both in his report and at the Daubert hearing, Clark justified his expense projection. Clark identified Heartland's fixed and variable costs and then determined a volume adjusted expense factor. Defendants have not challenged this methodology.

4.   Damages Calculation

Defendants then argue that Clark overstated past damages because when he compared his "but for" profits to actual profits, Clark did not reduce the out-of-network rates Heartland actually received to the in-network rates Heartland would have received if it had been in-network. (Docs. 952 at 23; 27-28.) Defendants assume that Heartland's past revenues would have been lower based on in-network rates. Clark testified that he has not done an analysis of in-network versus out-of-network rates and does not know whether Heartland was paid more, on average, as an out-of-network provider. Heartland points out, however, that "re-pricing" of its actual income was not

-13-

necessary because of the effects of "stacking."[10]  In his report, the higher total volume Heartland would have experienced in the "but for" world would have included cases "stacked" at Heartland which would have been compensated from payor sources reimbursing at a higher rate than the blended reimbursement rate used (e.g., workers' compensation cases).

Clark opines that the difference between the higher rates for the stacked cases and the blended rate used is a reasonable approximation of any re-pricing of actual out-of-network rates.  Regarding reliability under the <u>Daubert</u> standards, the Tenth Circuit has recently stated:

> To be reliable under <u>Daubert</u>, an expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, not mere subjective belief or unsupported speculation.  In other words, an inference or assertion must be derived by the scientific method and must be supported by appropriate validation—i.e. 'good grounds,' based on what is known.  **While expert opinions must be based on facts which enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation, absolute certainty is not required.  The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community.**  Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements.

<u>Goebel v. Denver & Rio Grande W. R.R. Co.</u>, 346 F.2d 987, 991-92 (10th

---

[10]  Clark defines stacking as "the process of scheduling an additional case at a location [the physician is] already scheduled to be at for that day, so the case ends up at a facility other than the Hospital because the physician is already doing his/her managed care cases at another facility that day."  (Doc. 952 Exh. A at 6.)

-14-

Cir. 2003) (internal quotations, citations and alterations omitted) (emphasis added).  Clark testified regarding the stacking analysis at the <u>Daubert</u> hearing, and based on his experience generally in the healthcare industry and specifically at Heartland, and the standards immediately above, Clark's stacking analysis appears reliable.

5.  Validation

Finally, defendants also claim that Clark utilized benchmarks in his report that are unsupported.  (Doc. 952 at 32-33.)  Defendants' argument in misguided, however.  In his report, Clark validated his results by noting the "substantial increase in patient volumes and Net Revenues" during the three months prior to his report that Heartland had been an in-network provider with Blue Cross and United.  Clark also validated his results by comparing his "but for" projected profit margin of 27.7 percent with the profit margins of nine other facilities he was familiar with that had similar lines of service with similar ownership structures.  Clark did not use these facilities as benchmarks to calculate Heartland's damages.

6.  Future Damages

Regarding future damages, defendants argue that Clark's future damages projection to 2012 is speculative and illogical.  (Doc. 952 at 33-34.)  In his report, Clark assumes that contracts obtained in 2003 in his "but for" world would extend to 2012.  Defendants point out that these future damages are based on 2006 volume estimates, which would be far too speculative to be carried forward for six additional years without any analysis of forecasted market

-15-

conditions.[11]

At the Daubert hearing, Clark simply testified regarding his reason for choosing the year 2012 (that, in his experience, MCO contracts usually extend for significant periods, that both the Blue Cross and United contracts extend to 2012, and that Heartland's other MCO contracts were for five years).  Clark did not explain why or how the projected volume for 2006 would continue to be accurate or reliable in 2012.  Heartland's response to defendants' motion does not address the issue.

The court finds that Clark's testimony on future damages is speculative.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971) (stating that "future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable").  Clark performed no analysis of future market conditions, future population trends, future reimbursement trends, future competition, etc.  As Clark testified, payors reimburse healthcare facilities at different rates, and it is difficult to accurately predict what a healthcare facility's payor mix would be at any certain date.  Without any modeling to aid in this estimation, Clark's analysis is unreliable.  See Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.2d 987, 991-92 (10th Cir. 2003) ("Under Daubert, any step that renders the analysis unreliable renders the expert's testimony inadmissible.").  In

---

[11] It should be noted that defendants did not even approach the subject of future damages at the Daubert hearing, despite Heartland's presentation of Clark's justification for his future damages calculation on direct examination.  However, because defendants' motion preserves the issue, the court will consider defendants' arguments made therein.

-16-

addition, as defendants point out, Clark fails to explain how Heartland would continue to be damaged through 2012, by alleged anti-competitive behavior originating in 2003, after it has obtained either settlements or the injunctive relief it seeks from defendants.

## III.   CONCLUSION

Defendants' joint motion to exclude the expert testimony of Troy Clark (Doc. 952) is DENIED in part and GRANTED in part for the reasons stated more fully herein.  Clark's testimony is excluded as it relates to future damages, but not as it relates to past damages.  By finding that Clark's testimony survives defendants' <u>Daubert</u> challenge, however, the court is not vouching for Clark's credibility or stating that his opinions are unassailable, either by effective cross-examination or by contrary opinions of defendants' experts.

This order is to be filed in the public record, as it contains nothing that could cause "a public or private harm sufficient to overcome the public's right of access to judicial records." <u>See</u> <u>Bryan v. Eichenwald</u>, 191 F.R.D. 650, 652 (D. Kan. 2000) (quoting <u>Ramirez v. Bravo's Holding Co.</u>, No. Civ.A. 94-2396-GTV, 1996 WL 507238, at *1 (D. Kan. Aug. 22, 1996)).  Pending further resolution of this case, however, the motions, memoranda, and exhibits this order relies on that were previously filed under seal may remain sealed.

IT IS SO ORDERED.

Dated this   19th   day of December, 2007, at Wichita, Kansas.


                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE



                              -17-